United States District Court
Northern District of Texas
Dallas Division

| | |
|---|---|
| Marten Group, Inc. d/b/a Senergy Medical Group and Scott Tennant,<br><br>*Plaintiffs*<br><br>v.<br><br>Jerald Tennant, MD, John Tennant, Teresa Jessen Tennant, Jared Tennant, Tennant Devices and Accessories, LLC, and Curador, LLC,<br><br>*Defendants* | Case No. _____ |

## Plaintiffs' Original Complaint

Plaintiffs Marten Group, Inc., d/b/a Senergy Medical Group ("Senergy") and Scott Tennant file this Complaint against Defendants Jerald Tennant, MD, John Tennant, Teresa Jessen Tennant, Jared Tennant, Tennant Devices and Accessories, LLC, and Curador, LLC.

### OVERVIEW

With Dr. Jerald Tennant's encouragement and approval, Dr. Tennant's son Scott Tennant and Scott's company Senergy spent decades, countless hours, and millions of dollars building a wellness company focused on providing acute and chronic pain relief and preventive health care. After nearly two decades of observing Scott and Senergy's achievements, Dr. Tennant and others in their family developed an obsession over how to get a piece of Senergy's pie. Once their efforts to fairly succeed in the marketplace failed, they conspired—as detailed below—to eliminate Senergy by unlawfully interfering with Senergy and its key manufacturer, customers, and strategic partners through extortionate threats and baseless claims, hence this lawsuit.

## PARTIES

1. Plaintiff Senergy is a corporation organized and existing under the laws of the State of Texas, with a principal place of business at 9901 Valley Ranch Pkwy E #1009, Irving, Texas 75063.

2. Plaintiff Scott Tennant resides in Dallas County, Texas.

3. Defendant Dr. Tennant resides at 3009 Edgewood Lane, Colleyville, Texas 76034.

4. Defendants John Tennant and Teresa "Terri" Jessen Tennant reside at 312 Steeplechase Drive, Irving, Texas 75062.

5. On information and belief, Defendant Jared Tennant resides in Dallas County, Texas.

6. Defendant Tennant Devices and Accessories, LLC is a Texas limited liability company, with its principal place of business at 9901 Valley Ranch Parkway E #2000, Irving, Texas 75063.

7. Curador, LLC is a Texas limited liability company, doing business as "Tennant Products," and with its principal place of business at 312 Steeplechase Drive, Irving, Texas 75062.

## JURISDICTION

8. This Court has federal question jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1338 because the claims involve the determination of trademark rights under the Lanham Act, 15 U.S.C. §§1114 and 1125, and as a declaratory judgment action under 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over the remaining claims under 15 U.S.C. § 1119 and 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Defendants Dr. Tennant, John Tennant, Terri Tennant, and Jared Tennant because they are domiciled in Texas. And it has personal jurisdiction over Defendants Tennant Devices and Accessories, LLC and Curador, LLC because they are Texas entities with their principal places of business in Texas. All Defendants can be served within Texas's territorial limits.

## VENUE

10. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2) and (c) because Defendants Dr. Tennant, John Tennant and Terri Tennant are domiciled in this Judicial District, all Defendants are subject to personal jurisdiction in this Judicial District, and a substantial part of the relevant events giving rise to Scott Tennant's and Senergy's Complaint occurred within this Judicial District.

## BACKGROUND

11. Scott Tennant is the founder and CEO of Senergy. A main line of Senergy's business is selling hand-held, battery-operated, microcurrent, electric-stimulation medical devices for drug and surgery-free pain relief. These devices, dubbed "biomodulators" and sold by Senergy under its TENNANT BIOMODULATOR marks, are backed by multiple studies. They offer easy-to-use features for consumers to administer microcurrent pain relief at home. Relevant here, Senergy also sells devices called "biotransducers"—sold by Senergy under its TENNANT BIOTRANSDUCER marks—that are designed to work with Senergy's biomodulators. The Tennant Biotransducers transmit frequencies and voltages on a carrier wave into tissue, through a person's skin and bone. Senergy's customers report great benefit and success from their use.

