**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MARTEN GROUP, INC. d/b/a SENERGY MEDICAL GROUP and SCOTT TENNANT, | § | |
| Plaintiffs, | § | Case No. 3:24-cv-01852 |
| v. | § | **JURY TRIAL DEMANDED** |
| JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, and CURADOR, LLC, | § | |
| Defendants. | § | |

## DEFENDANTS' ORIGINAL ANSWER AND COUNTERCLAIM

COME NOW Defendants Jerald Tennant, MD ("**Dr. Tennant**"), John Tennant, Teresa Jessen Tennant, Jared Tennant, Tennant Devices and Accessories, LLC ("**TDA**"), and Curador, LLC ("**Curador**") (collectively, "**Defendants**") by and through their counsel of record and file this Original Answer and Counterclaims to Plaintiffs Marten Group, Inc. d/b/a Senergy Medical Group's ("**Senergy**") and Scott Tennant's (collectively, "**Plaintiffs**") Complaint [Dkt. 1] (the "**Complaint**"), as follows:

## ANSWER

### [Alleged] Overview

Defendants deny the allegations in Plaintiffs' alleged Overview.

**Parties**

1.    Defendants admit the allegation set forth in Paragraph 1.

2.    Defendants admit the allegation set forth in Paragraph 2.

3.    Defendants admit the allegation set forth in Paragraph 3.

4.    Defendants admit the allegation set forth in Paragraph 4.

5.    Defendants admit the allegation set forth in Paragraph 5.

6.    Defendants admit the allegation set forth in Paragraph 6.

7.    Defendants admit the allegation set forth in Paragraph 7.

**Jurisdiction**

8.    Defendants admit the Complaint alleges causes of action under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and declaratory judgment under 25 U.S.C. §§ 2201 and 2202.  Except as expressly admitted herein, the remainder of Paragraph 8 constitutes legal conclusions to which no answer is required.

9.    Defendants admit Defendants are domiciled in Texas and/or are Texas entities with principal places of business in Texas.  Except as expressly admitted herein, the remainder of Paragraph 9 constitutes legal conclusions to which no response is required.

**Venue**

10.    Defendants admit Defendants are domiciled in Texas and/or are Texas entities with principal places of business in Texas.  Except as expressly admitted

herein, the remainder of Paragraph 10 constitutes legal conclusions to which no response is required.

### [Alleged] Background

11.    Defendants admit Scott Tennant is the CEO of Senergy.  Defendants deny that Scott Tennant is the founder of Marten Group, Inc. d/b/a Senergy Medical Group. Scott was gifted the company.  Defendants lack knowledge or information sufficient to form a belief as to what constitutes Senergy's alleged "main line" of business.  Defendants deny Senergy owns the Tennant BioModulator® trademark. Defendants admit that with Dr. Tennant's permission Senergy previously was licensed to sell Dr. Tennant's Tennant BioModulator® products, which, in general, transmit frequencies, through a person's skin.  Defendants admit that users of Defendant's Tennant BioModulator® products report great benefit and success from their use and, therefore, deny such allegations.  Defendants deny that Senergy owns the Tennant Biotransducer mark, but admit that Senergy previously was licensed to sell Tennant Biotransducers pursuant to the agreement between Dr. Tennant and Scott. Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 11 of the Complaint.

12.    Defendants admit that Defendant Dr. Jerald Tennant ("**Dr. Tennant**") is a retired ophthalmologist, who helped restore his patients' eyesight.  Defendants admit Dr. Tennant was a surgeon.  Defendants deny that Dr. Tennant is Scott's

father, but admit that Scott is Dr. Tennant's stepson, whom Dr. Tennant allowed to legally change his name to Scott Edward Tennant and whom Dr. Tennant raised as though Scott was one of his own children.   Defendants deny that Plaintiff Scott Tennant ("**Scott**") assisted Dr. Tennant as an optician, ophthalmic assistant, surgical technician, and medical study coordinator.  Rather, Scott was allowed to assist any support staff that asked for his assistance in menial tasks.   Defendants lack knowledge or information sufficient to form a belief as to Scott's alleged subjective beliefs set forth in Paragraph 12 (*e.g.*, that he "relished the opportunity to work with his father"; "Scott took pride in playing a role;" "Scott's participation in his father's medical practice was transformative and set his future's trajectory on course to remain near and work together with his father").   Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 12 of the Complaint.

13.    Defendants admit Dr. Tennant began suffering from a serious chronic illness that forced him to prematurely retire, and that Dr. Tennant began seeking alternative treatments to heal himself.   Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 13 of the Complaint.

14.    Defendants admit Dr. Tennant's illness went uncured for several years, and that he spent approximately ten years studying, among other things, cellular

4

biology and methods to cure his illness.  Defendants admit that Dr. Tennant's illness was healed by Dr. Tennant's findings and with the contribution of low-voltage neuro stimulation electrotherapy, the research for which is believed to have been developed in the Soviet Union in the 1950s.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 14 of the Complaint.

15.    Defendants admit they did not invent the general concept of biofeedback electronic stimulation; however, Defendants deny the allegations set forth in Paragraph 15 to the extent they imply Defendants did not develop and invent the Tennant BioModulator® products, including specific frequencies used on the devices.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 15 of the Complaint.

16.     Defendants admit Dr. Tennant became determined to introduce a low-voltage neuro stimulation electrotherapy device to the United States market, in order to help other chronic sufferers.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 16 of the Complaint.

17.    Defendants deny the allegations set forth in Paragraph 17 of the Complaint.

18.    Defendants deny the allegations set forth in Paragraph 18 of the Complaint.

19.    Defendants deny the allegations set forth in Paragraph 19 of the

Complaint.

20.     Defendants admit that, at the time Dr. Tennant and Tennant Family Ltd. were introduced to Avazzia, Avazzia manufactured a Russian low-voltage neuro stimulation electrotherapy device.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 20 of the Complaint.

21.     Defendants admit they are aware of a distribution agreement(s) by and between Senergy and Avazzia but lack knowledge or information sufficient to form a belief as to the terms of such distribution agreement(s), if any.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 21 of the Complaint.

22.     Defendants admit Dr. Tennant formed an institute for integrative medicine.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 22 of the Complaint.

23.     Defendants admit thousands of patients have found relief from chronic illness through Dr. Tennant's Tennant BioModulator® products.  The article cited within Paragraph 23 speaks for itself.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 23 of the Complaint.

24.     Defendants admit that Scott Tennant and Dr. Tennant formed a licensing and royalty arrangement through which Scott was permitted to sell Dr.

Tennant's Tennant Biomodulator and Tennant Biotransducer in exchange for monthly reporting sales and paying a royalty to Dr. Tennant. Except as expressly admitted herein, Defendants deny the allegations set forth in Paragraph 24 of the Complaint.

25.    Defendants admit Scott is Dr. Tennant's stepson and John Tennant ("**John**") is married to Teresa Jessen Tennant ("**Teresa**"). Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 25 of the Complaint.

26.    Defendants admit that John is a member of Curador, which is engaged in the business of selling nutritional health supplements and that Curador does business as "Tennant Products." Defendants admit that from approximately 2011 through 2021 Curador sold supplements to Senergy. Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 26 of the Complaint.

27.    Defendants deny the allegations set forth in Paragraph 27 of the Complaint.

28.    Defendants admit Curador no longer sells products through Senergy. Defendants admit that Dr. Tennant, Scott, John, Jared, and Senergy's Chief Operating Officer had a meeting. Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 28 of the Complaint.

29.     Defendants deny the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendants admit they proposed a settlement that included, among other things, Plaintiffs transmitting a copy of Senergy's customer database (*i.e.*, list of purchases of the devices subject to the royalties), which Plaintiffs refused.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 30 of the Complaint.

31.     Defendants admit they delivered a demand letter to Plaintiffs, which speaks for itself.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 31 of the Complaint.

32.     Defendants admit they believe Plaintiffs owe Dr. Tennant an amount in excess of $5 million, as set forth below in Defendants' Counterclaim and that they provided Plaintiffs a proposed "Confidentiality, Unauthorized Disclosure, and Non-Disparagement Agreement" ("**Proposal**") as a full and final settlement and resolution of all claims, which Plaintiffs rejected.  The Proposal referenced in Paragraph 32 of the Complaint speaks for itself. Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 32 of the Complaint.

33.     The Proposal referenced in Paragraph 33 of the Complaint speaks for itself.  Except as expressly admitted herein, Defendants deny each and every other

allegation as set forth in Paragraph 33 of the Complaint.

34.    Defendants deny the allegations set forth in Paragraph 34 of the Complaint.

35.    Defendants admit they delivered the cease-and-desist letter referenced in Paragraph 35 of the Complaint (the "**Demand Letter**").  The Demand Letter referenced in Paragraph 35 of the Complaint speaks for itself.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 35 of the Complaint.

36.    The Demand Letter referenced in paragraph 36 speaks for itself.

37.    Defendants deny any allegation that they contacted Senergy customers. Defendants do not know what Senergy contends to be its "strategic contents" but do admit that Dr. Tennant is the only person who can authorize use of his name, likeness, and trademarks including the trademarks that Senergy is willfully infringing through its continued use of them to market its business. Defendants admit that they delivered notice of cancelation to Avazzia of the licensing and royalty arrangement by and between Dr. Tennant and Plaintiffs. Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 37 of the Complaint.

38.    Defendants lack knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 38 of the Complaint and, therefore, deny

said allegations.

39.    Defendants deny the allegations set forth in Paragraph 39 of the Complaint.

40.    Defendants deny the allegations set forth in Paragraph 40 of the Complaint.

## Causes of Action

## Count 1: [Alleged] Declaratory Judgment – Exclusion from Market

41.    Defendants incorporate by reference the preceding paragraphs.

42.    The allegations set forth in Paragraph 42 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 42 of the Complaint.

43.    Defendants admit Dr. Tennant and TDA, on one hand, and Scott and Senergy, on the other hand entered into certain licensing agreements, which are referenced in Defendants' Counterclaim below.  Those agreements speak for themselves.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 43 of the Complaint.

44.    The agreements referenced in Paragraph 44 of the Complaint speak for themselves.  Except as expressly admitted herein, Defendants deny each and every other allegation as set forth in Paragraph 44 of the Complaint.

45.    The allegations set forth in Paragraph 45 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 45 of the Complaint.

46.    Defendants deny the allegations set forth in Paragraph 46 of the Complaint.

47.    Defendants deny the allegations set forth in Paragraph 47 of the Complaint.  Defendants lack knowledge or information sufficient to form a belief as to the alleged "adverse effects" set forth in Paragraph 47 of the Complaint and, therefore, deny said allegations.

48.    The allegations set forth in Paragraph 48 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 48 of the Complaint.

