## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

MARTEN GROUP, INC. d/b/a
SENERGY MEDICAL GROUP and
SCOTT TENNANT,

     Plaintiffs,

v.

JERALD TENNANT, MD, JOHN
TENNANT, TERESA JESSEN
TENNANT, JARED TENNANT,
TENNANT DEVICES AND
ACCESSORIES, LLC, and
CURADOR,
LLC,
     Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Case No. 3:24-cv-01852

**JURY TRIAL DEMANDED**

## DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

I.      INTRODUCTION ...............................................................1

II.     BACKGROUND ................................................................2

     A.     Dr. Tennant's Extensive History of Medical Innovation.....................2

     B.     Dr. Tennant Grants Scott License Rights to Use Dr. Tennant's Marks...........................................................3

     C.     Dr. Tennant Diligently Protected the Tennant Marks.........................6

     D.     The Parties Enjoy 20 Years of Success from Dr. Tennant's Products..8

     E.     Senergy Infringes the Tennant Trademarks in Violation of Federal Law .............................................................................10

     F.     Procedural History...........................................................15

III.    LEGAL STANDARD .........................................................16

IV.    ARGUMENT.....................................................................17

     A.     Senergy Is Actively Infringing on Dr. Tennant's Trademarks ..........17

          1.     Dr. Tennant possesses a legally protectable trademark ............17

          2.     Because the trademarks are distinctive, they are protectable ...18

          3.     Dr. Tennant is the senior user of the trademarks .....................20

          4.     Senergy's Infringement Creates a Likelihood of Confusion ....23

          5.     There Is No Evidence for Scott's Defenses to Infringement....25

     B.     Dr. Tennant Has and Will Continue to Be Irreparably Harmed Absent an Injunction..........................................................27

C.    The Equities Favor Issuing a Preliminary Injunction ........................28

D.    The Public Will Be Served By the Injunction.....................................29

V.    CONCLUSION................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Burger King Corp. v. Mason,*
    710 F.2d 1480 (11th Cir. 1983) ....................................................................24

*Choice Hotels Int'l, Inc. v. Patel,*
    940 F. Supp. 2d 532 (S.D. Tex. 2013)......................................................28, 29

*Exxon Corp. v. Oxxford Clothes, Inc.,*
    109 F.3d 1070 (5th Cir. 1997). ...............................................................23, 26

*Fed. Sav. & Loan Ins. Corp. v. Dixon,*
    835 F.2d 554 (5th Cir. 1985) ......................................................................16

*Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC,*
    434 F. Supp. 3d 473 (E.D. Tex. 2020) ...................................................*passim*

*ICEE Distributors, Inc. v. J&J Snack Foods Corp.,*
    325 F.3d 586 (5th Cir. 1998) ......................................................................21

*Marten Group, Inc. d/b/a Senergy Medical Group v. Jerald Tennan, MD,*
    No. 3:24-cv-01852-E (filed July 21, 2024) ...................................................15

*Paulsson Geophysical Servs., Inc. v. Sigmar,*
    529 F.3d 303 (5th Cir. 2008) ......................................................................24

*Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.,*
    514 F.2d 665 (5th Cir. 1975) .................................................................21, 23

*Rex Real Estate I, L.P. v. Rex Real Estate Exchange, Inc.,*
    80 F.4th 607 (2023) ..................................................................................18

*Sahara Health Care, Inc. v. Azar,*
    975 F.3d 523(5th Cir. 2020) .......................................................................16

*Savage Tavern, Inc. v. Signature Stag, LLC,*
    589 F. Supp. 3d 624 (N.D. Tex. 2022) ...........................................16, 17, 27

*Tennant Devices & Accessories, LLC v. Marten Group, Inc. d/b/a Senergy Medical*

*Group*,
    No. DC-24-10471 (filed July 18, 2024) ........................................................15

*TGI Friday's Inc. v. Great Nw.Restaurants, Inc.*,
    652 F. Supp. 2d 763 (N.D. Tex. 2009) ....................................................*passim*

*Union Nat'l Bank of Texas, Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*,
    909 F.2d 839 (1990) ...................................................................................20

*Viacom Int'l v. IJR Capital Invests., L.L.C.*,
    891 F.3d 178 (5th Cir. 2018) ...................................................................*passim*

*Wilson v. Tessmer Law Firm, PLLC*,
    483 F. Supp. 3d 416 (W.D. Tex. 2020) ........................................................18

## Statutes/Rules

15 U.S.C. § 1055 ........................................................................................21

15 U.S.C. § 1072 ........................................................................................17

15 U.S.C. § 1114 ...................................................................................16, 17

15 U.S.C. § 1115(a) ......................................................................................17

15 U.S.C. § 1116(a) ...............................................................................16, 27

15 U.S.C. § 1125 ........................................................................................16

15 U.S.C. § 1125(c) ......................................................................................16

15 U.S.C. § 1127 ........................................................................................21

## I.    INTRODUCTION

Beginning in 2003, Dr. Tennant introduced to the U.S. market micro-current therapy medical devices enhanced by his own research and marked with his branding. The devices were a success. Starting in 2005, Dr. Tennant registered his valuable trademarks with the United States Patent and Trademark Office associated with these devices—Tennant BioModulator®, Tennant BioTransducer®, and Healing is Voltage®. Dr. Tennant later assigned the marks to Tennant Devices and Accessories, LLC (TDA), which he controls. Dr. Tennant and TDA (collectively Dr. Tennant) seek a preliminary injunction to prohibit the infringing use of these valuable marks by former licensees Scott Tennant and Marten Group, Inc. d/b/a Senergy Medical Group (collectively Senergy).

