**United States District Court**
**Northern District of Texas**
**Dallas Division**

| | |
|---|---|
| MARTEN GROUP, INC. D/B/A SENERGY MEDICAL GROUP AND SCOTT TENNANT, | |
| *Plaintiffs* | Case No. 3:24-cv-01852-E |
| v. | |
| JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, AND CURADOR, LLC, | |
| *Defendants* | |

**Plaintiffs' Response to Defendants' Amended Motion for**
**Preliminary Injunction**

Plaintiffs Marten Group, Inc. d/b/a Senergy Medical Group ("Senergy") and Scott Tennant (collectively, the "Senergy Parties") file their Response in Opposition to Defendants Jerald Tennant, MD ("Dr. Tennant") and Tennant Devices and Accessories, LLC's ("TDA") (collectively, the "Dr. Tennant Parties") Amended Motion for Preliminary Injunction (the "Motion").

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................... iv

**SUMMARY** ............................................................ 1

**STATEMENT OF THE ISSUES** ........................................ 2

**BACKGROUND** ...................................................... 2

    1.    Scott builds the Senergy brand. ........................................ 2

    2.    Scott and Dr. Tennant agree to a "Royalty Agreement" covering the Tennant BioModulator. ................................... 3

    3.    In 2012, Senergy sells a new device—the Tennant BioModulator Pro—and Scott and Senergy enter into a new Royalty Agreement. ................................................. 4

    4.    Senergy sells a "BioTransducer," and Scott executes a "Modification" for Dr. Tennant covering a specific BioTransducer model. ........................................... 4

    5.    Due to its marketing efforts, Senergy's BioModulator venture was successful. ................................................ 5

    6.    The Dr. Tennant Parties sued the Senergy Parties in state court, who responded with this suit, and the Dr. Tennant Parties ultimately asserted trademark claims for the first time here. ....................................................... 5

**LEGAL STANDARD** .................................................. 6

**ARGUMENT** ........................................................ 7

    1.    The Dr. Tennant Parties are unlikely to succeed because they fail to establish their ownership of the Marks. ..................... 7

        1.1.    As a threshold issue, Dr. Tennant cannot establish use of the Marks by the mere selection of their names..................... 7

1.2.    The Dr. Tennant Parties did not first use the Marks in commerce. ................................................................. 8

    1.2.1.    Avazzia presumptively owns the Marks for devices they made—not Dr. Tennant. ........................... 9

    1.2.2.    Dr. Tennant's federal filings show Senergy and Avazzia first used the Marks in commerce. .................... 9

    1.2.3.    Dr. Tennant's evidence of "use" also reinforces that Senergy and Avazzia are the first users in commerce. ................................................................ 12

1.3.    The Dr. Tennant Parties never licensed any trademark rights. ........................................................................... 12

    1.3.1.    The use-based Grant Clause covers a technology—not a trademark—by its plain language. ........................................................................... 13

    1.3.2.    Other clauses show the agreed-upon "use" of "Grantors Property" is antithetical to trademark law. ................................................................ 14

    1.3.3.    Dr. Tennant could neither use in commerce nor license a trademark for a product that did not exist in 2003. ......................................................... 16

    1.3.4.    The Royalty Agreements restrict their license grants and foreclose implied licenses—one of Dr. Tennant's central liability theories. ........................ 17

    1.3.5.    The Modification to the Royalty Agreements does not grant any trademark rights (express or implied) to the Senergy Parties. ................................... 18

2.    Dr. Tennant's monetary demands and filing delay rebut the presumption of irreparable harm. ...................................... 19

2.1.    Dr. Tennant's pre-suit conduct undercuts his claim of irreparable harm. ................................................................ 19

2.2.    The Dr. Tennant Parties solely rely upon a bursting-bubble presumption for irreparable harm. ............................... 21

3.    The equities weigh against the Dr. Tennant Parties. ......................... 21

4.    A preliminary injunction does not serve the public interest. .............. 22

**CONCLUSION** ................................................................**23**

# TABLE OF AUTHORITIES

## Cases

*Bianco v. Globus Med., Inc.*,
    No. 2:12-CV-00147-WCB, 2014 WL 1049067
    (E.D. Tex. Mar. 17, 2014) ............................................................... 23

*Bluefield Water Ass'n, Inc. v. City of Starkville*,
    577 F.3d 250 (5th Cir. 2009) ............................................................. 6

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) ............................................................. 6

*Canal Auth. of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ............................................................. 7

*Conceptus, Inc. v. Hologic, Inc.*,
    2012 WL 44064 (N.D. Cal. Jan. 9, 2012) ......................................... 23

*Crow-Billingsley Stover Creek, Ltd. v. SLC McKinney Partners, L.P.*,
    No. 05-09-00962-CV, 2011 WL 3278520
    (Tex. App.—Dallas Aug. 2, 2011, no pet.) ...................................... 19

*Equistar Chemicals L.P. v. Indeck Power Equip. Co.*,
    No. 4:18-CV-4349, 2020 WL 4746469
    (S.D. Tex. Aug. 17, 2020) ........................................................ 13, 14