12. Beginning when he was a teenager, Scott Tennant relished the opportunity to work with his father, now-retired ophthalmologist Dr. Jerald Tennant. Scott took pride in playing a role, no matter how small, in helping his father restore patients' eyesight. Dr. Tennant, for instance, performed surgeries involving placing intraocular lenses—a common treatment for cataracts or for people with refractive errors who are not candidates for other types of vision correction. And Scott was there alongside Dr. Tennant, assisting as an optician, ophthalmic assistant, surgical technician, and medical study coordinator, or supporting Dr. Tennant in any other manner necessary. Scott's participation in his father's medical practice was transformative and set his future's trajectory on course to remain near and work together with his father. And for a significant part of Scott's life, he and his father did just that.

13. Scott's working relationship with his father was interrupted in the mid-1990s when

Dr. Tennant began suffering from a serious chronic illness. This chronic illness would eventually force Dr. Tennant to prematurely retire from his medical practice. Despite his best efforts, Dr. Tennant was unable to cure his illness through the "conventional" medicine he dedicated his practice to while an active ophthalmologist.

14. For years, Dr. Tennant found no relief. But then, on his quest to find anything that could change his fortune, Dr. Tennant stumbled on a Russian-made, Soviet-Union era, microcurrent, biomodulator-type device, which provided the first bit of recovery from his years-long malaise.

15. The concept of using a biofeedback electronic stimulation device to treat chronic conditions wasn't invented by Dr. Tennant, Scott Tennant, Senergy, or any of the parties to this suit. In fact, this technology was pioneered by Soviet scientists during the Cold War to treat cosmonauts.

16. As his health continued to improve, assisted by the Russian device, Dr. Tennant became determined to introduce it to the United States market. Dr. Tennant wished to help other chronic sufferers—just as the device had helped him.

17. Dr. Tennant, however, couldn't realize his dream without help. Alight with his new passion and purpose, Dr. Tennant approached his adopted son Scott Tennant with the proposition of joining forces again. Without Scott's expertise and Senergy's infrastructure, Dr. Tennant would be incapable of marketing the Russian devices. For his father, Scott delivered.

18. Within the first few years of marketing the Russian biomodulator, it became apparent the Russian-made device was unreliable and increasingly hard to service in the United States. Scott and Dr. Tennant decided to seek a new domestic partner to fulfill their manufacturing needs and to provide superior quality control for the device.

19. Scott and Dr. Tennant endeavored to find their new manufacturer while holding no patents, no trademarks, no trade secrets, nor any other form of intellectual property. And they sought no such rights from their then-partner in Russia. Rather, they shopped the Russian device to a capable, American partner for replication and fabrication.

20. That capable partner was Avazzia, Inc. Upon presentment of the Russian device to Avazzia, with the directive "Make this," Dr. Tennant and Scott were delighted to discovery Avazzia already had.

21. Senergy negotiated an agreement with Avazzia to distribute the Avazzia made biomodulator devices—with Dr. Tennant's support. And soon after, Senergy and Scott realized Dr. Tennant's dream of making biomodulator devices more widely known to the American public.

22. Senergy's biomodulator venture was an instant success, to the delight of all involved. Avazzia had Senergy to buy the biomodulator devices. Senergy developed a market to sell the devices. And Dr. Tennant—who had been forced to abandon his ophthalmological practice—was now positioned to form what would eventually become an institute for integrative medicine.

23. Through the burgeoning biomodulator device market forged by Senergy, thousands of patients found relief from the daunting, at times debilitating, symptoms of chronic illness. Indeed, one government-sponsored study reported Senergy's own biomodulator had comparable benefits to other long-standing non-pharmacological pain alleviation methods, such as acupuncture.[1]

24. Throughout this time, Senergy's business was thriving, and Dr. Tennant himself amassed millions. For nearly two decades, this arrangement ran smoothly. But greed and jealously eventually set in.