49.    The allegations set forth in Paragraph 49 constitute relief requested, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 49 of the Complaint.

**Count 2: [Alleged] Declaratory Judgment – Trademark Rights**

50.    Defendants incorporate by reference the preceding paragraphs.

51.    The allegations set forth in Paragraph 51 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 51 of the Complaint.

52.    The allegations set forth in Paragraph 52 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 52 of the Complaint.

53.    Defendants admit the allegations set forth in Paragraph 53 of the Complaint.

54.    The allegations set forth in Paragraph 54 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 54 of the Complaint.

55.     The allegations set forth in Paragraph 55 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 55 of the Complaint.

56.    The allegations set forth in Paragraph 56 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 56 of the Complaint.

57.    The allegations set forth in Paragraph 57 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 57 of the Complaint.

58.    The allegations set forth in Paragraph 58 constitute requests for relief, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 58 of the Complaint.

**Count 3: [Alleged] Cancellation of Registered Trademarks**

59.     Defendants incorporate by reference the preceding paragraphs.

60.     The allegations set forth in Paragraph 60 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 60 of the Complaint.

61.     Defendants admit that Defendant TDA owns Trademark Reg. Nos. 3157112 and 4382782.  The remainder of the allegations set forth in Paragraph 61 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 61 of the Complaint.

62.     The allegations set forth in Paragraph 62 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 62 of the Complaint.

**Count 4: [Alleged] Breach of Fiduciary Duty/ Inducing Breach of Fiduciary Duty**

63.     Defendants incorporate by reference the preceding paragraphs.

64.     The allegations set forth in Paragraph 64 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 64 of the Complaint.

65.     The allegations set forth in Paragraph 65 constitute legal conclusions, to the extent they are premised upon a finding whether and to what extent Dr. Tennant owed fiduciary duties to Plaintiffs, as a matter of law, and, thus no response

is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 65 of the Complaint.

66.    Defendants deny the allegations set forth in Paragraph 66 of the Complaint.

67.    The allegations set forth in Paragraph 67 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 67 of the Complaint.

68.    Defendants deny the allegations set forth in Paragraph 68 of the Complaint.

69.    The allegations set forth in Paragraph 69 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 69 of the Complaint.

**Count 5: [Alleged] Tortious Interference with Contract**

70.    Defendants incorporate by reference the preceding paragraphs.

71.    Defendants lack sufficient information to admit or deny the allegations set forth in Paragraph 71.

72.    Defendants deny the allegations set forth in Paragraph 72 of the Complaint.

73.    The allegations set forth in Paragraph 73 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants

deny the allegations set forth in Paragraph 73 of the Complaint.

74.    Defendants deny the allegations set forth in Paragraph 74 of the Complaint.

75.    The allegations set forth in Paragraph 75 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 75 of the Complaint.

**Count 6: [Alleged] Money Had and Received**

76.    Defendants incorporate by reference the preceding paragraphs.

77.    Defendants deny the allegations set forth in Paragraph 77 of the Complaint.

**Count 7: [Alleged] Unjust Enrichment**

78.    Defendants incorporate by reference the preceding paragraphs.

79.    Defendants deny the allegations set forth in Paragraph 79 of the Complaint.

**Count 8: [Alleged] Conspiracy**

80.    Defendants incorporate by reference the preceding paragraphs.

81.    The allegations set forth in Paragraph 81 constitute legal conclusions, to which no response is required.  To the extent a response is required, Defendants deny the allegations set forth in Paragraph 81 of the Complaint.

82.    The allegations set forth in Paragraph 82 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants

deny the allegations set forth in Paragraph 82 of the Complaint.

83.    The allegations set forth in Paragraph 83 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants

deny the allegations set forth in Paragraph 83 of the Complaint.

84.    The allegations set forth in Paragraph 84 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants

deny the allegations set forth in Paragraph 84 of the Complaint.

85.    The allegations set forth in Paragraph 85 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants

deny the allegations set forth in Paragraph 85 of the Complaint.

86.    The allegations set forth in Paragraph 86 constitute legal conclusions,

to which no response is required.  To the extent a response is required, Defendants

deny the allegations set forth in Paragraph 86 of the Complaint.

## Demand for Jury Trial

87.    Defendants acknowledge that Plaintiffs have demanded a trial by jury.

## Prayer for Relief

88.    Defendants deny Plaintiffs are entitled to any of the requested relief

whatsoever, including, but not limited to, any declaratory judgments, monetary

damages, attorneys' fees and expenses, costs, and/or pre- and post-judgment interest,

and denies any such allegations set forth in paragraphs A through H of Plaintiffs'
Prayer for Relief.

## AFFIRMATIVE DEFENSES

Further answering the Complaint, and as additional defenses thereto,
Defendants assert the following additional defenses, without assuming the burden of
proof which such burden would otherwise be on Plaintiffs.  Defendants expressly
reserve the right to amend its Answer as additional information becomes available,
is otherwise discovered, and/or as permitted within the time frame envisioned by any
future case management and discovery orders and/or as leave may be granted by the
Court, and to introduce any of the following defenses, other defenses, and other
counterclaims, that may arise.

1.      The Complaint fails to state a claim against Defendants upon which
relief can be granted and the allegations contained therein are vague, ambiguous,
and uncertain.

2.      Plaintiffs' claims are barred, in whole or in part, by the statute of
limitations applicable to their claims.

3.      Plaintiffs' claims are barred, in whole or in part, based on the doctrines
of estoppel and waiver.

4.      Plaintiffs' claims are barred, in whole or in part, based on the doctrine
of unclean hands.

5.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' own acts or omissions proximately caused or contributed to Plaintiffs' injury.

6.     Plaintiffs' claims are barred, in whole or in part, because Defendants' acts and/or statements, of which Plaintiffs complain, were legally justified.

7.     Plaintiffs' claim for tortious interference with contract is barred because the contract upon which Plaintiffs base their claim is illegal.

8.     Plaintiffs' claims are barred, in whole or in part, due to Plaintiffs' failure to mitigate damages.

9.     Defendants deny they owed any fiduciary duties to Plaintiffs.  To the extent it is determined that any of the Defendants did owe any of the Plaintiffs fiduciary duties, Plaintiffs' claims for breach of fiduciary duty are barred, in whole or in part, because their acts were legally justified and Plaintiffs have unclean hands.

10.     To the extent Plaintiffs purport to assert rights on behalf of manufacturer, Avazzia, they lack standing to do so.

11.     In the unlikely event Defendants are found liable for exemplary damages, such damages must be capped under Section 41.008 of the Texas Civil Practice and Remedies Code, the Due Process Clause of the United States Constitution, and the Due Course of Law provisions of the Texas Constitution.

12.     Defendants reserve the right to assert additional affirmative defenses upon further investigation and discovery.

## DEFENDANTS JERALD L. TENNANT'S AND TENNANT DEVICES AND ACCESSORIES, LLC'S ORIGINAL COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 13, Defendants Jerald L. Tennant ("**Dr. Tennant**") and Tennant Devices and Accessories, LLC ("**TDA**") (collectively, "**Counter-Plaintiffs**") assert the following counterclaims against Plaintiffs Marten Group, Inc. d/b/a Senergy Medical Group ("**Senergy**") and Scott E. Tennant ("**Scott**") (collectively, "**Counter-Defendants**"), as follows:

### I.    PARTIES

1.    Counter-Plaintiff Dr. Tennant is an individual that is a citizen of the State of Texas.

2.    Counter-Plaintiff TDA is a limited liability company that is organized under the laws of the State of Texas.

3.    Counter-Defendant Scott Tennant is an individual that is a citizen of the State of Texas.

4.    Counter-Defendant Senergy is a corporation that is organized under the laws of the State of Texas.

### II.    JURISDICTION AND VENUE

5.    The Court has federal question jurisdiction over the subject matter of this action under the Lanham Act, 15 U.S.C. §§ 1114 and 1125.  *See* 28 U.S.C. §§ 1331 and 1338.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Counter-Plaintiffs' remaining counterclaims because they are so related to the

claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (2) because Counter-Defendants reside in this district, and a substantial part of the events or omissions giving rise to this claim occurred in this district.

### III.    FACTS

7.     Ever since Counter-Plaintiff Dr. Tennant completed his residency in ophthalmology at Massachusetts Eye and Ear Infirmary of Harvard Medical School and Southwestern Medical School/Parkland System in 1968, he has innovated medical products and methods that have improved the worldwide practice of medicine for generations to come. Collaborating with other world leaders in cataract and implant surgery, Dr. Tennant is one of the most awarded ophthalmologists of his generation.

8.     Dr. Tennant's contributions to ophthalmology are too numerous to name. He has taught surgeons all around the world to do outpatient eye surgery; he chaired an ad hoc committee that wrote the rules that govern outpatient surgicenters in Texas; he was also one of the first surgeons in the U.S. to place intraocular lenses in eyes after cataract surgery, eliminating the need for thick, incapacitating glasses and he taught his technique around the world; and, as a pioneer in LASIK surgery, he was responsible for most of the research done on the Excimer laser for VISX.

9.      Dr. Tennant has served as a humanitarian, helping people worldwide live life with less or no pain.  He is one of the few surgeons to be awarded the Corboy Award for Advancements in Ophthalmology and the American Academy of Ophthalmology Award. Dr. Tennant was awarded the Order of Saint Sylvester by Pope Benedict XVI in 2008 for his contributions to medicine.  He holds a doctorate of natural medicine from the Board of Pastoral Medical Association; is licensed by the Board of Homeopathic and Integrated Medicine Examiners in Arizona; and is a current member of the American Academy of Anti-Aging Medicine.

10.     After many years and thousands of eye surgeries, Dr. Tennant became ill.  His illness severely limited Dr. Tennant's mental and physical abilities, causing him to retire at the height of his career and stop performing surgeries.  Doctors told Dr. Tennant that his illness would eventually take his life.

11.     Undeterred by this illness and prognosis, Dr. Tennant devoted his limited energy to studying cellular biology and alternative treatments to heal himself. In time, Dr. Tennant conceived of a method for fighting chronic disease by maintaining voltage levels in cells, based on research developed by Soviet scientists in the 1950s.  Dr. Tennant used his concept to fully heal himself.

12.     Once healed and with a renewed purpose to help others, Dr. Tennant started treating patients using the same electrotherapy technology that saved his life. At the same time, Dr. Tennant remained committed to innovating and improving

upon existing electrotherapy devices in the market.

13.    Dr. Tennant's continued research eventually led to a breakthrough, as he discovered the human body heals at different frequencies than what current devices provided.

14.    Dr. Tennant developed his innovative concepts into two therapeutic devices: the Tennant BioModulator® and the Tennant BioTransducer®.  These FDA accepted, non-invasive devices are designed to offer healthcare professionals and home users affordable drug-free and user-friendly options for relief from chronic, severe, and intractable pain.