For 20 years, Dr. Tennant granted Scott a license to use the marks, which Scott did through his company Senergy, in exchange for a royalty payment from device sales. But, in April/May 2024, Dr. Tennant discovered that Senergy had been grossly underreporting sales and underpaying royalties owed. Stunned by his stepson's flagrant breaches, Dr. Tennant canceled Scott's license on June 21, and informed Scott and Senergy that they could no longer use the Tennant marks. Notwithstanding the cancelation, Senergy admits it continues to sell Dr. Tennant's branded devices and distribute marketing materials falsely associating Dr. Tennant

with Senergy's business.

Dr. Tennant respectfully requests that the Court issue a preliminary injunction prohibiting Senergy's infringement.

## II.    BACKGROUND

### A.  Dr. Tennant's Extensive History of Medical Innovation.

Dr. Tennant completed his residency in ophthalmology at Massachusetts Eye and Ear Infirmary of Harvard Medical School and Southwestern Medical School/Parkland System in 1968. Tennant Decl. ¶ 32 at App. 016. From the outset, Dr. Tennant has innovated medical products and methods to improve lives and medical outcomes. *Id.* His numerous contributions earned him the Corboy Award for Advancements in Ophthalmology and the American Academy of Ophthalmology Award. *Id.* ¶ 33-34 at App. 017.

After decades of practice and thousands of eye surgeries, Dr. Tennant became severely ill, and devoted himself to studying cellular biology and alternative treatments to heal himself. *Id.* ¶¶ 2-3 at App. 002-003. Dr. Tennant's research led him to a method for fighting chronic illness by maintaining voltage levels in cells. *Id.* ¶ 3 at App. 003.

Dr. Tennant sought to bring this new treatment and the associated technology to market in the United States. *Id.* ¶ 3 at App. 003-004. In

approximately 2003, Dr. Tennant worked with a U.S. based manufacturer to manufacture the Tennant BioModulator® and differentiated his device from others by using the voltage frequencies he found more effective for healing. *Id.* ¶ 6 at App. 004-005. This device, ultimately marked with his Tennant BioModulator® mark, is an FDA accepted non-invasive device, designed to offer healthcare professionals and home users affordable drug-free and user-friendly options for relief from chronic pain. *Id.* Dr. Tennant initially introduced the Tennant BioModulator® to the market through his medical practice and education seminars, and by 2004 the manufactured device contained his mark, which he then applied to register in 2005. *Id.* at ¶ 9 at App. 005-006; *see also* Tennant Exs. A-23 (App. 148-149), A-28 (App. 161-163), A-29 (App. 164-165).

In 2012, Dr. Tennant developed additional technology that enhances the Tennant BioModulator® treatment—the Tennant BioTransducer®—was again manufactured to Dr. Tennant's specifications. Tennant Decl. ¶ 9 at App. 005. Dr. Tennant introduced this technology to the market through his personal promotion of the products and prescription to his patients. *Id.* ¶ 9 at App. 005.

### B.    Dr. Tennant Grants Scott License Rights to Use Dr. Tennant's Marks.

Scott is Dr. Tennant's stepson. Tennant Decl. ¶ 5 at App. 004. During the Tennant BioModulator® development phase, Dr. Tennant offered Scott a new

career opportunity selling the trademarked medical devices. *Id.* On June 15, 2003, Dr. Tennant and Scott executed a Royalty Agreement (2003 Agreement) to enable Scott to market and sell the devices Dr. Tennant developed and branded. *Id.*; Tennant Ex. A-5 at App. 031-038. The 2003 Agreement recites that Dr. Tennant "owns and has the right to grant interest in Tennant BioModulator." Dr. Tennant then granted to Scott "the rights and license" to use the Tennant BioModulator® mark for a period of 20 years in connection with the sale of medical devices. Tennant Ex. A-5 at App. 032. Scott agreed to (1) pay a $350 royalty from each sale of the Tennant BioModulator® device (*id.* at App. 034), and (2) keep an accurate account of revenue generated from the device sales and provide monthly statements of those sales to Dr. Tennant (*id.* at App. 034-035). If Scott failed to comply with his obligations to provide regular statements of sales and pay royalties on those sales, such default is a basis to terminate the 2003 Agreement with 30-days notice. *Id.* at App. 035.

On October 1, 2012, Dr. Tennant and Scott executed a second Royalty Agreement (2012 Agreement). Tennant Decl. ¶ 11 at App. 007; Tennant Ex. A-6 at App. 039-046. The 2012 Agreement granted Scott rights and license to use the Tennant BioModulator® mark in connection with sales of the device, for a period of twenty (20) years. *Id.* at App. 040. In exchange, Scott agreed to pay Dr. Tennant

a $550 royalty per unit sold. *Id.* at App. 042. The 2012 Agreement incorporates the same termination provision. *Id.* at App. 043. Collectively, the 2003 Agreement and 2012 Agreement constitute the License Agreements.

In March 2016, Dr. Tennant and Scott discussed a clarifying affidavit to explain Senergy's license to use the trademarks covered by the Licensing Agreements. Tennant Ex. A-12 at App. 060-061. Although Scott agreed to sign such documents to align with the fact that the royalty payments were made by Senergy, he never provided a copy of a signed affidavit to Dr. Tennant. Tennant Decl. ¶ 18 at App. 011. Nonetheless, contemporaneous communications reflect that commercial reality—*i.e.*, everyone involved understood that Dr. Tennant controlled the right to license the (now federally registered) marks and that his permission for Scott to use those marks provided the basis for Senergy's use. *See, e.g.*, Tennant Ex. A-12 at App. 061.