*Minebea Co., Ltd. v. Papst*,
    444 F. Supp. 2d 68 (D.D.C. 2006) .................................................. 18

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ............................................................. 6

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
    44 F.4th 180 (3d Cir. 2022) ............................................................. 21

*Omni USA, Inc. v. Parker-Hannifin Corp.*,
    798 F. Supp. 2d 831 (S.D. Tex. 2011) ............................................. 18

*Paulsson Geophysical Servs., Inc. v. Sigmar*,
    529 F.3d 303 (5th Cir. 2008) ............................................................. 8

*Romac Env't Servs. LLC v. Wildcat Fluids LLC*,
    No. 6:20-CV-00581 LEAD, 2022 WL 421416
    (W.D. La. Feb. 10, 2022) ................................................................. 9

*S & H Indus., Inc. v. Selander*,
    932 F. Supp. 2d 754 (N.D. Tex. 2013) .......................................... 22

*Savage Tavern, Inc. v. Signature Stag, LLC*,
    589 F. Supp. 3d 624 (N.D. Tex. 2022) ............................... 8, 10, 22

*Spireas v. Comm'r of Internal Revenue*,
    112 T.C.M. (CCH) 262 (T.C. 2016) .............................................. 17

*Sport Supply Grp., Inc. v. Savage*,
    No. 3:10-CV-913-O, 2011 WL 13234197
    (N.D. Tex. Dec. 22, 2011) ............................................................... 9

*Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*,
    622 S.W.3d 884 (Tex. 2021) ........................................................ 15

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) .......................................................... 6

*Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.*,
    909 F.2d 839 (5th Cir. 1990) .......................................................... 8

*Valentine v. Collier*,
    978 F.3d 154 (5th Cir. 2020) .......................................................... 6

*Webpass Inc. v. Banth*,
    No. C14-02291 HRL, 2014 WL 7206695
    (N.D. Cal. Dec. 18, 2014) ............................................................. 14

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*,
    80 F.4th 536 (5th Cir. 2023) ........................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................... 2, 6

## Treatises

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th
ed. 2019) ........................................................................................ 7, 11, 13, 17

# SUMMARY

The Dr. Tennant Parties seek a preliminary injunction, asserting only trademark infringement. But the Dr. Tennant Parties are not the owner of the trademarks they seek to wield, destroying their likelihood of success. The Senergy Parties, along with third-party manufacturer Avazzia, Inc., were the first to use those marks in commerce. And it is use in commerce that controls—not the Dr. Tennant Parties' federal registrations.

The Dr. Tennant Parties also argue several "Royalty Agreements" were trademark licenses—purportedly relieving the Dr. Tennant Parties of their need to show commercial use. Yet the Dr. Tennant Parties perform no textual analysis of those agreements to determine what rights, if any, they granted. Even so, a review of the Royalty Agreements' plain language shows they are not trademark licenses. So, too, does the evidence—one Royalty Agreement predates the first commercial use of one of the marks by over a year.

The other equitable factors also skew against injunctive relief. An injunction preventing the sale of healthcare devices (the underlying goods covered by the marks) disserves the public. Further, Senergy—not the Dr. Tennant Parties—developed the marks' goodwill through extensive marketing efforts, pushing the equities against an injunction. And Dr. Tennant's pre-suit activities show his alleged harm is reparable.

## STATEMENT OF THE ISSUES

Whether the Court should grant a preliminary injunction for trademark infringement under the traditional four-factor test. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## BACKGROUND

Senergy sells hand-held, electric-stimulation medical devices for pain relief. Senergy Appendix ("SA") 004 (¶¶ 8–9). These devices—dubbed "BioModulators"—are sold by Senergy under its TENNANT BIOMODULATOR marks. *Id.* Senergy also sells devices called "BioTransducers"—sold by Senergy under its TENNANT BIOTRANSDUCER marks—that are designed to work with Senergy's BioModulators. SA 004 ¶12.

### 1.   Scott builds the Senergy brand.

Before selling their own devices, Dr. Tennant and Scott, through Senergy, sold a Russian-made, Soviet-Union era microcurrent BioModulator-type device branded as SCENAR. SA 255–256 at 24:20–25:1. But the Russian-made device was unreliable and increasingly hard to service in the United States. SA 257 at 27:15–24. In 2004, Scott found a new domestic partner in Avazzia to launch a competing device. Tim Smith, an Avazzia principal, provided Senergy with the BioModulator, which improved on the SCENAR design. SA 258 at 28:5–14. Senergy negotiated an agreement with Avazzia to distribute the Avazzia-made BioModulator. SA 003 (¶ 7). In 2005, Avazzia delivered its first BioModulator device to Senergy. *Id.* (¶¶ 7–10). Senergy then sold the Avazzia-produced BioModulators. *Id.*; SA 270 at 69:14–22.

**2.    Scott and Dr. Tennant agree to a "Royalty Agreement" covering the Tennant BioModulator.**

Dr. Tennant and Scott agreed to a document titled "Royalty Agreement"— which purports to grant some kind of license to Scott for the Tennant BioModulator. App. 0032. Dr. Tennant and Scott started from a RocketLawyer.com form, back-dated it to June 2003, defined Dr. Tennant as the "Grantor" and Scott, individually, as the "Grantee." SA 003 (¶ 5); App. 0032. For simplicity, this document is referred to as the "**2003** Royalty Agreement."