25. Scott Tennant is not Dr. Tennant's only son. His brother, Defendant John Tennant, is also involved with Dr. Tennant in a related business. Seeing Scott's success, John and his wife, Defendant Teresa "Terri" Jessen Tennant, decided they wanted in on the action.

26. John Tennant entered the family business through his entity, Defendant Curador, LLC ("Curador"), selling nutritional health supplements. Curador does business as "Tennant

---

[1] Peacock KS, Stoerkel E, Libretto S, Zhang W, Inman A, Schlicher M, Cowsar JD Jr, Eddie D, Walter J. A randomized trial comparing the Tennant Biomodulator to transcutaneous electrical nerve stimulation and traditional Chinese acupuncture for the treatment of chronic pain in military service members. Mil Med Res. 2019 Dec 2;6(1):37. doi: 10.1186/s40779-019-0227-4. PMID: 31791416; PMCID: PMC6886190.

Products." While Curador sold supplements directly to consumers, John and Curador sought to take advantage of Senergy's goodwill and established marketing sales channels. Curador began selling their supplements to Senergy, who in turn sold to its own customers.

27. Unsurprisingly, Senergy was immediately successful selling Curador's supplements. So much so, that—on information and belief—Senergy was Curador's largest customer by far. As John's jealousy continued to fester, he decided Curador should have direct access to Senergy customers.

28. John and Curador sought Dr. Tennant's help to syphon Senergy's business for themselves, and Dr. Tennant obliged. In a meeting attended by Dr. Tennant, Scott, John, another Tennant son (Jared Tennant), and Senergy's Chief Operating Officer, Dr. Tennant issued an edict: Senergy would no longer be allowed to sell Curador's supplements. This edict caused millions of dollars in revenue to quickly slip from Senergy's grasp.

29. Dr. Tennant, John, and Curador's scheme did not, however, go as planned. They incorrectly assumed Senergy's customers would seamlessly transition to buying supplements directly from Curador. But, to their dismay, the hoped-for demand never materialized.

30. Several months after Dr. Tennant's edict, Dr. Tennant and John—desperate to generate sales leads for Curador—demanded Senergy's customer database, including its customers' private health information. Scott refused to bend to Dr. Tennant and John's demands, widening the growing family rift.

31. Scott's principled defiance has caused other family members to join with Dr. Tennant, John, and Curador in a scheme to eliminate Senergy's business. Recently, Dr. Tennant and John Tennant, joined by Curador's CEO Terri Tennant (John's wife) and Jared Tennant (another brother of Scott's) met with Scott to deliver a letter attempting to coerce Scott into effectively shutting down his business, and handing over his market share to his now despotic family.

32. To begin with, Defendants claimed Senergy and Scott owed Dr. Tennant "around $5M dollars." They then offered to generously agree to waive the allegedly owed amounts, not sue for fraud and breach of contract, and falsely represent to the public that Scott sold Senergy to Dr.

Tennant to pursue other interests *if* Scott and Senergy agreed *within 48 hours* to, among other things:

    a.    "Transmit a full and unedited copy of [Senergy's] customer database."

    b.    "Provide a filtered list of all affiliates & educators."

    c.    "Provide dates & contacts for upcoming … events, and facilitate transition of these support activities."

    d.    "Provide all previous Marketing materials, including course videos; all training materials including user guides; all customer support material including access to the [Senergy] customer training portal; and copies of all email automations all customer support material including trainings user guides and access to customer training portal."

    e.    "Not to pursue legal action of any kind against any Tennant family member, including but not limited to [Defendants] Jerald Tennant, Jared Tennant, John Tennant, [and] Teresa Jessen Tennant. . . [and] any organization where any Tennant extended family member owns a controlling share . . ."

    f.    "[N]ot to not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of Dr. Tennant or his other extended family members, their employees, directors, and officers. This prohibition extends to statements, written or verbal, made to anyone, including but not limited to, the news media, investors, potential investors, any board of directors or advisory board or directors, industry analysts, competitors, strategic partners, vendors, current and past customers, employees, Tony Robbins members, and clients."

    g.    Acknowledge that Dr. Tennant, his co-conspirators, and related parties gave Scott and Senergy access to "valuable, special and unique assets of the extended Tennant family," such as "inventions," "products," "product design," "technical matters," "trade secrets," "prices," "costs," "discounts," "business affairs," and "future plans," and promise never "at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information of the type and tenor of the items above to any third party."