**A. The Tennant Marks.**

15.    Over the years, Dr. Tennant's Tennant BioModulator® and Tennant BioTransducer® devices have resulted in thousands of success stories and testimonials of patients' recovery and pain reduction.

16.    Counter-Plaintiffs'    Tennant    BioModulator®    and    Tennant BioTransducer® brands, trade names, and other related intellectual property are the result of significant investment and are worth millions of dollars.

17.    To protect their investment in their marks, Counter-Plaintiffs registered their trademarks with the United States Patent and Trademark Office ("**USPTO**") on the Principal Register.

18.    Counter-Plaintiffs' registered marks include the following:

| Trademark/ Wordmark | Reg. Date | Services | Reg. No. |
|---|---|---|---|
| TENNANT BIOMODULATOR and design:  | Oct. 17, 2006 | (Int'l Class: 010; U.S. Classes: 026, 039, 044)<br><br>Medical apparatus and instruments for use in electromagnetic resonance therapy, namely, cybernetic biofeedback devices, interactive neuromuscular simulators, and diagnostic testing equipment | 3157112 |
| TENNANT BIOTRANSDUCER | Aug. 13, 2013 | (Int'l Class: 010; U.S. Classes: 026, 039, 044)<br><br>Medical apparatus and instruments for use in electromagnetic resonance therapy, namely, cybernetic biofeedback devices, interactive neuromuscular simulators, and diagnostic testing equipment | 4382782 |
| HEALING IS VOLTAGE | May 14, 2013 | (Int'l Class: 16; US Classes: 2, 5, 22, 23, 29, 37, 38, 50)<br><br>A series of books, written articles, handouts and worksheets in the field of energy medicine and healthcare | 4334430 |
| HEALING IS VOLTAGE | December | (Int'l Class: 41; US | 4878439 |

| | 29, 2015 | Classes: 100, 101, 107)<br><br>Providing lectures and seminars in the field of energy medicine and healthcare | |
|---|---|---|---|

19.    The above-described currently registered trademarks are collectively referred to as the "**Tennant Marks**."  True and correct copies of the U.S. Certificate of Registrations for the Tennant Marks are attached hereto as **Exhibit A**.

20.    The Tennant Marks constitute Counter-Plaintiffs' proprietary interests.

21.    The registrations of the Tennant Marks are currently in full force and effect.

22.    Pursuant to the Lanham Act, Counter-Plaintiffs' registrations constitute prima facie evidence of (a) the Tennant Marks' validity and registration; (b) Counter-Plaintiffs' ownership of the Tennant Marks; (c) Counter-Plaintiffs' exclusive right to use the Tennant Marks on or in connection with the products and services stated in the registration, including the exclusive right to license the marks on or in connection with the products and services stated in the registrations.  *See* 15 U.S.C. §§ 1057(b) and 1115(a).

23.    Counter-Plaintiffs have given notice to the public of the registration of the Tennant Marks as provided in 15 U.S.C. § 1111.

24.    In addition, Counter-Plaintiffs' registrations constitute constructive

notice of their claim of ownership of the Tennant Marks.  *See* 15 U.S.C. § 1072.

25.    Counter-Plaintiffs' products bearing the Tennant Marks are offered and sold in commerce.

26.    Dr. Tennant and his company, TDA, have developed name recognition and goodwill among practitioners and consumers in the medical devices market through the Tennant Marks.

27.    Counter-Plaintiffs' products have been met with popular approval and the public is familiar with the Tennant Marks.  The products and services associated with the Tennant Marks are understood by the public to be produced, marketed, sponsored, supplied by, and/or affiliated with Dr. Tennant and TDA.  When the Royalty Agreement was in effect, Counter-Defendants had permission to use the Tennant Marks in order to market Dr. Tennant's Tennant BioModulator® and Tennant BioTransducer® devices.

**B. The Licensing Agreements.**

28.    Counter-Defendant, Scott Tennant, is Dr. Tennant's stepson.  Although Dr. Tennant was neither Scott's biological nor adoptive father, Dr. Tennant raised Scott as if he was one of his own.

29.    Although Scott has no medical or ophthalmological background and limited formal education consisting of a degree in Fashion Design, Dr. Tennant gave Scott opportunities to work as an assistant to the support staff of his ophthalmology

clinic doing menial tasks.

30.    When asked by a British company to teach and sell the Russian SCENAR device in the US, Dr. Tennant began to work on the research, trials, and innovation that generated the Tennant Biomodulator®.  In conjunction with developing the device and the brand, Dr. Tennant also became a leading advocate for the therapy.  He called his first clinic "Computerized Stress Reduction", and his son Jared (working for Dr. Tennant) started a website to promote the business.

31.    Dr. Tennant developed the Tennant Biomodulator® and named it after himself because it was his conception and his vision to promote the innovative healing power of therapy to patients throughout the United States and the world.

32.    Dr. Tennant and Scott (like everyone else) recognized that Dr. Tennant had conceived of the Tennant Biomodulator® and the corresponding "Tennant" brand based on his life story and his innovations in treatment.  They also recognized Scott's utility in getting involved in sales.  They agreed that Scott would be able to use Dr. Tennant's brand to sell Dr. Tennant's innovative products.  On June 15, 2003, Dr. Tennant and Scott executed a written contract ("**2003 Agreement**"), a true and correct copy of which is attached hereto as **Exhibit B**.

33.    Under the 2003 Agreement, Dr. Tennant granted Scott rights and license to use the Tennant Biomodulator® mark for a period of twenty (20) years in connection with the sale of medical devices to consumers and practitioners.  *See* Ex.

B, § 1.

34.    In exchange, Scott agreed, among other things, to (i) pay Dr. Tennant $350 of Scott's Net Profit (defined therein) realized from each new customer purchase of a Tennant BioModulator® device; (ii) keep an accurate account of revenue generated from sales of Tennant BioModulator® devices; (iii) render a statement of such sales in writing to Dr. Tennant within thirty (30) days after the end of each calendar month; and, (iv) refrain from, either directly or indirectly, divulging, disclosing, communicating, or using for personal benefit, any information that is proprietary to Dr. Tennant and Dr. Tennant's employees, agents, and representatives in any manner.  *See id*., §§ 4(b), 6, 9.

35.    The 2003 Agreement also spelled out Scott's fiduciary duty to Dr. Tennant, specifically that Scott was obligated to maintain the Tennant Biomodulator® in confidence, with the same degree of care he would exercise with respect to his own proprietary information.  *See id.*, § 3(a).

36.    On October 1, 2012, Dr. Tennant and Scott executed a second written contract ("**2012 Agreement**"), a true and correct copy of which is attached hereto as **Exhibit C**.

37.    The 2012 Agreement granted Scott rights and license to use the Tennant Biomodulator® mark in connection with the sale of a Tennant Biomodulator® PRO device, for a period of twenty (20) years.

38.    In exchange, Scott agreed, among other things, to (i) pay Dr. Tennant $550 of Scott's Net Profit (defined therein) realized from each new customer purchase of a Tennant BioModulator® device; (ii) keep an accurate account of revenue generated from sales of Tennant BioModulator® devices; (iii) render a statement of such sales in writing to Dr. Tennant within thirty (30) days after the end of each calendar month; and, (iv) refrain from, either directly or indirectly, divulging, disclosing, communicating, or using for personal benefit, any information that is proprietary to Dr. Tennant and Dr. Tennant's employees, agents, and representatives in any manner.  *See* id., §§ 4(b), 6, 9.

39.    Like the 2003 Agreement, the 2012 Agreement provided that Scott was obligated to maintain the Tennant Biomodulator® Pro in confidence, with the same degree of care he would exercise with respect to his own proprietary information. *See* id., § 3(a).

40.    Both the 2003 Agreement and 2012 Agreement provided that Scott's failure to render statements and make royalty payments constitute an event of default, which, if left uncured after 30 days, result in termination of the respective agreements.  *See* Exs. B and C, at § 7(a).  Together the 2003 Agreement and 2012 Agreement are the "**License Agreements**".

41.    For several years, Scott sold Tennant Biomodulator® and Tennant Biomodulator® PRO devices through Senergy and made monthly payments to Dr.

Tennant. Dr. Tennant oversaw the quality of the devices sold and helped to promote sales and his approach to therapy.

42. On March 15, 2016, Dr. Tennant signed and sent a contract addendum to Scott ("**Addendum 1**"), a true and correct copy of which is attached hereto as **Exhibit D**. Addendum 1 permitted cancelation by either party, without prejudice and for any reason within thirty days' notice and provided for a new royalty calculation method. Scott did not sign Addendum 1.

43. On April 22, 2016, Scott sent a signed contract addendum to Dr. Tennant ("**Addendum 2**"), a true and correct copy of which is attached hereto as **Exhibit E**. Like Addendum 1, Addendum 2 permitted cancelation by either party, without prejudice and for any reason within thirty days' notice. Addendum 2 provided Scott's own suggested royalty calculation method. Dr. Tennant never signed Addendum 2.

44. As of April 22, 2016, it was understood and agreed between Counter-Plaintiffs, on one hand, and Counter-Defendants, on the other hand, that the License Agreements could be canceled by either party, without prejudice, for any reason with thirty days' notice.

**C. Counter-Defendants fraudulently underreport sales for years and otherwise fail to perform as required under the License Agreements.**

45. In recent years, Counter-Defendants failed to provide detailed statements of monthly sales, as required under the License Agreements, despite Dr.

Tenant's repeated requests for them.

46.    As a result, on June 10, 2024, Counter-Plaintiffs conducted an audit of Counter-Defendants' reports.

47.    The audit revealed that, since at least 2021, Counter-Defendants underreported the number of device sales for various Tennant BioModulator® and Tennant BioTransducer® devices.

48.    Further, Counter-Plaintiffs discovered that Counter-Defendants paid royalties to Dr. Tennant on the underreported number of products using the methodology from Addendum 2 to which Dr. Tennant never agreed, rather than the amount owed under the 2003 Agreement or the 2012 Agreement signed by both parties.

49.    Moreover, through Addendums 1 and 2, the parties agreed that Senergy would adjust royalties against the devices MSRP.  This never happened.

50.    Counter-Plaintiffs notified Counter-Defendants of these errors and provided Counter-Defendants ample opportunities to cure.  Counter-Defendants refused.

51.    Counter-Defendants also refused to provide Counter-Plaintiffs with their database of customers who have purchased Counter-Plaintiffs' products, stifling Counter-Plaintiffs' ability to calculate the actual number of sales, and also frustrating Counter-Plaintiffs' ability to provide assistance with Dr. Tennant's

products, honor the product warranties, and prevent further brand corruption by Counter-Defendants.