On March 15, 2016, Dr. Tennant signed and sent an addendum to Scott (Addendum 1), which permitted cancelation of the Agreements "by either party, without prejudice and for any reason" with 30-days notice. Tennant Ex. A-10 at App. -056-057. Addendum 1 also included a new royalty calculation method, under which Scott would pay 15% of the retail sales price of the Tennant BioModulator®, BioModulator® Pro, and BioTransducer®. *Id.* Scott did not sign

Addendum 1. *Id.*

On April 22, 2016, Scott sent a proposed addendum to Dr. Tennant (Addendum 2). Addendum 2 incorporated the identical cancelation term allowing cancelation "without prejudice and for any reason" with 30-days' notice. Tennant Ex. A-11 at App. 058-059. Addendum 2 provided Scott's own suggested royalty calculation method for each existing marked product that Senergy had been selling with Dr. Tennant's permission in exchange for royalty payments—the Tennant BioModulator®, Tennant BioModulator® PRO, and BioTransducer® CrystalWave (later redeveloped and marked as the Tennant BioTransducer® PRO and PRO II). *Id.* Dr. Tennant never signed Addendum 2. *Id.*

### C.    Dr. Tennant Diligently Protected the Tennant Marks.

While building a bustling medical practice and a nationwide market for his new devices, Dr. Tennant first applied to register his Tennant device trademarks with the USPTO on the Principal Register. On October 17, 2006, the USPTO registered the Tennant BioModulator® mark. Tennant Ex. A-1 at App. 020-021. Separately, on August 13, 2013, the USPTO registered the Tennant BioTransducer® mark. Tennant Ex. A-2 at App. 022-024. These marks have been assigned throughout the years, including most recently to TDA, which Dr. Tennant controls. Tennant Decl. ¶ 4 at App. 003.

In May 2013 and December 2015, Dr. Tennant also registered his Healing is Voltage® marks. Tennant Exs. A-3 at App. 025-027 & A-4 at App. 028-030. These marks are associated with Dr. Tennant's treatment and training seminars and materials related to the Tennant BioModulator® and Tennant BioTransducer® devices and therapy, all of which he has promoted through the Tennant Institute since at least 2006.[1] *Id.*

Dr. Tennant's collection of trademarks (the marks) are summarized below:

| Trademark/ Wordmark | Reg. Date | Services | Reg. No. |
|---|---|---|---|
| TENNANT BIOMODULATOR® and design:<br><br>TENNANT BIOMODULATOR | Oct. 17, 2006 | (Int'l Class: 010; U.S. Classes: 026, 039, 044)<br><br>Medical apparatus and instruments for use in electromagnetic resonance therapy, namely, cybernetic biofeedback devices, interactive neuromuscular simulators, and diagnostic testing equipment | 3157112 |
| TENNANT BIOTRANSDUCER® | Aug. 13, 2013 | (Int'l Class: 010; U.S. Classes: 026, 039, 044)<br><br>Medical apparatus and instruments for use in electromagnetic resonance therapy, namely, cybernetic biofeedback devices, interactive neuromuscular simulators, and diagnostic testing equipment | 4382782 |
| HEALING IS VOLTAGE® | May 14, 2013 | (Int'l Class: 16; US Classes: 2, 5, 22, 23, 29, 37, 38, 50)<br><br>A series of books, written articles, handouts and worksheets in the field of energy medicine and healthcare | 4334430 |
| HEALING IS VOLTAGE® | December 29, | (Int'l Class: 41; US Classes: 100, | 4878439 |

---

[1]     The USPTO acknowledged the incontestable status of the Tennant BioTransducer® mark on September 10, 2018 (Tennant Ex. A-26 at App. 157-158) and the same for the Healing is Voltage® marks on June 29, 2018 and May 7, 2022 (Tennant Exs. A-25 at App. 155-156 & A-27 at App. 159-160).

| Trademark/ Wordmark | Reg. Date | Services | Reg. No. |
|---|---|---|---|
|  | 2015 | 101, 107)<br><br>Providing lectures and seminars in the field of energy medicine and healthcare |  |

Throughout this licensing arrangement and Dr. Tennant's own use of his marks, neither Scott nor Senergy ever objected to these registrations, challenged the validity of the marks, or claimed that they own Dr. Tennant's marks. Tennant Decl. ¶ 7 at App. 005.

### D.   The Parties Enjoyed 20 Years of Success from Dr. Tennant's Products.

As Senergy explicitly recognizes, the licensing arrangement "ran smoothly" for nearly two decades. Compl. ¶ 24. Senergy sold thousands of the trademarked Tennant BioModulator® and Tennant BioTransducer® devices. *See* Tennant Ex. A-18 at App. 127-133. Between 2020 and 2023 alone, Senergy reported selling an average of 734 units per year. *Id.* at App. 130-133. Senergy's website recognizes Dr. Tennant's central role with respect to the success of these trademarked devices:

> Dr. Jerry Tennant, MD, MD(H), PScD is the founder of the Tennant Institute for Integrative Medicine, a world-renowned physician and integrative health practitioner, and the inventor of the Tennant BioModulator®.

*See*, Farmer Decl. Ex. B-1 at App 192; *see also* Farmer Decl. Ex. B-2 at App. 199.