The 2003 Royalty Agreement defined the at-issue property to be "the Tennant Biomodulator":

> Whereas the Grantor owns and has the right to grant interest in Tennant Biomodulator (hereinafter called the property). Grantors right was issued to the Grantor on June 15, 2003, by 01/02/2003; and

App. 0032. In the first numbered paragraph of the 2003 Royalty Agreement, Dr. Tennant purports to give Scott a worldwide use-based license to "Grantors Property."

> 1. **GRANTING OF RIGHTS**. The Grantor hereby grants to the Grantee the rights and license, in the United States of America and its territories, along with any worldwide maket , to use the Grantors Property for a period of 20 years and renewable yearly thereafter automatically without written objection from either party.

*Id.* ¶ 1 (the "Grant Clause"). In exchange, the agreement provides that Scott would pay Dr. Tennant royalties from the net profits of a "new customer's purchase of a Tennant Biomodulator." App. 0034 ¶ 4(b).

3.  **In 2012, Senergy sells a new device—the Tennant BioModulator Pro— and Scott and Senergy enter into a new Royalty Agreement.**

In 2012, Senergy, with the help of Avazzia's manufacturing services, introduced a different BioModulator—dubbed the Tennant BioModulator Pro. SA 004 (¶ 8).

Because the BioModulator models are different, Dr. Tennant claims he needed a new agreement to cover the new model. SA 264–266 at 52:24–54:6 (analogizing differences between BioModulators models as the differences between a Chevy and a Buick). As a result, Dr. Tennant insisted Scott agree to a new "Royalty Agreement" largely mirroring the 2003 Royalty Agreement—except it changed the definition of the licensed "property" to "Tennant Biomodulator *PRO*." App. 0040 (emphasis added).

> Whereas the Grantor owns and has the right to grant interest in Tennant Biomodulator PRO (hereinafter called the property). Grantors right was issued to the Grantor on October 01, 2012, by Jerry Tennant; and

4.  **Senergy sells a "BioTransducer," and Scott executes a "Modification" for Dr. Tennant covering a specific BioTransducer model.**

In 2009, Senergy began selling a "BioTransducer" device—largely made to work with the BioModulators. SA 004–005 (¶¶ 12). But neither the 2003 Royalty Agreement nor 2012 Royalty Agreement covered the BioTransducer. In April 2016, Scott executed a "Modification of Royalty Agreement" that ostensibly changed the cancellation options for the parties under the Royalty Agreements, added a bankruptcy condition for Senergy (who never executed the original agreements), changed

royalty payments for the Tennant BioModulator and BioModulator PRO, and added a royalty payment for the "Biotransducer CrystalWave"—despite no grant of any property rights to the BioTransducer. App. 0059. The Modification also states that if retail pricing changes, the royalty will be adjusted commensurate with the percentage change. *Id.* The Modification is the only agreement modifying the previous Royalty Agreements. SA 304–305 at 275:20–276:3.

## 5.    Due to its marketing efforts, Senergy's BioModulator venture was successful.

Senergy developed a market to sell the at-issue devices. Senergy advertised through seminars—the ones Dr. Tennant claim are his "use in commerce." SA 299–300 at 266:20–267:23. Dr. Tennant even had a Senergy credit card to cover his expenses. SA 299 at 266:7–14. Senergy paid for booths and staffed them with its employees and created and paid for all DVDs, CDs, printed material, including the workbooks (such as those shown in Exhibit A-23). SA 299-300 at 266:20–267:8; SA 003 ¶ 4. Even Dr. Tennant admits Senergy marketed the devices. SA 300 at 267:12–17 ("[B]y and large, the marketing was done by Senergy.").

## 6.    The Dr. Tennant Parties sued the Senergy Parties in state court, who responded with this suit, and the Dr. Tennant Parties ultimately asserted trademark claims for the first time here.

After Dr. Tennant decided the Senergy Parties underpaid royalties required by the 2003 and 2012 Royalty Agreements and subsequent modifications, he (along with TDA) sued the Senergy Parties in state court. SA 306–320. Absent from the petition was any trademark claim. *Id.* There, along with money damages, Dr. Tennant sought a permanent injunction prohibiting the Senergy Parties "from

continuing to hide the database of customers who have purchased [Dr. Tennant's] products from [Dr. Tennant]." SA 317 (¶ 71).

After the Senergy Parties filed this suit, the Dr. Tennant Parties counter-claimed—asserting trademark rights for the first time—and moved for a preliminary injunction. Dkt. #22. Following the discovery of allegedly countersigned documents, the Dr. Tennant Parties filed the Amended Motion for Preliminary Injunction, moot-ing their original motion. Dkt. # 48. The sole cause of action asserted in the Dr. Ten-nant Parties' Motion is trademark infringement. *Id.*

## LEGAL STANDARD

Rule 65(a) provides for the issuance of preliminary injunctions. Fed. R. Civ. P. 65(a). "A preliminary injunction is an 'extraordinary remedy.'" *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *see Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant a pre-liminary injunction is to be treated as the exception rather than the rule."). In fact, "[i]n some ways, the permanent injunction is less demanding than the preliminary injunction." *Valentine v. Collier*, 978 F.3d 154, 159 (5th Cir. 2020). A preliminary injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).