33.    Defendants also warned Scott that, "In the event of a *single* breach of the [foregoing] confidentiality, unauthorized disclosure of information, and non-disparagement provisions":

    a.    "Incremental *criminal* and civil legal action criminal and civil legal action will be

immediately brought on [Senergy], Scott Tennant, [and Senergy's COO and a Senergy accountant]"; and

b. "[Persons key to Dr. Tennant's ongoing business success, such as Tony Robbins, Sean Callagy, Joseph McClendon, etc. will be notified of the fraud, in order to mitigate the tortious interference . . . It is Dr. Tennant's current plan to notify these key persons of the end of the business relationship with [Senergy]; but only in the event of a breach would the details of the perpetuated fraud be shared."

34. The above demand was an attempt to extort Scott and Senergy. But Scott and Senergy rebuffed that attempt. Yet Defendants' misconduct did not stop there.

35. After the meeting, Defendants delivered a cease-and-desist letter to Senergy's manufacturer, Avazzia. Defendants represented that Scott and Senergy "are no longer licensed to manufacture, market or sell devices utilizing [Dr. Tennant's name] or I.P., including the Tennant Biomodulator® Plus, the Tennant Biomodulator(r) Pro, and/or the Tennant Biotransducer(r) Crystal Wave," and demanded that Avazzia "cease and desist selling said devices to Scott Tennant, [Senergy], and/or their representatives immediately."

36. Tellingly, they told Avazzia there are "alternative plans to sell said devices," and they "will reach out to you with an order."

37. But Defendants did not stop there either. They also contacted Senergy's customers and strategic contacts and told them Dr. Tennant is the *only* person who can make, sell, train, or service the biomodulator and biotransducer devices, and that "nothing" goes through Scott and Senergy.

38. At least one of those contacts, confused and concerned, called Scott to discuss Dr. Tennant's efforts to block Senergy from selling product. Again, Scott was forced to clean up the mess left in his father's wake.

39. As a result of Defendants' continuing misconduct, Scott and Senergy had to immediately transition to damage control to maintain their long-standing, and profitable, business relationships.

40. In short, after Defendants' efforts to honestly and fairly enter the marketplace failed, they have conspired to eliminate Senergy as competition, no matter the cost.

# CAUSES OF ACTION

## Count 1: Declaratory Judgment – Exclusion from Market

41. Plaintiffs incorporate by reference the preceding paragraphs.

42. There is an actual case and controversy regarding Defendants' right to exclude Senergy from the marketplace and Avazzia's right to manufacture and sell devices to Senergy.

43. Defendants have contended they have the right to do so under agreements executed by Scott Tennant and Senergy over the last 20 years. But those agreements dated 2003,[2] 2012, and 2016 confer no such rights to Defendants. They do not identify any technology, trade secrets, know-how, or any protectible ideas intended to be disclosed and/or licensed to Plaintiffs. There are no trademark or copyrighted materials identified or licensed in those agreements. There are no patents identified in the agreements, and none of the Defendants owned any patents when those agreements were executed anyway.

44. Furthermore, neither those agreements nor any other actions by Plaintiffs have conferred any rights on Defendants to interfere with Plaintiffs' ability to continue their business, including having devices manufactured for themselves.

45. In fact, those agreements are invalid and/or unenforceable against Plaintiffs for reasons including: that Defendants are seeking to enforce them in a manner that violates public policy, Dr. Tennant committed prior material breaches of the agreements, and there was no meeting of the minds between Dr. Tennant on the one hand and Scott Tennant and Senergy on the other regarding essential subject-matter of the agreements.

46. Scott and Senergy's legitimate conduct in advertising, selling, and using the Senergy devices in connection with Senergy's business has created an adversarial conflict with Defendants.