52.    Counter-Plaintiffs have calculated over $2 million in underpaid royalties.    However, the full extent of Counter-Defendants' fraudulent underreporting and/or miscalculation is currently unknown, and Counter-Plaintiffs anticipate Counter-Defendants likely owe millions more following full accounting of their books and records.    Despite the Licensing Agreement's clear provisions, Counter-Defendants have refused to allow an independent accountant to review the records to assess Counter-Defendants' compliance with the royalty obligations.

**D. Counter-Plaintiffs cancel the Licensing Agreements, but Counter-Defendants continue to unlawfully use, market, and sell devices bearing the Tennant Marks.**

53.    On June 21, 2024, Dr. Tennant hand-delivered a notice of Termination of Royalty Agreements to Counter-Defendants, setting forth written notice of Counter-Defendants' defaults of the License Agreements and fraudulent conduct (the "**Demand**"). A true and correct copy of the Demand is attached hereto as **Exhibit F**.

54.    Counter-Defendants failed to cure their defaults and other material breaches of the License Agreements within thirty (30) Days.

55.    The Demand further notified of Dr. Tennant's intent to immediately terminate the License Agreements because Counter-Defendants failed to make all

payments due under the agreements, provided fraudulent statements of sales, and improperly calculated royalty payments.

56.    The Demand provided Counter-Defendants with thirty days to cease marketing and distributing Counter-Plaintiffs' products and terminated Counter-Defendants' license to use the Tennant Marks.

57.    To date, Counter-Defendants continue to market, sell, and distribute products bearing the Tennant Marks without Counter-Plaintiffs' permission.

58.    Among other things, although they no longer have Dr. Tennant's permission to use his marks, Counter-Defendants continue to market Tennant BioModulator® and the Tennant BioTransducer® devices on the Senergy website, including, but not limited to the following images on the Senergy homepage:[1]

*Image 1 - Image from Senergy's Homepage*



---

[1]    *See* Senergy, "Home", *available at* store.senergy.us (last visited Aug. 20, 2024).

*Image 2 - Image from Senergy's Homepage*



59.    In addition, the Senergy website continues to list devices bearing the

Tennant Marks for sale on the Senergy website:[2]

---

[2]    *See* Senergy, "Shop All", results filtered by product type "Tennant BioModulator & BioTransducer Devices", *available at* https://store.senergy.us/collections/all?filter.v.price.gte=&filter.v.price.lte=&filter.p.product_type=Tennant+BioModulator+%26+BioTransducer+Devices (last visited Aug. 20, 2024).

*Image 3- Catalog of Tennant BioModulator® and the Tennant BioTransducer® Devices Listed for Sale on Senergy's Website*



60.     Further, Senergy's website contains pages (i) describing "Senergy's recommended BioModulator and BioTransducer packages"[3], (ii) permitting visitors

---

[3]     Senergy, Recommended Devices, *available at* https://senergy.us/dr-tennants-recommend-devices/ (last visited Aug. 20, 2024).

to schedule appointments with purported "Senergy Advisors" to "educate" and help prospective customers select a Tennant device;[4] and, (iii) publishing customer testimonials (referred to as "Senergy Stories") regarding their experience with Tennant devices.[5]

61.    Senergy's continued use and display of the Tennant Marks or any items associated with Dr. Tennant's name is without Counter-Plaintiffs' license or consent, and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to source, affiliation, and sponsorship.

62.    Upon seeing the familiar Tennant Marks, through Counter-Defendants unauthorized use thereof, consumers will be deceived into concluding that the products and services sold and/or offered by Counter-Defendants are made or supplied by Counter-Plaintiffs, are prepared in a manner prescribed by Counter-Plaintiffs and subject to Counter-Plaintiffs' supervision, are sponsored or endorsed by Counter-Plaintiffs, and bear the Tennant Marks pursuant to Counter-Plaintiffs' authority and permission.

63.    Such impressions are calculated to have and will have a material influence on customers' purchasing decisions, inducing them to purchase products and services from Counter-Defendants in reliance on the goodwill, reputation, and

---

[4]    Senergy, "Meet our Senergy Advisors", *available at* https://senergy.us/appointments/# (last visited Aug. 20, 2024).
[5]    Senergy, Senergy Stories, *available at https://senergy.us/senergy-stories/* (last visited Aug. 20, 2024).

appeal of Dr. Tennant.

64.     By reason of the foregoing, Counter-Plaintiffs have suffered damages, in an amount to be proven at trial.  Counter-Plaintiffs are no longer the source or sponsor of products sold by Counter-Defendants, Counter-Plaintiffs have not authorized Counter-Defendants to use the Tennant Marks, and Counter-Plaintiffs have expressly protested against Counter-Defendants' continued use.

65.     Consumer confusion as to the source or sponsorship of products marketed and sold by Counter-Defendants bearing the Tennant Marks will be attended not only by the inevitable loss of product distinctiveness, image, and goodwill, but will also cause a diversion of sales from and/or royalties owed to Counter-Plaintiffs.

66.     The economic injury to Counter-Plaintiffs resulting from such diversion is incalculable and, as such, constitutes irreparable harm.

## IV.    CAUSES OF ACTION

**Count I:     Trademark Infringement under 15 U.S.C. § 1114 (Against Scott and Senergy)**

67.     Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

68.     As described herein, Counter-Defendants have used and continue to use the Tennant Marks without Counter-Plaintiffs' consent in commerce in connection with the sale, offering for sale, distribution, or advertising of their goods and services

36

when the use is likely to deceive or cause confusion or mistake as to the source or origin of the goods, and such use has already caused actual mistake, confusion, or deception of the general public.

69.     Counter-Defendants' above-described conduct constitutes trademark infringement under the Lanham Act, 15 U.S.C. § 1114, as well as common law trademark infringement.

70.     Counter-Defendants' actions have been with full knowledge of Counter-Plaintiffs' rights and with the intent to trade on Counter-Plaintiffs' goodwill in the Tennant Marks, thus, making this an exceptional case under 15 U.S.C. § 1117(a).

71.     Further, the activities of Counter-Defendants are intended to, and are likely to, lead the public to be confused as to the source of the infringing uses of the Tennant Marks described in this Counterclaim to the damage and harm of Counter-Plaintiffs.  Counter-Defendants' activities constitute deliberate infringement of the Tennant Marks in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114(1), entitling Counter-Plaintiffs to damages.

**Count II:    Unfair Competition under 15 U.S.C. § 1125 (Against Scott and Senergy)**

72.     Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

73.     Counter-Defendants have engaged in passing off by selling their

products under Dr. Tennant's name and/or under the Tennant Marks or otherwise expressly misrepresenting that their products originated with Counter-Plaintiffs.

74.    Further, Counter-Defendants have made and distributed, in interstate commerce, advertisements and other representations that contain false or misleading statements of fact or designations of origin regarding its products and their affiliation with Counter-Plaintiffs, as more particularly described in the foregoing paragraphs.

75.    These false statements actually deceive, or have a tendency to deceive, a substantial segment of Counter-Plaintiffs' and Counter-Defendants' customers and potential customers.  This deception is material in that it is likely to influence the purchasing decisions of customers and potential customers.

76.    Counter-Defendants' conduct described above constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1).

77.    Pursuant to 15 U.S.C. § 1117, Counter-Plaintiffs are entitled to recover from Counter-Defendants the damages sustained by Counter-Plaintiffs as a result of their acts, the gains, profits, and advantages that Counter-Defendants have obtained as a result of their acts, and the costs of this action.

78.    Moreover, Counter-Defendants' conduct was undertaken willfully and/or deliberately, making this an exceptional case entitling Counter-Plaintiffs to recover additional damages and reasonable attorneys' fees.

**Count III:   Dilution under 15 U.S.C. § 1125(c) (Against Scott and Senergy)**

79.     Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

80.     Counter-Plaintiffs are the sole owners of the Tennant Marks.   The Tennant Marks were registered by the USPTO, as set forth above, and Dr. Tennant has used them in interstate commerce since 2003.

81.     The Tennant Marks have become distinctive and/or are inherently distinctive.   Counter-Defendants' actions, as described above, infringe upon the Tennant Marks, which are famous and distinctive and widely recognized by the public throughout the United States as being recognizable and affiliated with Dr. Tennant, and are likely to cause confusion or mistake by Counter-Plaintiffs' existing and potential customers as to its connection with Counter-Defendants or of the origin, sponsorship, or approval of Counter-Defendants or their products by Counter-Plaintiffs.

82.     Counter-Defendants' actions constitute dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c).

83.     Furthermore, Counter-Defendants' actions, as described herein, were willful and deliberate and for the purpose of trading on Counter-Plaintiffs' reputation or to cause dilution of the Tennant Marks.   Accordingly, Counter-Plaintiffs are entitled to all damages provided for its cause of action for dilution.

**Count IV:   Texas   Common   Law   Trademark   Infringement,   Unfair Competition, and Dilution (Against Scott and Senergy)**

84.     Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

85.     Counter-Defendants acts complained of herein constitute trademark infringement, unfair competition, and dilution in violation of Section 16.103 of the Texas Business and Commerce Code.

86.     Counter-Plaintiffs have been damaged by Counter-Defendants' acts in an amount to be proven at trial.

**Count V:    Texas Common Law Misappropriation of Name or Likeness**

87.     Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

88.     Counter-Defendants' acts complained of constitute misappropriation of Dr. Tennant's name.

89.     Counter-Defendants use Dr. Tennant's name in connection with the advertising and marketing of the medical devices that Senergy sells and/or distributes.

90.     Consumers reasonably identify Dr. Tennant in Counter-Defendants' advertisements, and use of Dr. Tennant's name and likeness was not authorized by Dr. Tennant. Examples from Counter-Defendant's website include:

- In connection with a purchase of the Tennant BioModulator, device owners

may enroll in a program to receive Dr. Tennant's protocols for use:

"Learn how to do Dr. Tennant's Daily Protocol step-by-step as well as additional device protocols you may find helpful on your health journey."[6]

- When customers use the website transaction process, directly above the "Add to Cart" and "Buy it Now" buttons are tabs labeled "About Senergy Wellness" and "About Dr. Jerry Tennant" that informs the website user:

We [Senergy] work in partnership with renowned doctor and surgeon, Dr. Jerry Tennant. He invented this health system after developing encephalitis and a bleeding disorder in November 1995. Diagnostic tests confirmed he had three viruses in his brain and Dr. Tennant's physicians told him nothing could be done. He started to expand his research beyond Western Medicine, into the world of energy and cellular therapy, and healed himself.

Dr. Jerry Tennant, MD, MD(H), PScD, is the founder of The Tennant Institute for Integrative Medicine, a world-renowned physician and integrative health practitioner, and the inventor of the Tennant BioModulator®.