Throughout this relationship, Dr. Tennant worked diligently to ensure the quality of the devices and associated medical treatment. Tennant Decl. ¶¶ 13-16 at

App. 007-009. For example, the Tennant BioTransducer® (a/k/a crystal waves) was initially manufactured by Avazzia. Jared Tennant Decl. ¶ 5 at App. 278-279. Dr. Tennant determined the product quality was insufficient. Tennant Decl. ¶ 13 at App. 007-008. He then enlisted a manufacturer in Florida to develop a new version, the Tennant BioTransducer® Pro. *Id.* at App 008; Jared Tennant Decl. ¶ 5 at App. 278-279. This device also was not up to Dr. Tennant's exacting standards. *Id.* As a result, in 2019, he pivoted to producing the device with his son, Jared Tennant, so that he could ensure a higher quality product. Jared Tennant Decl. ¶¶ 5-6 at App. 278-279. Jared continued to manufacture the Tennant BioTransducers® sold by Senergy before Dr. Tennant terminated the licensing agreement. *Id.* ¶ 8 at App. 279-280. Dr. Tennant also developed training materials and lectured regularly at seminars, which were provided to the public under his Healing is Voltage® marks. Tennant Decl. ¶ 17 at App. 009; Farmer Ex. B-3 at App. 208-222.

Dr. Tennant also has maintained an active medical practice, which includes prescribing treatment using the Tennant devices where appropriate and working with patients to ensure the efficacy of their treatment regimens. Tennant Decl. ¶ 17 at App. 009. His insight into any quality concerns from a patient perspective and work with the manufacturer and Senergy to maintain high quality has been

continuous for decades.

    **E.**    **Senergy Infringes the Tennant Trademarks in Violation of Federal Law.**

For years and according to the License Agreements, Senergy would send Dr. Tennant a spreadsheet reflecting patient names and devices sold. Tennant Decl. ¶ 21 at App. 011. Based that accounting, Senergy would make royalty payments to Dr. Tennant. *Id.*; Tennant Ex. A-24 at App. 150-154. More recently, Senergy stopped consistently providing detailed monthly accounting statements. Tennant Decl. ¶ 21 at App. 011. Instead, Senergy would send an email stating the royalty payment without supporting documentation. *Id.*; Tennant Ex. A-13 at App. 062-070.

In response, Dr. Tennant requested that Scott provide supporting documentation. Tennant Ex. A-14 at App. 072. Senergy provided several spreadsheets reflecting the reported device sales. Tennant Decl. Exs. A-15 at App. 074-075 & A-16 at App. 077-124. But Dr. Tennant discovered that Scott had been significantly underreporting the number of sales of the marked devices since at least 2021. For example, in 2021, Senergy reported the sale of 388 BioTransducer® Pro IIs to Dr. Tennant. Tennant Ex. A-18 at App. 128-133. But a spreadsheet sent by Senergy to Jared related to BioTransducer® Pro II repairs reflects 593 total sales. *Compare* Tennant Ex. A-18 at App. 131 *with* Jared Tennant

Decl. Ex. C-1 at App. 289. Another disparity arose when Senergy's CFO responded to an audit request stating that it had paid Dr. Tennant $414,350 in royalties for calendar year 2021. Tennant Ex. A-18 at App. 131. But the tax form (1099) that Senergy had provided to Dr. Tennant for 2021 reflected $350,900 in royalty payments. Tennant Ex. A-20 at 141. Based on these documents, Dr. Tennant estimates millions of dollars of underpaid royalties. Tennant Decl. ¶ 26 at App. 013.

Because of the sustained violations of the Licensing Agreements (both failures to provide adequate documentation and underpayments), Dr. Tennant unequivocally canceled the Licensing Agreements on June 21, 2024. Tennant Ex. A-21 at App. 142-145; Tennant Decl. ¶ 27 at App.013. That same day Dr. Tennant delivered to Avazzia, the Tennant BioModulator® manufacturer, notification of the cancelation of the Licensing Agreements. Tennant Ex. A-22 at App. 147.

Despite providing notice to all relevant parties and the expiration of the 30-day notice period on July 21, Senergy continues to use the trademarks. Tennant Decl. ¶ 28 at App. 014. The Complaint alleges: "Senergy is presently engaged in the sale and advertising of goods under TENNANT marks, including but not limited to TENNANT BIOMODULATOR and TENNANT BIOTRANSDUCER and variants thereof." Compl. ¶ 53.

On July 23, Dr. Tennant delivered through counsel a second notice to Scott regarding the termination of the Licensing Agreement. Dr. Tennant reiterated TDA's ownership of the marks. Farmer Ex. B-4 at App. 223-226. The letter specifically demanded that Scott and Senergy immediately cease and desist any actions that infringe on Dr. Tennant's marks. *Id.* at App 225. Nevertheless, Senergy's infringement continues:

*Image 1 - Image from Senergy's Homepage[2]*



*Image 2 - Image from Senergy's Homepage[3]*

---

[2] Senergy, "Senergy homepage," https://store.senergy.us/ (last visited Aug. 28, 2024).
[3] Senergy, "Senergy homepage," https://store.senergy.us/ (last visited (Aug. 28, 2024).



*Image 3- Catalog of Tennant BioModulator® and the Tennant BioTransducer® Devices*

*Listed for Sale on Senergy's Website[4]*



Dr. Tennant has also requested that Avazzia discontinue distribution of

trademarked products to Senergy, to no avail. Farmer Ex. B-5 at App. 227-229. As a result, Dr. Tennant does not have access to newly manufactured devices. This means that his patients cannot purchase the marked devices from an authorized distributor, but instead must go to Senergy to purchase them. Tennant Decl. ¶ 29 at App. 014-015.