To obtain their preliminary injunction, the Dr. Tennant Parties must prove (1) a substantial likelihood of success on the merits, (2) a substantial threat of irrep-arable harm in the absence of preliminary relief, (3) that the balance of equities tips

in the movant's favor, and (4) that the injunction serves the public interest. *See Winter*, 555 U.S. at 20. "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

## ARGUMENT

### 1.    The Dr. Tennant Parties are unlikely to succeed because they fail to establish their ownership of the Marks.

The Dr. Tennant Parties are unlikely to succeed because they are not the owners of either the TENNANT BIOMODULATOR or TENNANT BIOTRANSDUCER marks (collectively, the "Marks"). They were not first to use the Marks in commerce, and they never licensed the Marks to those who did.

### 1.1.    As a threshold issue, Dr. Tennant cannot establish use of the Marks by the mere selection of their names.

Dr. Tennant cannot argue the terms "Biomodulator" or "Biotransducer" in isolation are trademarks because he allegedly coined them. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:11 (5th ed. 2019) (hereafter "McCarthy") ("Trademark rights grow out of use, *not mere selection*.") (emphasis added). These "Bio-" terms describe underlying goods, and both triggered disclaimers from the USPTO during prosecution. *See* SA 063–066 (Office Action requiring disclaimer for BIOMODULATOR and citing definition as "biologic response modifier"); *see also* SA 172–173 (Office Action requiring disclaimer for BIOTRANSDUCER in view of myriad BIO- and TRANSDUCER marks). Dr.

Tennant disclaimed both—admitting to the world he does not claim exclusive rights to them. App 0021; App 0023.

### 1.2.    The Dr. Tennant Parties did not first use the Marks in commerce.

"Ownership of trademarks is established by use, not by registration." *Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842 (5th Cir. 1990). The first to use a mark in commerce is generally held to be the senior user with the ability to enjoin junior users with deceptively similar marks. *Id.* "Moreover, federal registration of a mark does not terminate the common law rights of a senior user." *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 647 (N.D. Tex. 2022). Thus, to succeed in their trademark claim, the Dr. Tennant Parties must prove that they are the Marks' senior user. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). They are not.

In fact, Senergy and Avazzia were the first to sell and manufacture Tennant BioModulators, respectively. SA 003–004 (¶¶ 7–8). The Dr. Tennant Parties wrongly claim Dr. Tennant "placed the marked Tennant BioModulator® product into commerce in 2003 via his promotion of the devices in therapy." Mot. at 22. But the Dr. Tennant Parties provide no supporting evidence for this assertion—because they cannot. Dr. Tennant admits only Avazzia has manufactured BioModulators. SA 270 at 69:14–17. But Avazzia was not formed until May 2004. SA 241–243. Thus, no Tennant BioModulator could have been manufactured in 2003 because its only manufacturer did not even exist. In fact, Avazzia did not manufacture the first Tennant BioModulator devices until 2004, and Senergy started selling them in 2005. SA 003–

004 (¶¶ 7–8). Moreover, the Dr. Tennant Parties' use-in-commerce evidence—in both federal filings and attached to the Motion—shows that either Avazzia or Senergy is the true owner of any trademarks.[1]

### 1.2.1. Avazzia presumptively owns the Marks for devices they made—not Dr. Tennant.

Under default trademark rules, Avazzia is presumed to be the trademark owner—as opposed to Dr. Tennant—because Avazzia manufactured the goods first bearing the Marks. "[T]here is a presumption that the manufacturer of goods is the owner of the trademark associated with those goods *in the absence of an agreement to the contrary*." *Romac Env't Servs. LLC v. Wildcat Fluids LLC*, No. 6:20-CV-00581 LEAD, 2022 WL 421416, at *5 (W.D. La. Feb. 10, 2022) (emphasis added). But Dr. Tennant cannot cite a contrary agreement he had with Avazzia—because the only agreements with Avazzia run through Senergy. SA 269–270 at 68:15–69:5 (Dr. Tennant cannot identify express license agreement with Avazzia). While Avazzia's ownership presumption is rebuttable, the law "place[s] a thumb on the ownership scale in favor of the manufacturer." *Romac*, 2022 WL 421416, at *5.

### 1.2.2. Dr. Tennant's federal filings show Senergy and Avazzia first used the Marks in commerce.

Dr. Tennant's trademark registrations are irrelevant to whether he owns the Marks. *See Sport Supply Grp., Inc. v. Savage*, No. 3:10-CV-913-O, 2011 WL 13234197, at *9 (N.D. Tex. Dec. 22, 2011) (deeming registration timeline "irrelevant" to the

---

[1] Whether Avazzia or Senergy is the owner of the TENNANT BIOMODULATOR or TENNANT BIOTRANSDUCER marks is of no moment to the Motion—all that matters here is the Dr. Tennant Parties are not the owners.

ownership analysis); *see also Savage Tavern*, 589 F. Supp. 3d at 664. And the Marks'
file histories highlight Dr. Tennant was uninvolved in the Marks' use in commerce.