47. Defendants' assertions that Plaintiffs have no right to sell Avazzia devices or

---

[2] Plaintiffs contend that while the "2003" agreement purports to have been entered into on June 15, 2003, it was actually not signed until at least 2004.

otherwise continue marketing the devices they have distributed for the past two decades adversely affects Plaintiffs and will continue to do so until this Court confirms Defendants' claims are incorrect.

48. A declaratory judgment is both necessary and proper to set forth and determine the rights, obligations, and liabilities, if any, that exist between the parties.

49. Scott and Senergy therefore seek a judgment of this Court declaring:

a. Defendants own no trade secrets used in the manufacture of Avazzia devices that Senergy advertises and sells.

b. Defendants have no contractual rights to prevent Plaintiffs from manufacturing, marketing or selling devices utilizing any intellectual property allegedly owned by Defendants.

c. Plaintiffs have the right to make (themselves or through a third-party), market, and sell the Tennant BioModulator and Tennant BioTransducer Crystal Wave devices.

d. The agreements dated 2003, 2012 and 2016 are invalid and/or unenforceable.

**Count 2: Declaratory Judgment – Trademark Rights**

50. Plaintiffs incorporate by reference the preceding paragraphs.

51. There exists an actual controversy between Senergy and Dr. Tennant and Tennant Devices and Accessories, LLC arising from the parties' dispute concerning ownership and use of TENNANT-related marks.

52. Defendants' threats to Plaintiffs and communications with Plaintiffs' customers, strategic contacts, and manufacturer Avazzia have created a reasonable apprehension by Plaintiffs that Defendants will cause a lawsuit to be filed against Senergy asserting claims for trademark infringement under 15 U.S.C. §§ 1114 and/or 1125.

53. Senergy is presently engaged in the sale and advertising of goods under TENNANT marks, including but not limited to TENNANT BIOMODULATOR and TENNANT BIO-TRANSDUCER and variants thereof (collectively referred to as the "TENNANT Marks").

54. Senergy's legitimate conduct in advertising, promoting and using the TENNANT

Marks in connection with its business has created an adversarial conflict with Defendants, including Tennant Devices and Accessories.

55. Defendants' assertion of trademark rights adversely affects Plaintiffs and will continue to do so until this Court confirms Senergy's ownership and continued right to use and license the TENNANT Marks in connection with Senergy's business.

56. Thus, it would be a substantial hardship on Plaintiffs if they must wait for Defendants to take action to confirm Senergy's ownership and continued right to use and license the TENNANT Marks.

57. A declaratory judgment is both necessary and proper to set forth and determine the rights, obligations and liabilities, if any, that exist between the parties.

58. Senergy therefore seeks a judgment of this Court declaring:

a. Senergy was the first to use the TENNANT Marks in commerce.

b. Senergy owns the TENNANT Marks it uses in connection with its business.

c. None of the Defendants own any rights in the TENNANT Marks used by Senergy.

d. Scott Tennant has the right to use and license the TENNANT marks because his surname is "Tennant".

e. Defendants have no rights in the TENNANT Marks.

f. Any rights Defendants may once have had in the TENNANT Marks were abandoned, including through naked licensing.

g. Senergy's use of the TENNANT Marks does not infringe any rights of Defendants relating to registered marks under federal, state or common law, or constitute false designation of origin or false description under federal, state or common law, or violate any applicable state or federal dilution statutes or common law principles of unfair competition and/or misappropriation.

**Count 3: Cancellation of Registered Trademarks**

59. Plaintiffs incorporate by reference the preceding paragraphs.

60. The Lanham Act § 37, 15 U.S.C. § 1119, gives the Court concurrent power with the Patent and Trademark Office to conduct cancellation proceedings.

61. Defendants have conspired to threaten Plaintiffs with a suit for infringement of U.S. Trademark Reg. Nos. 3157112 and 4382782 owned by Defendant Tennant Devices and Accessories (the "Tennant Devices and Accessories Registrations").