Dr. Jerry Tennant is a true Renaissance man. He is a teacher, inventor, healer, scholar, humanitarian, innovator, and entrepreneur — those are just a few of the ways we describe Dr. Tennant who has led a remarkable life dedicated to healing and innovation, which has altered the paradigm of western medicine. People from around the world travel to the Tennant Institute for Integrative Medicine in Colleyville, Texas, to seek out and benefit from his healing expertise.[7]

91.    Dr. Tennant has been injured by Counter-Defendants' conduct in an amount to be proven at trial.

---

[6]    Senergy, https://senergy.us/educationcenter/tennant-protocols/ (last visited Aug. 26, 2024).

[7]    *E.g.,* Senergy, https://store.senergy.us/collections/biomodulator(r)-pro/products/pro-crystal-wave-mini-bundle (last visited Aug. 26, 2024).

**Count VI:   Breach of Contract (Against Scott)**

92.    Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

93.    The License Agreements provided that Dr. Tennant would grant Scott rights and license to market and distribute his property in exchange for royalties to be paid to Dr. Tennant.

94.    The License Agreements also provided that Scott would (i) keep an accurate account of revenue generated from sales of Tennant BioModulator® devices; (ii) render a statement of such sales in writing to Dr. Tennant within thirty (30) days after the end of each calendar month; (iii) pay Dr. Tennant the amount of royalties accrued during the corresponding month; and, (iv) refrain from, either directly or indirectly, divulging, disclosing, communicating, or using for personal benefit, any information that is proprietary to Dr. Tennant and Dr. Tennant's employees, agents, and representatives in any manner.

95.    Dr. Tennant fully performed his obligations.

96.    Scott breached the License Agreements by failing to render statements in writing to Dr. Tennant within thirty (30) days after the end of each calendar month, by failing to pay Dr. Tennant the correct amount of royalties, by failing to keep an accurate account of revenue generated from sales of Tennant BioModulator® devices, and by using Dr. Tennant's and TDA's proprietary information for his own

personal benefit.

97.    Scott's breaches caused injury to Dr. Tennant, which resulted in damages in excess of $2 million.

98.    In addition, Dr. Tennant is entitled to recover reasonable and necessary attorney fees under Chapter 38 of the Texas Civil Practices and Remedies Code.

**Count VII:  Promissory Estoppel (Against Scott and Senergy)**

99.    Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

100.   In the event the Court finds there was no contractual relationship between Dr. Tennant and Scott, Counter-Plaintiffs assert an alternative claim for promissory estoppel.

101.   Counter-Defendants promised Counter-Plaintiffs that Counter-Defendants would fairly and accurately compensate Counter-Plaintiffs for rights to market Counter-Plaintiffs' products.

102.   Counter-Plaintiffs relied on Counter-Defendants' promise by permitting Counter-Defendants to market products bearing the Tennant Marks. Because of the nature of the promise, Counter-Plaintiffs' reliance was both reasonable and substantial.

103.   Counter-Defendants knew, or reasonably should have known, that Counter-Plaintiffs would rely on Counter-Defendants' promise.

43

104.   Injustice to Counter-Plaintiffs can be avoided only if Counter-Defendants' promise is enforced.

105.   Counter-Plaintiffs' reliance on Counter-Defendants' promise resulted in economic injury to Counter-Plaintiffs, who did not receive the full amount of royalties for which they are entitled.

106.   Counter-Plaintiffs seek damages within the jurisdictional limits of this Court.

107.   Counter-Plaintiffs are entitled to recover reasonable and necessary attorney fees under Texas Civil Practice & Remedies Code section 38.001(8) because this suit is for promissory estoppel.

**Count VIII: Quantum Meruit (Against Scott and Senergy)**

108.    Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

109.   In the event the Court finds there was no contractual relationship between Counter-Plaintiffs and Counter-Defendants, Counter-Plaintiffs assert an alternative claim for quantum meruit.

110.   Counter-Plaintiffs provided Counter-Defendants with the rights and license to market Counter-Plaintiffs' products, including products bearing the Tennant Marks.

111.   Counter-Defendants accepted the license and marketed the products.

112.    Counter-Defendants knew or should have known that Counter-Plaintiffs expected full and accurate compensation.

113.    Counter-Defendants failed to provide Counter-Plaintiffs with full and accurate compensation for Counter-Defendants' right to market Counter-Plaintiffs' products.

114.    Counter-Defendants owe Counter-Plaintiffs the difference between the full and accurate compensation owed to Counter-Plaintiffs versus what was actually paid to Counter-Plaintiffs.

115.    Counter-Plaintiffs are entitled to recover reasonable and necessary attorney fees under Texas Civil Practice & Remedies Code section 38.001(1) to (3) because this suit involves services and materials.

**Count IX: Fraud; Fraudulent Concealment (Against Scott and Senergy)**

116.    Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

117.    Counter-Defendants misrepresented and concealed facts related to the total sales of Counter-Plaintiffs' products.

118.    Counter-Defendants owed a duty to disclose correct and accurate information related to total sales to Counter-Plaintiffs.

119.    The information was material because the number of products sold determined the royalties to be paid to Counter-Plaintiffs, pursuant to the Licensing

Agreements.

120.    Counter-Defendants knew Counter-Plaintiffs were ignorant of the information and did not have an equal opportunity to discover the truth. In fact, Counter-Defendants were the only party in possession of the information necessary to calculate royalties due to Counter-Plaintiffs.

121.    Counter-Defendants deliberately remained silent, failed to disclose the information, and made intentional misrepresentations about the number of products sold. In doing so, Counter-Defendants intended for Counter-Plaintiffs to rely upon Counter-Defendants' fraudulent misrepresentations and fraudulent concealments to accept substantially smaller sums for royalties, than what Counter-Defendants, in fact, owed.

122.    Counter-Plaintiffs reasonably and justifiably relied on Counter-Defendants' fraudulent misrepresentations and deliberate silence. Counter-Plaintiffs relied upon Counter-Defendants' accounting of monthly sales to determine the amount of royalties due to Dr. Tennant and such information was only known by Counter-Defendants. Moreover, Counter-Defendants owed a fiduciary duty to Counter-Plaintiffs. Additionally, Scott is Dr. Tennant's stepson and Dr. Tennant was justified in relying on Scott to fully disclose Counter-Defendants' sales of Counter-Plaintiffs' products.

123.    Counter-Defendants' fraudulent misrepresentations and fraudulent

concealment proximately caused injury, to Counter-Plaintiffs, which resulted in damages.

124.    Counter-Plaintiffs seek damages within the jurisdictional limits of this Court.

125.    Counter-Plaintiffs' injuries resulted from Counter-Defendants' actual fraud, gross negligence, and/or malice, which entitles Counter-Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

**Count X:    Money Had and Received (Against Scott and Senergy)**

126.    Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

127.    By unlawfully diverting Counter-Plaintiffs' royalty payments, Counter-Defendants hold money that belongs to Counter-Plaintiffs in equity and good conscience.  Counter-Plaintiffs are entitled to recover such money.

**Count XI:    Accounting (Against Scott and Senergy)**

128.    Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

129.    At all times, Counter-Defendants and Counter-Plaintiffs had a contractual and fiduciary relationship.  The facts and accounts here are so complex that adequate relief cannot be obtained through standard legal remedies.  Counter-Plaintiffs request equitable relief permitting an accounting of Counter-Defendants

records as they relate to Counter-Defendants' sale of Counter-Plaintiffs' products, including those products bearing the Tennant Marks. Justice and fairness require the accounting.

## Count XII: Constructive Trust and Disgorgement (Against Scott and Senergy)

130. Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

131. Counter-Defendants' actions described herein were fraudulent and clear and serious violations of state and federal law. Counter-Defendants have wrongfully profited from their misconduct, as described above.

132. Accordingly, Counter-Plaintiffs request the Court place a constructive trust on profits, proceeds, funds, and property obtained or otherwise realized by Counter-Plaintiffs as a result of their fraud and violations of state and federal law. Further, Counter-Plaintiffs request that all profits, proceeds, funds, and property obtained or otherwise realized by Counter-Defendants as a result of their fraud and violations of state and federal law be disgorged and paid to Counter-Plaintiffs.

## Count XIII: Permanent Injunction (Against Scott and Senergy)

133. Counter-Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

134. Counter-Defendants have demonstrated a willingness to cause irreparable harm to Counter-Plaintiffs' reputation, property, and rights. Counter-

Defendants' conduct is without right, entitlement, or justification. Counter-Plaintiffs have and will continue to be damaged by Counter-Defendants if allowed to continue to engage in the above-described actions.

135. Counter-Plaintiffs have no adequate remedy at law for the injuries just described. The injuries and losses are continuing. The property and rights involved are unique and irreplaceable, so that it will be difficult to accurately measure in monetary terms the damages caused by Counter-Defendants' conduct.

136. Counter-Plaintiffs are therefore entitled to a preliminary and/or permanent injunction about Counter-Defendants enjoining them from the actions described above, including but not limited to ordering Counter-Defendants and any of Counter-Defendants' agents, representatives, and employees to: (1) discontinue and refrain from using the Tennant Marks, or any other mark confusingly similar to the Tennant Marks, in conjunction with the advertisement and sale of medical devices, medical device accessories, and other related products; (2) remove the Tennant Marks or any product bearing the Tennant Marks from all written or electronically published advertising and marketing materials or media; (3) remove all products bearing the Tennant Marks from the Senergy website; and, (4) discontinue and refrain from engaging in further acts of trademark infringement, or false advertising and representations regarding their products. 15 U.S.C. § 1116; TEX. BUS. & COM. CODE §§ 16.103(a), 16.104(b).

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiffs/ Counter-Defendants Marten Group, Inc. d/b/a Senergy Medical Group and Scott E. Tennant take nothing by their suit and that this Court enter judgment in Defendant/Counter-Plaintiffs' favor.  Further, Defendants/ Counter-Plaintiffs Jerald L. Tennant, M.D. and Tennant Devices and Accessories, LLC pray that the Court award the following relief against Plaintiffs/ Counter-Defendants:

a.  Actual damages;

b.  Statutory damages;

c.  Exemplary damages;

d.  An accounting;

e.  Imposition of a constructive trust on all profits, proceeds, funds, and property obtained or otherwise realized by Counter-Plaintiffs as a result of their fraud and violations of state and federal law;

f.  Disgorgement of all profits, proceeds, funds, and property obtained or otherwise realized by Counter-Plaintiffs as a result of their fraud and violations of state and federal law;

g.  Preliminary and permanent injunctive relief ordering Plaintiffs/ Counter-Defendants to:

(i)     discontinue and refrain from using the Tennant Marks, or any other mark confusingly similar to Dr. Tennant or the Tennant Marks, in conjunction with the advertisement and sale of medical devices, medical device accessories, and other related products;

(ii)    remove the Tennant Marks or any product bearing the Tennant Marks from all written or electronically published advertising and

marketing materials or media;

    (iii)   remove all products bearing the Tennant Marks from the Senergy website; and,

    (iv)   discontinue and refrain from engaging in further acts of trademark infringement, or false advertising and representations regarding their products;

    (v)   discontinue using Dr. Tennant's name or likeness in connection with the marketing or sell of medical devices by Senergy;

h.  Reasonable attorney's fees;

i.  Pre- and post-judgment interest;

j.  Court costs; and,

k.  All other further relief to which Defendants/ Counter-Plaintiffs are justly entitled.