### F.    Procedural History.

Dr. Tennant initially filed suit in Dallas County District Court focused on his breach of contract claims. *Tennant Devices & Accessories, LLC v. Marten Group, Inc. d/b/a Senergy Medical Group*, No. DC-24-10471 (filed July 18, 2024).[5] Now that Scott has refused to comply with the cease-and-desist demands related to Dr. Tennant's marks, Dr. Tennant must seek relief from this Court, including enforcement of his trademark rights.

Scott and Senergy filed this federal suit just days after Dr. Tennant filed in state court. *Marten Group, Inc. d/b/a Senergy Medical Group v. Jerald Tennant, MD*, No. 3:24-cv-01852-E (filed July 21, 2024). Plaintiffs seek declaratory judgment that would allow them to continue infringing Dr. Tennant's trademark rights. *See* Compl. ¶¶ 49, 48, 60-62. Defendants answered the complaint and filed

---

[5] Because Dr. Tennant's counterclaims incorporate the allegations of the state court suit and now include claims under the Lanham Act, Dr. Tennant has non-suited the state court action and consolidated all claims here, pursuant to the Court's federal question jurisdiction.

counterclaims, including trademark infringement (15 U.S.C. § 1114), unfair

competition (15 U.S.C. § 1125), and trademark dilution (15 U.S.C. § 1125(c)),

among other common law and breach of contract claims.

### III.   LEGAL STANDARD

A party seeking a preliminary injunction must establish: "(1) it is

substantially likely to succeed on the merits of its claim; (2) it will suffer

irreparable injury in the absence of injunctive relief; (3) the balance of the equities

tips in its favor; and (4) the public interest is served by the injunction." *Id.* (quoting

*Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 528 (5th Cir. 2020)). A party need

not "prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan

Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985).

The Lanham Act grants the Court the power to issue injunctions. 15 U.S.C. §

1116(a). A preliminary injunction serves to "preserve the relative positions of the

parties until a trial on the merits can be held." *Savage Tavern, Inc. v. Signature

Stag, LLC*, 589 F. Supp. 3d 624, 639 (N.D. Tex. 2022). Where trademark

infringement is at issue, the status quo preserves the last time when the mark was

not contested—*i.e.* before the infringer unlawfully began using the mark. *Id.*

# IV.   ARGUMENT

## A.    Senergy Is Actively Infringing on Dr. Tennant's Trademarks.

To demonstrate trademark infringement under the Lanham Act (15 U.S.C. § 1114), a claimant must show "(1) it possesses a legally protectable trademark and (2) the alleged infringer's use of this trademark creates a likelihood of confusion as to source, affiliation, or sponsorship." *Savage Tavern*, 589 F. Supp. at 640 (citation omitted).

### 1.    Dr. Tennant possesses a legally protectable trademark.

The Lanham Act "confers important legal rights and benefits on trademark owners who register their marks with the Patent and Trademark Office." *Id.* at 641 (internal citations omitted). Registration serves as "constructive notice of the registrant's claim of ownership," 15 U.S.C. § 1072, and "registrants enjoy a presumption of validity and exclusivity" in infringement actions (*Savage Tavern*, 589 F. Supp. 3d at 641 (citing 15 U.S.C. § 1115)(a)). Indeed, registration "shall be prima facie evidence" of the validity of the mark, its ownership, and the registrant's "exclusive right to use" the mark in commerce. 15 U.S.C. § 1115(a).

All of Dr. Tennant's marks at issue are registered with the USPTO. This alone demonstrates the marks are valid and that Dr. Tennant (through TDA) owns and has the exclusive right to use the marks. *See Savage Tavern*, 589 F. Supp. 3d at

644; *see also Wilson v. Tessmer Law Firm, PLLC*, 483 F. Supp. 3d 416, 424 (W.D. Tex. 2020).

   2. <u>Because the trademarks are distinctive, they are protectable.</u>

  Senergy has not challenged the distinctiveness of Dr. Tennant's marks. Nor could it. At minimum, the marks are descriptive and have acquired secondary meaning.[6] *E.g.*, *Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 484 (E.D. Tex. 2020) (categorizing family name marks as descriptive). Courts consider the following factors to determine whether a mark has acquired secondary meaning:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the mark.

*Fletcher's*, 434 F. Supp. 3d at 484. Any combination of these factors may show distinctiveness. *Viacom Int'l v. IJR Capital Invests., L.L.C.*, 891 F.3d 178, 190 (5th Cir. 2018).

  These factors conclusively demonstrate that Dr. Tennant's marks have

---

[6] Dr. Tennant's marks are properly categorized as suggestive because they "suggest, but do[] not describe, an attribute of the good" and "require[] the consumer to exercise his or her imagination to apply the trademark to the good." *Rex Real Estate I, L.P. v. Rex Real Estate Exchange, Inc.*, 80 F.4th 607, 619 (2023). Because the marks also meet the more stringent test of acquiring secondary meaning, the Court need not decide the categorization issue at this time.

acquired secondary meaning.

- **Lengthy Use**: The trademarks have been in use between nine (Healing is Voltage®) and fifteen (product marks) years and consistently used throughout those periods. *See, e.g.*, *Viacom*, 891 F.3d at 190 (a mark used for 18 years and in many episodes of a television show support secondary meaning); *Fletcher's*, 434 F. Supp. 3d at 484 (mark in use for several decades and associated with the sale of corndogs supports secondary meaning).

- **Millions in Sales**: It is undisputed that the volume of sales has been significant. Both Scott and Dr. Tennant have made millions of dollars from revenues and resulting royalties. *See, e.g.*, Compl. ¶ 24. Even adopting Senergy's underreported sales of devices, in 2021 alone Senergy received over $8 million in revenues (Tennant Ex. A-19 at App. 139) and (under)paid Dr. Tennant $414,000 in royalties (Tennant Ex. A-18 at App. 131).