Here, Dr. Tennant's federal trademark filings reinforce that Senergy and
Avazzia were the first commercial users. Consistent with Senergy's 2004 agree-
ments with Avazzia, Avazzia's invoices to Senergy, and Scott's testimony, Dr. Ten-
nant stated the first use in commerce of the TENNANT BIOMODULATOR mark
was at least as early as January 24, 2005. SA 003–004 (¶¶6–10); SA 019. And Dr.
Tennant's federal "specimen of use"—a requirement for registrations—shows
Avazzia made the BioModulator device (bound in red):



SA 077. Dr. Tennant's 2012 and 2016 specimens are consistent—Dr. Tennant again
relied on Avazzia-made products to maintain his federal registration. SA 037; SA
028.

The TENNANT BIOTRANSDUCER specimens also support that Senergy used the mark before Dr. Tennant. The initial specimen in the trademark application relied on *Senergy* documentation:



SA 239. For his updated 2022 specimen, Dr. Tennant used *Senergy's* website to show the BioTransducer's commercial use:



SA 110. This evidence establishes that Senergy (or Avazzia) is the first user of the marks. McCarthy § 16:18.50 ("Neither application for nor registration of a mark at

the federal level wipes out the prior nonregistered, common[-]law rights of others.").

### 1.2.3. Dr. Tennant's evidence of "use" also reinforces that Senergy and Avazzia are the first users in commerce.

While Dr. Tennant claims *he* introduced the Tennant BioModulator via seminars, those efforts were Senergy's. Senergy paid for, developed, and distributed the promotional materials used in those seminars. SA 299–300 at 266:20–267:23. Senergy also organized, paid for, and staffed those seminars. *Id.* And Senergy paid for Dr. Tennant's attendance and expenses at those seminars. *Id.*

Dr. Tennant's claimed BioModulator 2004 "prototype"—a picture of which is attached to his declaration—is irrelevant. App. 00163. That device was the Avazzia-made model Senergy sold in 2005. SA 004 (¶11). Even so, "the shipment of a prototype" is not "the kind of public use necessary to achieve priority." McCarthy § 16:12. Thus, Dr. Tennant's "prototype" cannot show commercial use.

### 1.3. The Dr. Tennant Parties never licensed any trademark rights.

The Motion is premised on the incorrect legal conclusion that Dr. Tennant licensed trademark rights to the Senergy Parties. The Dr. Tennant Parties assume (without any analysis) that Dr. Tennant granted Scott trademark licenses via the Royalty Agreements. But a review of the Royalty Agreements show they are instead a grant of know-how or trade secrets. To wit, the Royalty Agreements never mention trademark rights (and contain provisions contradicting trademark rights), expressly foreclose implied licenses, and lack any quality control provisions.

### 1.3.1.   The use-based Grant Clause covers a technology—not a trademark—by its plain language.

Dr. Tennant never licensed trademarks under the Royalty Agreements. In the Royalty Agreements' Grant Clauses, Dr. Tennant gave Scott the worldwide "rights and license . . . *to use* the Grantors Property" for a 20-year, renewable term. App. 0032 (emphasis added). The 2003 Agreement defines "Grantors Property" as "Tennant Biomodulator," while the 2012 Agreement defines "Grantors Property" as "Tennant Biomodulator PRO." App. 0032, 0040. Thus, the scope of the licensed "use," which is "perhaps the oldest and simplest form" of a license, is the critical question. *Equistar Chemicals L.P. v. Indeck Power Equip. Co.*, No. 4:18-CV-4349, 2020 WL 4746469, at *12 (S.D. Tex. Aug. 17, 2020).

But "Grantors Property" is not a trademark. Indeed, the Royalty Agreements never reference "Grantors Property" as a trademark. Nor do they use any trademark symbols (® or ™). In fact, the Royalty Agreements never mention trademarks *at all*. And the Royalty Agreements lack the hallmark of trademark licensing: quality control provisions. *See* McCarthy § 18:48 (A trademark can be licensed "only if the licensor exercises control over the nature and quality of the goods . . . sold by the licensee under the licensed mark."). Simply put, nothing in the Royalty Agreements links "Grantors Property" to trademark rights. Instead, "Grantors Property" is a technology—either the Tennant BioModulator or the Tennant BioModulator PRO.

Under normal contract interpretation principles, a license "to use" technology does not cover all intellectual property rights associated with that technology. *Equistar*, 2020 WL 4746469, at *12 (collecting cases). The language of the

agreements control—and the Dr. Tennant Parties can point to nothing in them addressing trademark rights. Thus, the Royalty Agreements grant bare licenses to "use" a technology, and trademark rights should not be shoehorned into the meaning of "Grantors Property." *Cf. id.* at *12–13 (citing cases declining to interpret a grant to use a technology as granting copyrights).