62. The Tennant Devices and Accessories Registrations are invalid and/or unenforceable and should be canceled for reasons including: Senergy owns the marks embodied those registrations; and alternatively, any rights Defendants may have once had in those marks have been abandoned.

**Count 4: Breach of Fiduciary Duty / Inducing Breach of Fiduciary Duty**

63. Plaintiffs incorporate by reference the preceding paragraphs.

64. Scott and Senergy had a fiduciary relationship with Dr. Tennant.

65. Dr. Tennant has breached his fiduciary duties to Scott and Senergy by, for example, accepting money not owed to him, demanding "royalties" for rights never granted to Senergy, claiming Scott and Senergy underpaid "royalties," and threatening business partners directly and through his fellow Defendants by claiming Senergy has no rights in its products.

66. Dr. Tennant's breaches of fiduciary duties injured Scott and Senergy and benefited Dr. Tennant including through his improper receipt of millions of dollars of royalties.

67. Senergy and Scott seek damages, including at least disgorgement of funds Senergy has paid Dr. Tennant.

68. The remaining Defendants have induced Dr. Tennant to breach his fiduciary duties to Scott and Senergy and have contributed to Plaintiffs' damages.

69. Plaintiffs' injuries resulted from Defendants' malice, fraud, or gross negligence, entitling Plaintiffs to exemplary damages.

**Count 5: Tortious Interference with Contract**

70. Plaintiffs incorporate by reference the preceding paragraphs.

71. Senergy has contracts with Avazzia.

72. Defendants intentionally and willfully interfered with Senergy's contracts with Avazzia, which Defendants knew existed.

73. Defendants' actions were the proximate cause of Senergy's actual damages.

74. Senergy has been injured because of Defendants' tortious interference.

75. Senergy's injuries resulted from Defendants' malice, fraud, or gross negligence, entitling Senergy to exemplary damages.

**Count 6: Money Had and Received**

76. Plaintiffs incorporate by reference the preceding paragraphs.

77. Dr. Tennant has money that in equity and good conscience belongs to Senergy, including funds he received from Plaintiffs.

**Count 7: Unjust Enrichment**

78. Plaintiffs incorporate by reference the preceding paragraphs.

79. Defendants' acts complained of herein caused Dr. Tennant to become unjustly enriched (e.g., funds received from Plaintiffs to which Dr. Tennant was not entitled) at the expense of Plaintiffs.

**Count 8: Conspiracy**

80. Plaintiffs incorporate by reference the preceding paragraphs.

81. Defendants are a combination of two or more persons.

82. The object of that combination was and is to eliminate Plaintiffs from the marketplace by unlawful means.

83. Defendants had a meeting of the minds on this object and course of action.

84. At least one of the Defendants committed at least one unlawful, overt act to further the object or course of action.

85. Plaintiffs have suffered injuries as a proximate result of the at least one wrongful act.

86. Each of the Defendants is therefore jointly and severally liable for all acts done by any of them in furtherance with the unlawful combination.

## DEMAND FOR JURY TRIAL

87. Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court enter judgment awarding them the following relief against Defendants:

    A.    Actual damages;

    B.    Disgorgement of profits;

    C.    Declaratory judgment;

    D.    Exemplary damages;

    E.    Attorneys' fees and expenses;

    F.    Costs;

    G.    Pre- and post-judgment interest; and

    H.    All other relief Plaintiffs are entitled to.

July 21, 2024

Respectfully submitted,

**Griffith Barbee PLLC**

/s/ *Casey Griffith*

Casey Griffith
Texas Bar No. 24036687
Casey.Griffith@griffithbarbee.com

Michael Barbee
Texas Bar No. 24082656
Michael.Barbee@griffithbarbee.com

Kirk Voss
Texas Bar No. 24075229
Kirk.Voss@griffithbarbee.com

Joshua Yun
Texas Bar No. 24120335
Joshua.Yun@griffithbarbee.com

One Arts Plaza
1722 Routh St., Ste. 910
Dallas, Texas 75201
(214) 446-6020 | main
(214) 446-6021 | fax

**Counsel for Plaintiffs**