Dated:  August 27, 2024          Respectfully submitted,

                    */s/ Tyler L. Farmer*
                    Tyler L. Farmer (admitted *Pro Hac Vice*)
                    Washington Bar No. 39912
                    Ariel A. Martinez (admitted *Pro Hac Vice*)
                    Washington Bar No. 54869
                    Chelsey L. Mam (admitted *Pro Hac Vice*)
                    Washington Bar No. 44609
                    **BRYAN CAVE LEIGHTON PAISNER LLP**
                    999 3rd Ave., Suite 4400
                    Seattle, WA 98104
                    Tel: (206) 623-1700
                    Fax: (206) 623-8717
                    Tyler.farmer@bclplaw.com
                    Ariel.martinez@bclplaw.com
                    Chelsey.mam@bclplaw.com

Justin D. Hanna
Texas Bar No. 24095726
**Bryan Cave Leighton Paisner LLP**
2200 Ross Avenue, Suite 4200W
Dallas, TX  75201-7965
Tel: (214) 721-8000
Fax: (214) 721-8100
Email: Justin.Hanna@bclplaw.com

**ATTORNEYS FOR DEFENDANTS**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record through CM/ECF on August 27, 2024.


By: _/s/ Tyler L. Farmer_
       Tyler L. Farmer

# EXHIBIT A

**Int. Cl.: 10**

**Prior U.S. Cls.: 26, 39 and 44**

**United States Patent and Trademark Office**

Reg. No. 3,157,112

Registered Oct. 17, 2006

## TRADEMARK
### PRINCIPAL REGISTER



TENNANT FAMILY, LTD. (TEXAS CORPORA-
TION)
3009 EDGEWOOD LANE
COLLEYVILLE, TX 76034

FOR: MEDICAL APPARATUS AND INSTRU-
MENTS FOR USE IN ELECTROMAGNETIC RESO-
NANCE THERAPY, NAMELY, CYBERNETIC
BIOFEEDBACK DEVICES, INTERACTIVE NEURO-
MUSCULAR SIMULATORS, AND DIAGNOSTIC
TESTING EQUIPMENT, IN CLASS 10 (U.S. CLS. 26,
39 AND 44).

FIRST USE 1-24-2005; IN COMMERCE 1-24-2005.

OWNER OF U.S. REG. NO. 1,266,232.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "BIOMODULATOR", APART FROM
THE MARK AS SHOWN.

THE MARK CONSISTS OF THE WORDS "TEN-
NANT BIOMODULATOR" IN STYLIZED LETTER-
ING, WITH THE LETTER "T" ON A PEDESTAL AND
SURROUNDED BY AN OVAL.

SER. NO. 78-655,612, FILED 6-21-2005.

EVELYN BRADLEY, EXAMINING ATTORNEY



# United States of America

## United States Patent and Trademark Office

# HEALING IS VOLTAGE

**Reg. No. 4,334,430**
**Registered May 14, 2013**

TENNANT FAMILY, LTD. (TEXAS CORPORATION)
3009 EDGEWOOD LANE
COLLEYVILLE, TX 76034

**Int. Cl.: 16**

FOR: A SERIES OF BOOKS, WRITTEN ARTICLES, HANDOUTS AND WORKSHEETS IN THE FIELD OF ENERGY MEDICINE AND HEALTHCARE, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

**TRADEMARK**

**PRINCIPAL REGISTER**

FIRST USE 7-2-2007; IN COMMERCE 7-2-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-731,084, FILED 9-17-2012.

MATTHEW MCDOWELL, EXAMINING ATTORNEY



Acting Director of the United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.



# United States of America
### United States Patent and Trademark Office

# TENNANT BIOTRANSDUCER

**Reg. No. 4,382,782**

**Registered Aug. 13, 2013**

TENNANT FAMILY, LTD. (TEXAS CORPORATION)
3009 EDGEWOOD LANE
COLLEYVILLE, TX 76034

**Int. Cl.: 10**

**TRADEMARK**

**PRINCIPAL REGISTER**

FOR: MEDICAL APPARATUS AND INSTRUMENTS FOR USE IN ELECTROMAGNETIC RESONANCE THERAPY, NAMELY, CYBERNETIC BIOFEEDBACK DEVICES, INTERACTIVE NEUROMUSCULAR SIMULATORS, AND DIAGNOSTIC TESTING EQUIPMENT, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 11-9-2009; IN COMMERCE 11-9-2009.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 3,157,112.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "BIOTRANSDUCER", APART FROM THE MARK AS SHOWN.

SEC. 2(F) AS TO "TENNANT".

SER. NO. 85-731,087, FILED 9-17-2012.

MATTHEW MCDOWELL, EXAMINING ATTORNEY



Acting Director of the United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.



# United States of America

## United States Patent and Trademark Office

# HEALING IS VOLTAGE

**Reg. No. 4,878,439**

**Registered Dec. 29, 2015**

TENNANT FAMILY, LTD. (TEXAS LIMITED PARTNERSHIP)
3009 EDGEWOOD LANE
COLLEYVILLE, TX 76034

**Int. Cl.: 41**

FOR: PROVIDING OF LECTURES AND SEMINARS IN THE FIELD OF ENERGY MEDICINE AND HEALTHCARE, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

**SERVICE MARK**

FIRST USE 7-31-2010; IN COMMERCE 7-31-2010.

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 4,334,430.

SN 86-424,790, FILED 10-15-2014.

ROBERT C. CLARK JR., EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

<div style="border:1px solid black">

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

</div>

**Requirements in the First Ten Years\***
**What and When to File:**

> ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.

> ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office
(USPTO). The time periods for filing are based on the U.S. registration date (not the international registration
date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to
those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international
registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the
underlying international registration at the International Bureau of the World Intellectual Property Organization,
under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated
from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal
forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark
owners/holders who authorize e-mail communication and maintain a current e-mail address with the
USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark
Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms
available at** http://www.uspto.gov.

# EXHIBIT B

# Royalty Agreement

This Royalty Agreement (Agreement) is made on June 15, 2003 by and between Jerry Tennant, 3009 Edgewood Lane, Colleyville, Texas 76034, (hereinafter referred to as "Grantor") and Scott Tennant, 1009 Glade Rd Ste C, Colleyville, Texas 76034, (hereinafter referred to as "Grantee").

Whereas the Grantor owns and has the right to grant interest in Tennant Biomodulator (hereinafter called the property). Grantors right was issued to the Grantor on June 15, 2003, by 01/02/2003; and

Whereas the Grantee desires to make use of the Grantors property for a specific period by paying a percentage of Grantees profits as Royalty to the Grantor apart from the lump sum payment Grantee pays the Grantor for the permission to use Grantors Property.

It is therefore agreed between the Parties as follows:

1. **GRANTING OF RIGHTS**. The Grantor hereby grants to the Grantee the rights and license, in the United States of America and its territories, along with any worldwide maket , to use the Grantors Property for a period of 20 years and renewable yearly thereafter automatically without written objection from either party.

2. **GRANTORS REPRESENTATIONS AND WARRANTIES.**

   a. Grantor represents and warrants that it owns the Property; that it has the right to grant any license or permission for using Grantors Property for which Grantor exercises its option hereunder; and that it has the right to enter into this Agreement.

   b. Substantially contemporaneously with the signing of this Agreement, Grantor shall deliver to Grantee, all relevant documents which are necessary for the use of Grantors Property.

   c.  Grantor shall indemnify and hold Grantee harmless from all losses, claims, damages and expenses resulting from the breach of its representations and warranties.

## 3. GRANTEES REPRESENTATIONS AND WARRANTIES.

   a.  Grantee shall, for a period of 20 years from the effective date of this Agreement, maintain the Grantors Property in confidence, with exercise of the same degree of care Grantee exercises with respect to Grantee's own proprietary information.

   b.  In the event Grantee becomes aware of any act or event which has or may have the effect of compromising the confidentiality with regard to Grantors Property, such as a Court Order requiring Grantee to produce documentation with regard to Grantors Property, Grantee shall promptly notify Grantor thereof and consult with Grantor with respect to the manner in which such compromise can be mitigated.

   c.  To the extent that Grantee's negligence is the cause of any personal injury or property damage suffered by Grantee, any of its affiliates or subsidiaries and/or any of their respective employees in the course of using the Grantors Property hereunder, Grantee hereby indemnifies Grantor and shall hold Grantor harmless against any such claims, demands or losses for personal injury or property damage in the course of using the Grantors Property, provided that Grantee is given prompt written notice of any such claim and has the right to control the defense of any such claim including the right to compromise any such claim on such terms as Grantee deems reasonable.

4. **ROYALTY**. As full consideration for the rights and licenses granted to Grantee hereunder, Grantee agrees to pay Grantor:

    a.  $0.00 as lump sum at the time of execution of this Agreement; and

    b.  $350 of the Grantees Net Proft from new cusomer's purchase of a Tennant Biomodulator.

5. **NET PROFITS**. "Net Profits" shall mean the total revenue received by Grantee from the use of Grantors Property, less:

    a.  all direct manufacturing and marketing expenses, including commissions payable to third parties;

    b.  all direct overhead and general administrative expenses, excluding taxes; and

    c.  all other amounts agreed to be excluded by written approval of the Grantor.

6. **PAYMENT OF ROYALTIES.** The Grantee shall keep an accurate account of the revenue generated by using Grantors Property under the scope of the right granted hereunder and shall render a statement in writing to the Grantor within 30-days after the end of each calendar month during the term of this Agreement, and shall, concurrently with the rendering of such statement, pay to the Grantor the amount of the Royalties accrued during the corresponding calendar month. The Grantor shall have the right, not more often than once in any calendar year, to have an independent certified public accountant acceptable to Grantee examine the books of the Grantee to verify the Royalty statements and Royalties due to the Grantor pursuant to this Agreement. The cost of such examination

shall be borne by the Grantor, unless such examination determines that the Grantee has underpaid the Royalties due hereunder; in which event, the Grantee shall pay the cost of such examination.