- **Effective Advertising**: Marketing directly and effectively connected the marks to Dr. Tennant, thereby altering the meaning of the marks (*i.e.*, Tennant refers to Dr. Jerry Tennant). *Fletcher's*, 434 F. Supp. 3d at 485. For example, Senergy's website references "the proprietary frequency developed by Dr. Tennant emitted through the BioModulator" and touts the "ultimate therapy" is directed by Dr. Tennant. Farmer Ex. B-6 at App. 230-236. Senergy advertises courses as: "courses are for anyone who is interested in learning more about Dr. Jerry Tennant, Healing is Voltage®, and why your body needs proper voltage in order to create new and healthy cells." Farmer Ex. B-7 at App. 237-241

- **Use of Marks in Journals**: Senergy's website links to medical journals that reference Dr. Tennant's marks confirming that direct consumers and medical professionals can view this marketing. *See, e.g.*, Farmer Decl. Ex. B-8 at App. 242-253. E.g., at App. 252, (Kimberly S. Peakcock, et al., A Randomized trial comparing the Tennant BioModulator® to transcutaneous electrical nerve stimulation and traditional Chinese acupuncture for the treatment of chronic pain in military service members, 6(1) Mil. Med. Res. 37 (Dec. 2019)).

- **Consumer Testimony**:  Although neither party has yet performed consumer surveys,[7] testimonials on Senergy's website support that consumers affiliate the marks with Dr. Tennant. Several of the videos specifically reference or thank Dr. Tennant for his treatment using the Tennant marked devices. *See, e.g.*, Senergy Testimonials, "Chronic Migraines Cured with ANS Reset," https://www.youtube.com/watch?v=Fh0V51fPxU8&t=6s (last visited Aug. 27, 2024); *see also id.*, "Georgia Heisser – TMJ Cured & Worthy Investment," https://vimeo.com/618295385/5460b1f413, (last visited Aug. 27, 2024); *id.*, "David Arfa Testimonial Clip," https://vimeo.com/618293775/eeb38cf8c2, (last visited Aug. 27, 2024).

- **Senergy Is Using the Identical Mark**: Senergy concedes it continues to use the *identical* marks that Dr. Tennant registered (*see* Compl. ¶ 53), implicitly recognizing the meaning and, in turn, value the marks have attained. *Fletcher's*, 434 F. Supp. 3d at 480 (infringer's use of the family name to precisely because it would associate its product with the family's reputation supports secondary meaning).

Dr. Tennant readily demonstrates the marks have acquired secondary meaning and are protectable.

### 3.    Dr. Tennant is the senior user of the trademarks.

Senergy's primary defense to the protectability of the trademarks is the outrageous assertion that *Senergy* was the first to place the mark in commerce. *Union Nat'l Bank of Texas, Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*, 909 F.2d 839, 842-43 (1990) (party must show it is senior user to demonstrate a protectable mark). This argument is meritless because Dr. Tennant

---

[7] Dr. Tennant has not had an opportunity to obtain survey data or customer testimony. This is not determinative. *Viacom*, 891 F.3d at 191.

and Scott entered into licensing agreements whereby Dr. Tennant authorized Scott to market and distribute Dr. Tennant's marked medical devices in exchange for royalty payments to Dr. Tennant.

Trademark law recognizes an owner's right to license the use of the marks with distributors. *ICEE Distributors, Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 598 (5th Cir. 1998). Licensing allows more distribution of information to the public "*without the licensor having to risk losing title to its mark.*" *Id.* (emphasis original). In other words, "[e]ven if only the licensee uses the mark, ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by the controlled licensee." *Viacom*, 891 F.3d at 188 (internal quotes omitted). This is consistent with the Lanham Act's assurance that legitimate use by related companies—*i.e.* companies whose use is "controlled by the owner of the mark" (15 U.S.C. § 1127)—"shall inure to the benefit of the registrant" and does not "affect the validity of such mark" (15 U.S.C. § 1055). A former licensee is not permitted to mislead the public, "[f]or once the contract ends, a licensee's right to the mark ends, and any subsequent use constitutes infringement." *Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975).

Consistent with this authority, Dr. Tennant is the senior user. After working

with an American manufacturer in 2003 to create a device to his specifications, he placed the marked Tennant BioModulator® product into commerce in 2003 via his promotion of the devices in therapy, prescription to his patients, and granting Scott a license to use the Tennant BioModulator® mark in sales of those devices. Tennant Exs. A-5 & A-6 at App. 031-046. Scott then paid Dr. Tennant royalties, the value of which was to correspond with each trademarked BioModulator unit sold. Tennant Decl. ¶ 8 at App. 005. Scott explicitly recognized that these License Agreements applied to Senergy as well. Tennant Ex. A-12 at App. 060-061. The contemporaneous communications and two decades of course of dealing confirm that Dr. Tennant owns the trademarks and Senergy's only use of them was based on Dr. Tennant's permission (and compensation).

This arrangement applied equally to the Tennant BioTransducer® mark from 2012 forward. While the parties did not have a written licensing agreement, Senergy consistently followed the same distribution and royalty payments obligations set forth in the Tennant BioModulator® agreements, in clear recognition of Dr. Tennant's ownership rights. Tennant Ex. A-18 at App. 128-133. For similar reasons, the parties recognized the Healing is Voltage® marks belonged to Dr. Tennant, as they used the education materials in connection with the marked devices and education seminars related to Dr. Tennant's treatments.