### 1.3.2.  Other clauses show the agreed-upon "use" of "Grantors Property" is antithetical to trademark law.

Other provisions governing the "Grantors Property" show that it cannot comprise a trademark. Scott, for example, agreed to "maintain the Grantors Property *in confidence*, with [the] exercise of the same degree of care Grantee exercise with respect to Grantee's own *proprietary* information." App. 0033 ¶ 3(a) (emphasis added); *see also* App. 0035–36 ¶ 9 (Scott agreed not to disclose "any information that is proprietary to Grantor"); App. 0041 ¶ 3(a); App. 0043 (same).

But if the Royalty Agreements are trademark licenses, Scott *cannot* "maintain Grantors Property in *confidence*." Trademark protection "helps consumers identify goods and services that they wish to purchase, as well as those they want to avoid." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017). Thus, a claim for trademark infringement cannot be rooted in confidential information. *See Webpass Inc. v. Banth*, No. C14-02291 HRL, 2014 WL 7206695, at *3 (N.D. Cal. Dec. 18, 2014) ("[P]roprietary and confidential business information is not a trademark, service mark, trade name, or other designation protectable under the Lanham Act . . . ."). Even Dr. Tennant agrees. SA 292–293 at 138:24–139:18 ("[C]onfidential information is confidential information, trademarks are public information.").

Put another way, construing "Grantors Property" to include trademark rights would render the Royalty Agreements' confidentiality provisions as nullities—because "Grantors Property" could never be confidential if it helped consumers identify Senergy's products. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) ("[W]e avoid construing contracts in a way that renders contract language meaningless."). Moreover, Dr. Tennant admits the confidentiality provisions for Grantors Property are "related to the proprietary modes and frequencies that [he] developed for [his] device . . . ." App. 004 ¶ 5. That admission is consistent with reading "Grantors Property" to mean know-how, not a trademark.

The Royalty Agreements' indemnity clauses also show "Grantors Property" cannot encompass trademark rights. There, Scott agreed to indemnify Dr. Tennant if Scott's "negligence is the cause of any personal injury or property damage . . . in the course of *using the Grantors Property* . . . ." App. 0033 ¶ 3(c) (emphasis added); App. 0041 ¶ 3(c). But "using" a trademark can never cause personal injury. Only something tangible could (like the device itself). Thus, the indemnity clauses reinforce that "Grantors Property" is a tangible technology—not a trademark.

Dr. Tennant's other representations show "Grantors Property" is not a trademark. Dr. Tennant, for example, promised to "deliver to [Scott] all relevant documents which are necessary for the *use of Grantors Property*." App. 0032 ¶ 2(b). And while Dr. Tennant never provided any documents, this provision only makes sense in the context of understanding the know-how of underlying technology, not the trademarks themselves.

### 1.3.3. Dr. Tennant could neither use in commerce nor license a trademark for a product that did not exist in 2003.

The 2003 Royalty Agreement cannot be a trademark license because the underlying property—the Tennant BioModulator—did not exist in 2003. Dr. Tennant informed the public that he was not using TENNANT BIOMODULATOR in 2003. In Dr. Tennant's trademark application (where he is incentivized to select the *earliest* supportable date of first use), his stated date of first use is January 24, 2005—a year-and-a-half *after the alleged licensure*. SA 019. While Dr. Tennant claims he worked on the "Tennant BioModulator" in 2003 (Mot. at 2–3) with a "U.S. Based Manufacturer" (i.e., Avazzia), that work did not begin *until 2004*. SA 003–004 (¶¶ 7–11). In fact, the first agreements between Senergy and Avazzia are from 2004. *Id.*

Dr. Tennant cannot refute the lack of commercial use of the TENNANT BIOMODULATOR mark at time of the 2003 Royalty Agreement. He, for example, could not remember at the time he was deposed in this case when he signed the agreement. SA 278–279 at 120:19–121:12. Moreover, Dr. Tennant cannot remember if he agreed to the 2003 Royalty Agreement before or after the Biomodulator was first used in commerce. SA 284–285 at 126:23–127:6. Dr. Tennant also does not know what use he made of the phrase "Tennant BioModulator" at execution. SA 286 at 132:13–16; SA 287–288 at 133:22–134:1. Nor could Dr. Tennant recall any marketing materials using the phrase "Tennant BioModulator" before execution. SA 289–290 at 135:24–136:14. Dr. Tennant also could not point to any specific instances of using the phrase "Tennant Biomodulator" with a device. SA 290–291 at 136:22–137:4. Nor could Dr. Tennant remember substantive details about the

2003 Royalty Agreement because it "was such a long time ago" and "that time period is a bit foggy in [his] mind . . . ." SA 280–282 at 122:21–124:20.

Thus, the primary source of Dr. Tennant's Parties' evidence—Dr. Tennant's memory—is mistaken. No Tennant BioModulator existed in 2003, and he had no trademark to license. *Cf. Spireas v. Comm'r of Internal Revenue*, 112 T.C.M. (CCH) 262 (T.C. 2016), *aff'd*, 886 F.3d 315 (3d Cir. 2018), *as amended* (June 1, 2018) (license "could not possibly have" covered drug formulations "because no such formulations existed" at license's effective date). At most, Dr. Tennant may have had an *idea* for a trademark in 2003, but "[i]t is a basic rule of trademark law that a concept or an idea for a new trademark is not itself a 'trademark.'" McCarthy § 16:11. Rights in a trademark are gained through use before the relevant public in the marketplace, not via invention. *Id*.