## 7. GRANTEES DEFAULT:

    a. If the Grantee fails to render statements or to make payment of Royalties as herein provided, the Grantor may on 30 days' written notice to the Grantee terminate this Agreement and the rights and license granted hereunder. If such default is not cured within such 30 days, this Agreement shall thereafter terminate upon the date set in such notice without prejudice, however, to the Royalties due to the Grantor hereunder.

    b. If the Grantee shall abandon the exploitation of the Grantors Property by failing for a period of one calendar year to pay Grantor a minimum royalty of $0.00. The Grantor may on 30 days' written notice to the Grantee terminate this Agreement and the rights granted hereunder without prejudice, unless Grantee, during said 30-day period, pays Grantor the difference between the minimum Royalty amount and the Royalties actually paid. Any termination by Grantor hereunder shall be without prejudice to the Royalties due to the Grantor hereunder.

## 8. INDEMNITY.
Except for any breach of this Agreement, neither party hereto shall be liable for any claims for personal injury or property damage suffered by the other party hereto or any third party resulting from any activity of either of the parties under or relating to this Agreement.

## 9. CONFIDENTIALITY.
Grantee and its employees, agents, or representatives will not at any time or in any manner, either directly or indirectly, use for the personal benefit of Grantee, or divulge, disclose, or communicate in any manner, any information that is proprietary to Grantor and its employees, agents, and representatives and will protect such

information and treat it as strictly confidential. The parties' obligations of confidentiality hereunder shall not apply to information either party possessed on the effective date of this Agreement and was not previously received from the other party hereto. This provision will continue to be effective after the termination of this Agreement.

10. **TERMINATION.** The Grantee may terminate this Agreement by giving notice thereof to the Grantor if:

a. The Grantor makes a general assignment of substantially all of its assets for the benefit of creditors; or,

b. A petition in bankruptcy or under any insolvency law is filed by or against the Grantor and such petition is not dismissed within sixty (60) days after it has been filed; or,

c. The Grantor commits a breach of a material obligation hereunder; provided, however:

    i. In the case of a breach by the Grantor which is capable of being cured, the Grantee may not terminate this Agreement unless and until the Grantor shall have failed to correct such breach within thirty (30) days after it shall have been served with a notice specifying the breach, requiring that such breach be corrected, and stating the Grantee's intention to terminate the Agreement if the breach is not corrected within such thirty (30) day period; and,

    ii. If the breach is not one which can reasonably be corrected within thirty (30) days, the Grantee may not terminate this Agreement unless the Grantor fails to begin diligent efforts to correct such breach within such thirty (30) day period and such breach is not completely corrected within one hundred eighty (180) days after service of the foregoing notice.

**11. ASSIGNMENT.** This Agreement may not be assigned by either party without the prior written consent of the other party.

**12. SEVERABILITY.** This Agreement shall be severable. In the event any provision(s) of this Agreement is deemed by any court of competent jurisdiction to be unenforceable, illegal or contrary to public policy, the provision found to be unenforceable, illegal or contrary to public policy shall be stricken and the remainder of the Agreement shall remain in force.

**13. WAIVER.** Failure of either party at any time or from time to time to exercise any right under this Agreement shall not be deemed a waiver of such right nor shall it prevent the party from subsequently asserting or exercising such right.

**14. GOVERNING LAW.** This Agreement shall be construed and governed according to the law of the State of Texas.

**15. NOTICE.** Any notices to be given under this Agreement by either party to the other may be effected either by personal delivery in writing or by mail, registered or certified, postage prepaid with return receipt requested. Mailed notices must be addressed to the addresses of the parties as they appear in the introductory paragraph of this Agreement, but each party may change address by written notice in accordance with this paragraph.

**16. ENTIRE AGREEMENT.** This Agreement and any attachments hereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, whether oral or written. No modification or claimed waiver of any of the provisions hereof shall be valid unless in writing and signed by the parties against whom such modification or waiver is sought to be

enforced.

17. **OTHER RIGHTS.** Nothing contained in this Agreement shall be construed as conferring by implication, estoppels, or otherwise upon either party any license or other right except the licenses and rights expressly granted hereunder to that party.

18. **ACCEPTANCE.** Each party hereby accepts the licenses and rights granted to it by a party under this Agreement subject to all of the terms and conditions of this Agreement.

In witness whereof the parties have executed this Agreement.

Jerry Tennant                    Scott Tennant

# EXHIBIT C

# Royalty Agreement

This Royalty Agreement (Agreement) is made on October 01, 2012 by and between Jerry Tennant, 3009 Edgewood Lane, Colleyville, Texas 76034, (hereinafter referred to as "Grantor") and Scott Tennant, 9901 Valley Ranch Pkwy E, Ste 1009, Irving, Texas 75063, (hereinafter referred to as "Grantee").

Whereas the Grantor owns and has the right to grant interest in Tennant Biomodulator PRO (hereinafter called the property). Grantors right was issued to the Grantor on October 01, 2012, by Jerry Tennant; and

Whereas the Grantee desires to make use of the Grantors property for a specific period by paying a percentage of Grantees profits as Royalty to the Grantor apart from the lump sum payment Grantee pays the Grantor for the permission to use Grantors Property.

It is therefore agreed between the Parties as follows:

1. **GRANTING OF RIGHTS**. The Grantor hereby grants to the Grantee the rights and license, in the United States of America and its territories, to use the Grantors Property for a period of 20 years and renewabe yearly thereafter automatically without written objection from either party.

2. **GRANTORS REPRESENTATIONS AND WARRANTIES.**

   a. Grantor represents and warrants that it owns the Property; that it has the right to grant any license or permission for using Grantors Property for which Grantor exercises its option hereunder; and that it has the right to enter into this Agreement.

   b. Substantially contemporaneously with the signing of this Agreement, Grantor shall deliver to Grantee, all relevant documents which are necessary for the use of

Grantors Property.

    c.  Grantor shall indemnify and hold Grantee harmless from all losses, claims, damages and expenses resulting from the breach of its representations and warranties.

## 3.  GRANTEES REPRESENTATIONS AND WARRANTIES.

    a.  Grantee shall, for a period of 20 years from the effective date of this Agreement, maintain the Grantors Property in confidence, with exercise of the same degree of care Grantee exercises with respect to Grantee's own proprietary information.

    b.  In the event Grantee becomes aware of any act or event which has or may have the effect of compromising the confidentiality with regard to Grantors Property, such as a Court Order requiring Grantee to produce documentation with regard to Grantors Property, Grantee shall promptly notify Grantor thereof and consult with Grantor with respect to the manner in which such compromise can be mitigated.

    c.  To the extent that Grantee's negligence is the cause of any personal injury or property damage suffered by Grantee, any of its affiliates or subsidiaries and/or any of their respective employees in the course of using the Grantors Property hereunder, Grantee hereby indemnifies Grantor and shall hold Grantor harmless against any such claims, demands or losses for personal injury or property damage in the course of using the Grantors Property, provided that Grantee is given prompt written notice of any such claim and has the right to control the defense of any such claim including the right to compromise any such claim on such terms as Grantee deems reasonable.

4. **ROYALTY**. As full consideration for the rights and licenses granted to Grantee hereunder, Grantee agrees to pay Grantor:

   a.  $0.00 as lump sum at the time of execution of this Agreement; and

   b.  $550 of the Grantees Net Profits frm new customer' purchase of a Tennant Biomoulator PRO.

5. **NET PROFITS**. "Net Profits" shall mean the total revenue received by Grantee from the use of Grantors Property, less:

   a.  all direct manufacturing and marketing expenses, including commissions payable to third parties;

   b.  all direct overhead and general administrative expenses, excluding taxes; and

   c.  all other amounts agreed to be excluded by written approval of the Grantor.

6. **PAYMENT OF ROYALTIES.** The Grantee shall keep an accurate account of the revenue generated by using Grantors Property under the scope of the right granted hereunder and shall render a statement in writing to the Grantor within 30-days after the end of each calendar month during the term of this Agreement, and shall, concurrently with the rendering of such statement, pay to the Grantor the amount of the Royalties accrued during the corresponding calendar month. The Grantor shall have the right, not more often than once in any calendar year, to have an independent certified public accountant acceptable to Grantee examine the books of the Grantee to verify the Royalty statements

and Royalties due to the Grantor pursuant to this Agreement. The cost of such examination shall be borne by the Grantor, unless such examination determines that the Grantee has underpaid the Royalties due hereunder; in which event, the Grantee shall pay the cost of such examination.

## 7. GRANTEES DEFAULT:

    a. If the Grantee fails to render statements or to make payment of Royalties as herein provided, the Grantor may on 30 days' written notice to the Grantee terminate this Agreement and the rights and license granted hereunder. If such default is not cured within such 30 days, this Agreement shall thereafter terminate upon the date set in such notice without prejudice, however, to the Royalties due to the Grantor hereunder.

    b. If the Grantee shall abandon the exploitation of the Grantors Property by failing for a period of one calendar year to pay Grantor a minimum royalty of $0.00. The Grantor may on 30 days' written notice to the Grantee terminate this Agreement and the rights granted hereunder without prejudice, unless Grantee, during said 30-day period, pays Grantor the difference between the minimum Royalty amount and the Royalties actually paid. Any termination by Grantor hereunder shall be without prejudice to the Royalties due to the Grantor hereunder.

## 8. INDEMNITY. Except for any breach of this Agreement, neither party hereto shall be liable for any claims for personal injury or property damage suffered by the other party hereto or any third party resulting from any activity of either of the parties under or relating to this Agreement.

## 9. CONFIDENTIALITY. Grantee and its employees, agents, or representatives will not at any time or in any manner, either directly or indirectly, use for the personal benefit of Grantee, or divulge, disclose, or communicate in any manner, any information that is

proprietary to Grantor and its employees, agents, and representatives and will protect such information and treat it as strictly confidential. The parties' obligations of confidentiality hereunder shall not apply to information either party possessed on the effective date of this Agreement and was not previously received from the other party hereto. This provision will continue to be effective after the termination of this Agreement.

**10. TERMINATION.** The Grantee may terminate this Agreement by giving notice thereof to the Grantor if:

**a.** The Grantor makes a general assignment of substantially all of its assets for the benefit of creditors; or,

**b.** A petition in bankruptcy or under any insolvency law is filed by or against the Grantor and such petition is not dismissed within sixty (60) days after it has been filed; or,

**c.** The Grantor commits a breach of a material obligation hereunder; provided, however:

**i.** In the case of a breach by the Grantor which is capable of being cured, the Grantee may not terminate this Agreement unless and until the Grantor shall have failed to correct such breach within thirty (30) days after it shall have been served with a notice specifying the breach, requiring that such breach be corrected, and stating the Grantee's intention to terminate the Agreement if the breach is not corrected within such thirty (30) day period; and,

**ii.** If the breach is not one which can reasonably be corrected within thirty (30) days, the Grantee may not terminate this Agreement unless the Grantor fails to begin diligent efforts to correct such breach within such thirty (30) day period and such breach is not completely corrected within one hundred eighty (180) days after service of the foregoing notice.