Tennant Decl. ¶ 17 at App. 009-010. Federal courts regularly recognize such arrangements: "even if the parties intend no formal licensing agreement . . . the entire course of conduct between a trademark owner and accused infringer may create an implied license." *Exxon Corp.*, 109 F.3d at 1076.

Scott and Senergy's vague allegations that the License Agreements are unenforceable and/or were not canceled are specious. Two decades of conduct confirm the parties had a meeting of the minds that allowed Senergy to use Dr. Tennant's marks in exchange for royalty payments and his continued oversight of the quality of the products. Those agreements were canceled on July 21—either "for any reason" as permitted in both 2016 Addendums (Tennant Exs. A-10 at App. 057 & A-11 at App. 059) or for breach under Section 7 of the Licensing Agreements (Tennant Exs. A-5 at App. 035 & A-6 at App. 043).

    4.    <u>Senergy's Infringement Creates a Likelihood of Confusion.</u>

Infringement exists when a person uses a "reproduction" of the mark in commerce without the registrant's consent and "is likely to cause confusion." *TGI Friday's Inc. v. Great Nw. Restaurants, Inc.*, 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009); *Pro. Golfers Ass'n of Am. V. Bankers Life & Cas. Co.*, 514 F. 2d 665, 669-70 (5th Cir. 1975) ("the gist of the action lies in the likelihood of confusion to the public").

Where the infringing party uses the exact same mark on the same product, the likelihood of confusion is self-evident and no digits of confusion analysis[8] is required. *See TGI Friday's*, 652 F. Supp. 2d at 767 (defendant's use of the exact marks on its restaurants makes likelihood of confusion evident); *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 310-11 (5th Cir. 2008) (affirming the district court's analysis of confusion where the marks were identical); *see also Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when terminated franchisee continues to use the former franchisor's trademarks.").

As in *Paulsson* and *TGI Friday's*, the confusion that Senergy has created is self-evident and intentional. Senergy's entire website is designed to sell Dr. Tennant's life story and his Tennant devices. The trademarks still in use after termination of the License Agreements are *identical* to Dr. Tennant's registered marks. Scott admits as much in his allegations: "Senergy is presently engaged in the sale and advertising of goods under TENNANT marks, including but not

---

[8] Courts typically consider the digits of confusion to analyze this prong: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of retail outlets and purchasers; (5) the identity of advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Viacom*, 891 F.3d at 192. But the result would be the same based on Senergy's egregious conduct.

limited to TENNANT BIOMODULATOR and TENNANT BIOTRANSDUCER and variants thereof." Compl. ¶ 53. Those marks continue to be used on the identical medical devices developed by Dr. Tennant.

The advertising by Senergy further bolsters the likelihood of confusion. Senergy's website continues to place Dr. Tennant at the heart of the advertising by specifically associating the devices with Dr. Tennant directly. This includes highlighting Dr. Tennant's personal endorsement because of his own use of the products (Farmer Ex. B-1 at App. 192; B-2 at App. 199) and explaining Dr. Tennant as the source of the marked devices: "Dr. Tennant's frequency sets, protocols, training, and books" that sets these devices apart from other Avazzia manufactured products. Farmer Ex. B-9 at App. 258-259. In other words, Senergy's continued advertising specifically relies on the goodwill and reputation (and attendant quality control) that Dr. Tennant has built with respect to the marked products.

> 5.    There Is No Evidence for Scott's Defenses to Infringement.

Scott has asserted a defense of abandonment through naked licensing. Compl. ¶ 58.f. That defense is meritless.

Naked licensing arises when the licensor "grant[s] [] permission to use its mark without attendant provisions to protect the quality of the goods or services

provided under the licensed mark." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075 (5th Cir. 1997). This failure to exercise control over the licensee "*may* result in an abandonment of trademark protection . . . ." *Id.* (emphasis original).

Dr. Tennant's involvement in promoting the trademarked devices, holding seminars and educating medical professionals, and overseeing any quality control issues is the antithesis of naked licensing. For over two decades, Dr. Tennant controlled what devices Senergy could market under his brand. Tennant Decl. ¶ 7 at App. 005. For example, the Tennant BioTransducer® device was initially manufactured by Avazzia—this was called the Tennant BioTransducer® crystal wave. Tennant Decl. ¶ 13 at App. 007-008. This device never performed to his expectations. *Id.* He then worked with a Florida manufacturer to create the Tennant BioTransducer® Pro device, but again the quality of the product was insufficient. *Id.*; *see also* Jared Tennant Decl. ¶ 5 at App. 278-279. As a result, in 2019 Dr. Tennant worked with his son, Jared, to invent an entirely new device of higher quality—the Tennant BioTransducer® Pro II. Jared Tennant Decl. ¶¶ 5-6 at App. 278-279. For similar reasons, in 2012, Dr. Tennant instructed Senergy to halt sales of the "violet" version of the Tennant BioTransducer®. Tennant Decl. ¶ 14 at App. 008. When he learned that Senergy continued to refer to the product during educational seminars, Dr. Tennant demanded that Senergy stop selling the product

that was associated with his name and reputation. *Id.*; *see also* Tennant Ex. A-7 at App. 048-049. Moreover, Dr. Tennant's integrative medical practice includes regular prescription of the BioTransducer® and BioModulator® to his patients. Tennant Decl. ¶ 17 at App. 009. He is closely involved with the patient care associated with the use of the products. Importantly, during the licensing period, Dr. Tennant regularly presented at conferences and classes to ensure that patients use the Tennant devices as designed and for maximal effect.