### 1.3.4.  The Royalty Agreements restrict their license grants and foreclose implied licenses—one of Dr. Tennant's central liability theories.

The Royalty Agreements disclaim implied licenses and broad interpretations of the Grant Clauses. Both agreements contain identical "Other Rights" clauses foreclosing the Royalty Agreements from supporting either implied license grants or any other license (like a trademark license) that was not expressly granted:

> **17. OTHER RIGHTS.** Nothing contained in this Agreement shall be construed as conferring by implication, estoppels, or otherwise upon either party any license or other right except the licenses and rights expressly granted hereunder to that party.

App. 0038 ¶ 17; App. 0046 ¶ 17. This provision forecloses any implied license theory. *Minebea Co., Ltd. v. Papst,* 444 F. Supp. 2d 68 (D.D.C. 2006), *dismissed*, 224 Fed. App'x 962 (Fed. Cir. 2007) ("Where there exists an express disclaimer, no license can be implied.") (cleaned up). Thus, the Other Rights clauses reaffirm the Grant Clause does not contain trademark rights.

### 1.3.5.  The Modification to the Royalty Agreements does not grant any trademark rights (express or implied) to the Senergy Parties.

The Modification also does not grant any trademark rights to the Senergy Parties. The Modification purports to change the parties' rights under the Royalty Agreements:

> Whereas on October 1, 2012 and June 15, 2012, agreements were made between Senergy Medical Group and / or Scott Tennant as Grantee from Jerry Tennant as Grantor; see attached exhibits.
>
> This agreement modifies those agreements for payments of royalties for Grantor's proprietary interest in the Tennant Biomodulators.

App. 0059. The Modification, for instance, added a mutual at-will cancellation provision with 30-days' notice. *Id.* The Modification also ostensibly changed the royalty structure for the BioModulators, and mentioned, for the first time, the "Biotransducer CrystalWave." *Id*. But like the Royalty Agreements before it, the Modification contains no trademark license grant. Nor does it add a quality control provision.

Via the Modification, the "Biotransducer CrystalWave" falls under the Royalty Agreements' ambit—eliminating an implied license theory for it, too. *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 849 (S.D. Tex. 2011) (A modification "introduces a new or different element into the details of the contract,

but leaves its general purpose and effect undisturbed.") (citation omitted). While neither of the original Agreements mentioned a BioTransducer, Scott and Dr. Tennant incorporated it via the Modification, where they established a royalty payment for the then-new device. Thus, the provisions of the Royalty Agreements—including the implied-license-barring "Other Rights" provision—also apply to the BioTransducer. *See Crow-Billingsley Stover Creek, Ltd. v. SLC McKinney Partners, L.P.*, No. 05-09-00962-CV, 2011 WL 3278520, at *6 (Tex. App.—Dallas Aug. 2, 2011, no pet.) (original contract provision still applied even though contract had been amended six times). In any case, Senergy had already been using the TENNANT BIOTRANSDUCER mark for years before the Modification. SA 004–006 (¶¶ 12–15). Thus, the Royalty Agreements foreclose the Dr. Tennant Parties' implied license theory.

## 2.    Dr. Tennant's monetary demands and filing delay rebut the presumption of irreparable harm.

This dispute arose because Dr. Tennant claimed the Senergy Parties owed him money. His pre-suit conduct rebuts the bursting-bubble presumption of irreparable harm.

### 2.1.    Dr. Tennant's pre-suit conduct undercuts his claim of irreparable harm.

There is no irreparable harm because pre-suit correspondence shows the Dr. Tennant Parties are motivated by money and access to business leads contained in Senergy's records—not by a desire to protect their goodwill. On June 21, 2024, Dr. Tennant sent the Senergy Parties a letter terminating the Royalty Agreements. SA

012–014. In that letter, Dr. Tennant claimed he is owed $5 million after determining Senergy supposedly underreported sales. SA 013. But when money is the answer to the liability question, there is no irreparable harm. *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 546 (5th Cir. 2023) ("Such harms are pecuniary in nature, and thus presumptively reparable.").

Along with his June letter, Dr. Tennant included a "settlement" offer—open only for 48 hours—where he demanded Scott falsely represent that he sold Senergy to Dr. Tennant, provide the Senergy customer database, and deliver all Senergy-produced marketing materials, in exchange for waiving all liability. SA 008–011. In fact, Dr. Tennant expressly admitted this public-facing messaging would be a lie: "Jerald Tennant has no desire to buy Senergy Medical Group/Senergy Wellness Group; this is for external messaging only." SA 008. Thus, via a time-sensitive offer, Dr. Tennant wanted to put pressure on the Senergy Parties to give up their business. His ploy failed.

Dr. Tennant's now-dismissed state lawsuit—where he neglected to assert any trademark claims—shows his primary concern is money. If the alleged harm was truly irreparable, the Dr. Tennant Parties would have sought trademark injunctive relief from the onset. They did not. Instead, they wanted access to Senergy's customers so that the Dr. Tennant Parties could sell those customers more products. SA 317 ¶ 71 (requesting permanent injunction to prevent Senergy from "continuing to hide [its] database of customers . . . .").