**11. ASSIGNMENT.** This Agreement may not be assigned by either party without the prior written consent of the other party.

**12. SEVERABILITY.** This Agreement shall be severable. In the event any provision(s) of this Agreement is deemed by any court of competent jurisdiction to be unenforceable, illegal or contrary to public policy, the provision found to be unenforceable, illegal or contrary to public policy shall be stricken and the remainder of the Agreement shall remain in force.

**13. WAIVER.** Failure of either party at any time or from time to time to exercise any right under this Agreement shall not be deemed a waiver of such right nor shall it prevent the party from subsequently asserting or exercising such right.

**14. GOVERNING LAW.** This Agreement shall be construed and governed according to the law of the State of Texas.

**15. NOTICE.** Any notices to be given under this Agreement by either party to the other may be effected either by personal delivery in writing or by mail, registered or certified, postage prepaid with return receipt requested. Mailed notices must be addressed to the addresses of the parties as they appear in the introductory paragraph of this Agreement, but each party may change address by written notice in accordance with this paragraph.

**16. ENTIRE AGREEMENT.** This Agreement and any attachments hereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, whether oral or written. No modification or claimed waiver of any of the provisions hereof shall be valid unless in

writing and signed by the parties against whom such modification or waiver is sought to be enforced.

**17. OTHER RIGHTS.** Nothing contained in this Agreement shall be construed as conferring by implication, estoppels, or otherwise upon either party any license or other right except the licenses and rights expressly granted hereunder to that party.

**18. ACCEPTANCE.** Each party hereby accepts the licenses and rights granted to it by a party under this Agreement subject to all of the terms and conditions of this Agreement.

In witness whereof the parties have executed this Agreement.

Jerry Tennant                            Scott Tenannt

# EXHIBIT D

**Modification of Royalty Agreement**

Whereas on October 1, 2012 and June 15, 2003, agreements were made between Senergy Medical Group and/or Scott Tennant as Grantee from Jerry Tennant as Grantor:  see attached exhibits.

This agreement modifies those agreements for payments of royalties for Grantor's proprietary interest in the Tennant BioModulators.

The said agreements may be cancelled by either party, without prejudice and for any reason with thirty days' written notice.

The agreements may be cancelled immediately and without prejudice upon the filing of bankruptcy by Scott Tennant and/or Senergy Medical Group and shall not be considered assets of either upon filing of bankruptcy.

The agreements shall not be considered personal assets of Scott Tennant upon his death, disability, or divorce but all rights and possession of said proprietary interest return immediately to Grantor upon the occurrence of any of these events.

These royalty contracts are not transferrable upon sale of Senergy Medical Group without written permission of Grantor.

Royalties shall be fifteen percent (15%) of the retail sales price of any device including accessories that bear the trademarked name "Tennant®" including accessories for the Tennant BioModulator, BioModulator Pro, and BioTransducer.

Royalty of fifteen percent (15%) of retail sales price shall also be paid on all sales of devices recommended by Grantor to Senergy, e.g., the Eagle Guardian and Eagle Remedy Maker, pH Prescription water devices, etc.

Agreed on March 15, 2016

Jerry Tennant

_____

Scott Tennant for himself personally and for Senergy Medical Group

# EXHIBIT E

**Modification of Royalty Agreement**

4/22/2016

Whereas on October 1, 2012 and June 15, 2012, agreements were made between Senergy Medical Group and / or Scott Tennant as Grantee from Jerry Tennant as Grantor; see attached exhibits.

This agreement modifies those agreements for payments of royalties for Grantor's proprietary interest in the Tennant Biomodulators.

The said agreements may be cancelled by either party, without prejudice and for any reason within thirty days written notice.
The agreements may be cancelled immediately and without prejudice upon the filing of bankruptcy by Scott Tennant and / or Senergy Medical Group and shall not be considered assets of either upon filing for bankruptcy.

The agreements shall not be considered personal assets of Scott Tennant upon his death, disability, or divorce but all rights and possession of said proprietary interest return immediately to Grantor upon the occurrence of any of these events.

These royalty contracts are not transferrable upon sale of Senergy Medical Group without permission of Grantor.

Royalties are based on the following as of 4/22/2016;

**Tennant Biomodulator (current retail $2,250 with applicable QuickSTART discount)**
50 Royalty per new device sold at retail
$200 IP per new device sold at retail
$100 Training course officiating

**Tennant Biomodulator PRO (Current retail $5,000 with applicable QuickSTART discount)**
50 Royalty per new device sold at retail
$400 IP per new device sold at retail
$100 Training course officiating

**Biotransducer CrystalWave (Current retail $3,000)**
$400

If any change in retail pricing occurs, the IP, Royalty will be adjusted accordingly to follow the current percentage of retail.

Agreed on April 22, 20016

_____

Jerry Tennant

_____

Scott Tennant for himself personally and for Senergy Medical Group

# EXHIBIT F

Jerry Tennant as Grantor; 3009 Edgewood Lane; Colleyville, Texas 76034

**June 21, 2024**


Scott Tennant for himself personally and for Senergy, Senergy Wellness Group, etc. ("Senergy")

9901 Valley Ranch Pkwy E #1009; Irving, Texas 75063

**Re: Termination of Royalty Agreement and all Amendments**

Dear Scott Tennant, for himself personally and for Senergy Medical Group and/or Senergy Wellness Group:

This is to notify you that I have elected to terminate the "Royalty Agreement" contracts and all amendments with you. This includes but is not limited to the original agreement dated June 15, 2003, and subsequent agreements and offers dated October 1, 2012, March 15, 2016, and April 22, 2016. This license and distribution termination applies to Scott Tennant personally as well as for Senergy Medical Group and/or Senergy Wellness Group and any employee, contractor, or any reseller (like Biohealth Energy Systems Ltd) or affiliate (like Lisa Williams). Termination is effective immediately, as of June 21, 2024. Note that our contract and amendments allow for termination for any reason or no reason.

Grantor notes Scott Tennant / Senergy Medical Group and/or Senergy Wellness Group's failure to meet their contractual obligations.

**Audit:** In accordance with the terms of our agreement, you were required to provide detailed statements of sales monthly, which you have not done per the contract terms. You were also required to provide accurate record keeping so that the royalties due were accurate and transparent. A recent, comprehensive audit done by Jerry Tennant, utilizing several sources, has determined that Scott Tennant, Jerry Gutierrez, and Linda Taylor have committed fraud, intentional interference with business and contractual relations, breach of contract, unjust enrichment, and promissory estoppel.

This audit has come to the conclusion, for instance, that fraud has been committed at least since 2021. In that calendar year, the number of reported device sales for BM4p, BMTP, BTCW, and BT Pro devices were ALL underreported. For instance, recovered data shows that Senergy Medical Group and/or Senergy Wellness Group sold approximately 1300 devices but only reported 880 sales. In addition, regarding the BT Pro SKU data, year after year, it is clear from the manufacturing source that Senergy Medical Group and/or Senergy Wellness Group has underrepresented their sales, which lowers the amount of claimed royalties due.

Further, the audit likewise concluded that the royalty amounts were calculated using a proposed algorithm by Scott Tennant, never agreed to or signed by the Grantor. Grantor did not fully comprehend that Senergy Medical Group and/or Senergy Wellness Group was using this formula

until Q1'24, after Jerald Tennant repeatedly asked Senergy Medical Group and/or Senergy Wellness Group and Scott Tennant for sales numbers by SKU, including royalty calculations. It is Grantor's prerogative to set the licensing rates and fees, but Scott Tennant + Senergy Medical Group and/or Senergy Wellness Group took it upon themselves to pay using a non-approved algorithm, while hiding the fact that they were using that methodology. That said, even using the formulas proposed by Scott Tennant, the audit concluded that the amounts owed (on the underreported volume) were incorrectly calculated – and when Senergy Medical Group and/or Senergy Wellness Group was asked to re-audit the (2021-current numbers) in 1H'24, the errors were not corrected. For illustration, Senergy Medical Group and/or Senergy Wellness Group's final 're-audit' in early June 2024 claimed to have paid Grantor $414,350 in 2021, when in fact the IRS Form 1099 shows an actual payment of $350,900.

Finally, both versions of the 2016 contractual amendments required Senergy Medical Group and/or Senergy Wellness Group to adjust royalties paid against the MSRP—which never happened. Here are the known price changes on the relevant SKUs:

| Adjustments Agreed to: | Starting Retail: | Price Change: Nov-18 | % Change | Price Change: Jun-23 | % Change | Price Change: Mar-24 | % Change |
|---|---|---|---|---|---|---|---|
| BM4p (Biomodulator) | $2,250 | $2,750 | 22.2% | $3,250 | 44.4% | $2,999 | 33.3% |
| BMTP (Biomodulator Pro) | $5,000 | $5,000 | 0.0% | $6,000 | 20.0% | $7,650 | 53.0% |
| BTCW (CrystalWave) | $3,000 | $3,000 | 0.0% | $3,850 | 28.3% | $3,500 | 16.7% |
| BT Pro (Transducer Pro) | -- | $4,000 | | $4,850 | 21.3% | $5,500 | 37.5% |

Grantor provided Scott Tennant and Senergy Medical Group and/or Senergy Wellness Group every opportunity to remedy their accounting and fraud, but instead Scott Tennant and Senergy Medical Group and/or Senergy Wellness Group have conspired to continue their ruse.

Just for the 3 calendar years 2021-2023, Senergy Medical Group and/or Senergy Wellness Group and Scott Tennant personally owe Grantor an estimated $2,434,672, and that is without calculating the royalties owed for non Biomodulators and Transducers products sold. The amount owed to Grantor since 2016 through May 2024 appears to be well north of $5M.

**Cease Purchase and Name Use:** With this immediate notice of termination, you can no longer purchase or manufacture any device or product included within the scope of the contract and amendments; identify yourself as an authorized representative of Grantor verbally, on your website, in collateral, or otherwise; and any I.P. or branding license heretofore granted is likewise terminated.

Finally, you may no longer use, in any shape or form, Grantor's name, image and/or likeness.

**30-day Notice of Sales Termination**: In accordance with the terms and provisions of the contract, you have 30 days notice at which time you may no longer sell any device or product included within the scope of the contract and amendments.

You may contact me at the above address if you have any questions. My e-mail address is jltennant@mac.com.

Sincerely,

Jerry Tennant as Grantor