### B.    Dr. Tennant Has and Will Continue to Be Irreparably Harmed Absent an Injunction.

Because Dr. Tennant is likely to succeed on the merits of his trademark infringement claim (*supra* sect. IV.A.), a presumption of irreparable harm attaches. In 2020, Congress amended the Lanham Act to specifically provide a presumption of irreparable harm:

> A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding . . . of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.

15 U.S.C. § 1116(a). That presumption applies here, where Dr. Tennant has established a likelihood of success on his trademark infringement claims. *See Savage Tavern*, 589 F. Supp. 3d at 659 (adopting this presumption as applicable).

The egregious infringement present here also readily demonstrates

irreparable injury. Courts recognize threatened harm where the infringing party continues to pass off the mark as its own, even after termination of a licensing agreement. *See, e.g., TGI Friday's*, 652 F. Supp. 2d at 771; *Fletcher's*, 434 F. Supp. 3d at 496; *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 543 (S.D. Tex. 2013). The inability to exercise control "poses a substantial threat of injury" to the "reputation and the goodwill" associated with the mark's brand; this injury cannot be remedied with money damages. *TGI Friday's*, 652 F. Supp. 2d at 771. The situation here is no different because Scott has intentionally ignored the termination of the License Agreements and continues to use the marks without permission.

### C.    The Equities Favor Issuing a Preliminary Injunction.

"Courts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants." *TGI Friday's*, 652 F. Supp. 2d at 773. Here, as with other cases on point, the harm to Dr. Tennant far outweighs the threatened harm to Scott. If an injunction is not entered, Dr. Tennant will lose control over the trademarks. *See id.* at 772. This loss can—and likely will—threaten the reputation of the brand and associated goodwill. *Id.* More, Scott's continued use has already interfered with Dr. Tennant's access to the supply of the marked products for use in his practice.

Meanwhile, the hardship to Senergy is compliance with state and federal law because the license agreements are terminated. *Choice Hotels*, 940 F. Supp. 2d at 543. Senergy may allege that the hardship also includes the loss of revenue from the sale of infringing products. Courts have rejected this argument: "Defendants' alleged hardship merits little consideration because it results directly from Defendants' decision to build their business around confusingly similar marks and to continue their efforts to do so after they received [plaintiff's] cease-and-desist letter." *Fletcher's*, 434 F. Supp. 3d at 497. Moreover, protecting Dr. Tennant from Senergy's continuing willful infringement of his trademarks would not prevent Senergy from marketing other non-Tennant devices and wellness products (*i.e.*, competing in the marketplace without infringement).

### D.    The Public Will Be Served by the Injunction.

"The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Fletcher's*, 434 F. Supp. 3d at 497 (citations omitted). Indeed, the "public interest promotes the protection of valuable trademarks . . ." even if there is an immediate effect on the infringers' business. *TGI Friday's*, 652 F. Supp. 2d at 773. Moreover, the public is served by prohibiting deceptive representations regarding the source of marked products. *Id.* Because Dr. Tennant meets the

burden of showing likelihood of success on the merits of the injunction claim, he necessarily demonstrates the public interest will be served by a preliminary injunction.

## V.    CONCLUSION

For the foregoing reasons, Dr. Tennant respectfully requests the Court enter a preliminary injunction that:

- Prohibits Scott and Senergy's continued use of each of the trademarks at issue—Tennant BioTransducer®, Tennant BioModulator®, and Healing is Voltage® including without limitation displaying the trademarks on their website properties or other marketing channels and on any products they offer for sale, nor advertising, marketing, or selling any products bearing the marks; and,

- Scott and Senergy submit a report within 30 days of the injunction demonstrating all actions they have taken to comply with the order, including with respect to withdrawing any advertising relying on the trademarks from their website or other promotional materials.

Dated: August 28, 2024          Respectfully submitted,


*/s/Tyler L. Farmer*
Tyler L. Farmer
WSBA No. 39912
*Pro Hac Vice*
Tyler.farmer@bclplaw.com
Ariel A. Martinez
WSBA No. 54869
*Pro Hac Vice*
Ariel.martinez@bclplaw.com
Chelsey L. Mam
WSBA No. 44609
*Pro Hac Vice*
Chelsey.mam@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER
LLP
999 3rd Ave., Suite 4400
Seattle, WA 98104
Tel: (206) 623-1700
Fax: (206) 623-8717


Justin D. Hanna
Texas Bar No. 24095726
Bryan Cave Leighton Paisner LLP
2200 Ross Avenue, Suite 4200W
Dallas, TX  75201-7965
(214) 721 8052
E: Justin.Hanna@bclplaw.com

ATTORNEYS FOR DEFENDANTS
JERALD TENNANT, MD, JOHN
TENNANT, TERESA JESSEN TENNANT,
JARED TENNANT, TENNANT DEVICES
AND ACCESSORIES, LLC, and
CURADOR, LLC

---

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(i), the undersigned certifies that the parties have complied with the meet and confer requirements of Local Rule CV-7(h) and that the foregoing motion and relief sought therein is unopposed.

By: /s/Tyler L. Farmer
Tyler L. Farmer

## CERTIFICATE OF WORD COUNT

Pursuant to Section II.A. of the Court's Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, the undersigned hereby certifies that, per the word-processor register, the foregoing Motion contains 6,223 words, excluding the case caption, signature block, and certificates.

By: /s/Tyler L. Farmer
Tyler L. Farmer

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record through CM/ECF on August 28, 2024.

By: /s/Tyler L. Farmer
Tyler L. Farmer