### 2.2. The Dr. Tennant Parties solely rely upon a bursting-bubble presumption for irreparable harm.

The Dr. Tennant Parties root their alleged irreparable harm argument in 15 U.S.C. § 1116(a)'s bursting-bubble presumption. But the Senergy Parties have adduced some evidence—a "slight evidentiary showing" is all that is required—for "a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022). Thus, the Dr. Tennant Parties have the burden of production "to point to evidence that irreparable harm is likely absent an injunction." *Id*. Yet they point to none—dooming their Motion.

### 3. The equities weigh against the Dr. Tennant Parties.

The balance of equities skews against the Dr. Tennant Parties. The Royalty Agreements and the Modification tie Dr. Tennant's royalty to a percentage of the retail sale. APP 0059. This arrangement ensures Dr. Tennant is financially incentivized to sell the devices to his patients at the highest possible price. This creates a conflict of interest—one that Dr. Tennant does not disclose to his patients. SA 298 at 202:12–21. And that arrangement has affected Dr. Tennant's conduct to the detriment of his patients. The Dr. Tennant Parties claim the Senergy Parties' trademark "use has already interfered with Dr. Tennant's access to the supply of the marked products for use in his practice," (Mot. at 28), but that problem is self-imposed. Dr. Tennant will not authorize his patients to buy products from Senergy because it "does not have a valid license to sell [his] devices." SA 262–263 at 36:15–37:23. In other words, Dr. Tennant refuses to treat his patients with Senergy-produced

BioModulators or BioTransducers because he no longer gets a cut from product sales. But before this lawsuit, he never refused to write a prescription for a BioModulator. SA 298 at 202:8–11. After the Royalty Agreement termination, Dr. Tennant—for the first time—refused to write a prescription for a BioModulator. SA 322–323 at 200:25–201:22.

Moreover, Senergy is a party that has "invested considerable time, effort and expense in promoting [the Marks]"—weighing against granting an injunction on equitable grounds. *Cf. S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 765 (N.D. Tex. 2013) (granting injunction where moving party paid for trademark promotion). In fact, the Dr. Tennant Parties spend several pages highlighting the marketing efforts to established acquired secondary meaning in the Marks. Mot. at 19–20. But again, those efforts were Senergy's.

### 4.    A preliminary injunction does not serve the public interest.

For this factor, "courts will often discuss whether an injunction protects consumers from deception or whether it will impede the free market." *Savage Tavern*, 589 F. Supp. 3d at 662. "Without a way to tell similar products apart, consumers cannot discriminate against the inferior version." *Id*. But the rub here is that there are not two similar products to tell apart. The Dr. Tennant Parties have never sold or manufactured competing devices. And there is no evidence that they are selling competing devices now. Thus, preserving the "status quo"—Senergy selling Tennant-branded devices—should continue.

Moreover, the Dr. Tennant Parties' injunctive relief would prevent patients from getting access to the sole supplier of prescribed medical devices, which is against the public interest. Courts "have recognized that the public interest factor weighs heavily when an injunction would have a potentially adverse effect on public health." *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147-WCB, 2014 WL 1049067, at *11 (E.D. Tex. Mar. 17, 2014) (collecting cases); *see also Conceptus, Inc. v. Hologic, Inc.*, 2012 WL 44064, at *3 (N.D. Cal. Jan. 9, 2012) ("Removing [the product] from the market would have eliminated an important alternative for patients."). That concern is magnified here because Senergy is the *sole* distributor of the Tennant Bio-Modulator devices. *Id.* (declining injunction when relief would leave only one alternative on market).

## CONCLUSION

The Dr. Tennant Parties' Motion for Preliminary Injunction should be denied.

.

November 1, 2024                         Respectfully submitted,

                                         **Griffith Barbee PLLC**

                                         /s/ *Casey Griffith*
                                         ─────────────────────────

                                         Casey Griffith
                                         Texas Bar No. 24036687
                                         Casey.Griffith@griffithbarbee.com

                                         Michael Barbee
                                         Texas Bar No. 24082656
                                         Michael.Barbee@griffithbarbee.com

                                         Kirk Voss
                                         Texas Bar No. 24075229
                                         Kirk.Voss@griffithbarbee.com

                                         Joshua Yun
                                         Texas Bar No. 24120335
                                         Joshua.Yun@griffithbarbee.com

                                         One Arts Plaza
                                         1722 Routh St., Ste. 910
                                         Dallas, Texas 75201
                                         (214) 446-6020  |  main
                                         (214) 446-6021  |  fax

                                         **Counsel for Plaintiffs**

## CERTIFICATE OF WORD COUNT

Pursuant to Section II.A. of the Court's Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, the undersigned certifies this document contains 5,274 words, excluding case caption, signature blocks and certificates. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

/s/ *Casey Griffith*

Casey Griffith

## CERTIFICATE OF SERVICE

I certify that on November 1, 2024 a copy of this document was served on all counsel of record via the Court's electronic document delivery system and pursuant to the Rules.

/s/ *Casey Griffith*

Casey Griffith