# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MARTEN GROUP, INC. d/b/a SENERGY MEDICAL GROUP and SCOTT TENNANT, | § § § § | |
| Plaintiffs, | § § § | Case No. 3:24-cv-01852 |
| v. | § § § | **JURY TRIAL DEMANDED** |
| JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, and CURADOR, LLC, | § § § § § § § | |
| Defendants. | § § | |

## APPENDIX TO DEFENDANTS' REPLY IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Local Rule 7.1, Defendants submit the attached evidence referenced in its Reply in Support of Amended Motion for Preliminary Injunction.

## INDEX

| EXHIBIT NO. | DESCRIPTION | APP. PAGE NOS. |
|---|---|---|
| E | Declaration of Chelsey L. Mam in Support of Defendants' Reply in Support of Amended Motion for Preliminary Injunction | APP 001 - 002 |
| E-1 | Excerpts from Dr. Tennant's deposition that occurred on October 16 & 17, 2024 | APP 003 – 0026 |

Dated:  November 12, 2024          Respectfully submitted,

*/s/Tyler L. Farmer*
Tyler L. Farmer
WSBA No. 39912
*Pro Hac Vice*
Tyler.farmer@bclplaw.com
Ariel A. Martinez
WSBA No. 54869
*Pro Hac Vice*
Ariel.martinez@bclplaw.com
Chelsey L. Mam
WSBA No. 44609
*Pro Hac Vice*
Chelsey.mam@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
999 3rd Ave., Suite 4400
Seattle, WA 98104
Tel: (206) 623-1700
Fax: (206) 623-8717

Justin D. Hanna
Texas Bar No. 24095726
Bryan Cave Leighton Paisner  LLP
2200 Ross Avenue, Suite 4200W
Dallas, TX  75201-7965
(214) 721 8052
E: Justin.Hanna@bclplaw.com

ATTORNEYS FOR DEFENDANTS
JERALD TENNANT, MD, JOHN
TENNANT, TERESA JESSEN TENNANT,
JARED TENNANT, TENNANT DEVICES
AND ACCESSORIES, LLC, and
CURADOR, LLC

## **CERTIFICATE OF SERVICE**

I certify that this document is being served via ECF on counsel of record.

*/s/Tyler L. Farmer*
Tyler L. Farmer

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| MARTEN GROUP, INC. d/b/a SENERGY MEDICAL GROUP and SCOTT TENNANT, | § § § § | |
| Plaintiffs, | § § | Case No. 3:24-cv-01852 |
| v. | § § § | **JURY TRIAL DEMANDED** |
| JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, and CURADOR, LLC, | § § § § § § § § | |
| Defendants. | § § | |

<u>**DECLARATION OF CHELSEY L. MAM IN SUPPORT OF DEFENDANTS'**</u>
<u>**REPLY IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY**</u>
<u>**INJUNCTION**</u>

I, Chelsey L. Mam, hereby declare as follows:

1.    I am one of the attorneys for Defendants in this matter. I am over age 18 and am competent to be a witness. I am making this declaration based on facts within my own personal knowledge.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the deposition of Jerald Tennant, MD on October 16 & 17, 2024.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Seattle, Washington on this 12th day of November, 2024.


*s/Chelsey L. Mam*
Chelsey L. Mam, WSBA #44609

## **CERTIFICATE OF SERVICE**

I certify that this document is being served via ECF on counsel of record.

*/s/Tyler L. Farmer*
Tyler L. Farmer

# EXHIBIT E-1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
MARTEN GROUP, INC. D/B/A      )
SENERGY MEDICAL GROUP AND     )
SCOTT TENNANT,                )
                             )
           Plaintiffs,        )
                             )
VS.                           )
                             ) Case No.
JERALD TENNANT, MD, JOHN      ) 3:24-cv-01852-E
TENNANT, TERESA JESSEN        )
TENNANT, JARED TENNANT,       )
TENNANT DEVICES AND           )
ACCESSORIES, LLC, AND         )
CURADOR, LLC,                 )
                             )
           Defendants.        )
```

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
JERALD TENNANT, MD
OCTOBER 16, 2024
VOLUME 1 OF 2
-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JERALD
TENNANT, MD, produced as a witness at the instance
of the Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on October 16, 2024,
from 10:37 a.m. to 4:27 p.m., before Christy
Cortopassi, CSR in and for the State of Texas,
reported by machine shorthand, at the law offices
of Bryan Cave Leighton Paisner LLP, 2200 Ross
Avenue, Suite 4200W, Dallas, Texas 75201, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

JERALD TENNANT, MD - 10/16/2024

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         Mr. Casey Griffith
           Mr. Kirk Voss
 5         GRIFFITH BARBEE PLLC
           One Arts Plaza
 6         1722 Routh Street
           Dallas, Texas 75201
 7         214.446.6020
           casey.griffith@griffithbarbee.com
 8         kirk.voss@griffithbarbee.com

 9
      FOR THE DEFENDANTS JERALD TENNANT, MD, JOHN TENNANT,
10    TERESA JESSEN TENNANT, JARED TENNANT, TENNANT
      DEVICES AND ACCESSORIES, LLC, AND CURADOR, LLC:
11
           Ms. Chelsey Mam
12         Mr. Justin Hanna
           BRYAN CAVE LEIGHTON PAISNER LLP
13         999 Third Avenue
           Suite 4400
14         Seattle, Washington 98104
           206.294.7425
15         chelsey.mam@bclplaw.com
           justin.hanna@bclplaw.com
16

17

18    ALSO PRESENT:
           Jerry Gutierrez, Marten Group
19         Jared Tennant
           Scott Tennant
20
           Alex Oviedo & Tony Harris - Videographers
21

22

23

24

25
```

JERALD TENNANT, MD - 10/16/2024

Page 9

```
 1   figure out whether you knew of Tim Smith before Avazzia
 2   was formed?
 3                    MS. MAM:  Object to form.  Go ahead.
 4        A.  Yes.
 5        Q.  (BY MR. GRIFFITH)  And how does it help you?
 6        A.  To the best of my recollection, Tim Smith came
 7   to -- made an appointment and came to see me somewhere
 8   in the neighborhood of 2002, 2003.
 9        Q.  Do you recall signing a -- and actually, before
10   I start going into any exhibits, my understanding is --
11   and I am sympathetic because I had a detached retina in
12   early August.
13                    But my understanding is that you do have
14   trouble reading documents; is that fair to say?
15        A.  Yes.
16        Q.  Okay.  Can you describe for me, generally, what
17   kind of problems you have reading documents?
18        A.  The -- first of all, I see next to nothing out
19   of my left eye.  And my right eye sees approximately
20   20/60, so -- 20/50, 22/60, somewhere in that
21   neighborhood, which means I can't read standard print.
22   And my vision varies from hour to hour.  So it depends
23   on how tired I am, what I can read.
24        Q.  Okay.  And is there a specific condition that
25   causes these eyes problems that you have?
```

JERALD TENNANT, MD - 10/16/2024

```
 1          Q.  Do you recall -- well, let me ask you this.  Do
 2     you recall signing any agreements with Avazzia?
 3          A.  I'm not recalling at this moment a specific
 4     agreement.  It was more, hey, will you manufacture this
 5     for me and here are the specifications.
 6          Q.  Okay.
 7          A.  So that started the thing.
 8          Q.  Okay.  So -- well, let me ask -- let me ask you
 9     this way.  Can you tell me today what agreements you
10     recall you have ever had with Avazzia?
11               MS. MAM:  Object to form.
12          A.  So the agreements have been, I would design a
13     device that I wanted to be manufactured.  And I would
14     talk to Tim Smith and sometimes his daughter, Tammy
15     Lahusky, who worked with Tim and say, this is what I
16     want, can you and will you build it.
17               And then we would agree upon that, yes, I
18     will or no, I can't or whatever and what it would cost.
19     And then they would do it.
20          Q.  (BY MR. GRIFFITH)  Okay.  And I know one of the
21     issues we are going to get to later is some royalty
22     agreements that you entered into with Scott Tennant, for
23     example.  And so you know that there are terms of
24     agreements, correct?
25               MS. MAM:  Object to form.
```

JERALD TENNANT, MD - 10/16/2024

Page 14

```
 1        Q.  And is it fair to say that, sitting here today,
 2   you can't recall whether Avazzia made the BioTransducer
 3   device for you or the BioModulator device?
 4               MS. MAM:  Object to form.
 5        A.  Well, I recall, of course, them making those
 6   devices.  But you asked me the question a while ago,
 7   what was the first device Avazzia ever made.  I have no
 8   idea what the first device they ever made.
 9        Q.  (BY MR. GRIFFITH)  Okay.  Well, let's talk
10   about this -- let's talk about it this way.
11               Do you recall when Avazzia made a
12   BioModulator device at your request?
13        A.  The first discussion of that was when Tim Smith
14   made an appointment and came to my office, somewhere in
15   the neighborhood of 2002 or 2003.  That is as best I can
16   recall.
17        Q.  And do you recall whether you asked -- well,
18   strike that.
19               Did you ask Avazzia to make a BioTransducer
20   device for you after that?
21        A.  Yes.
22        Q.  Okay.  And do you recall how long after that
23   you made that request?
24        A.  It was approximately 2004.
25        Q.  You think that you made the request to build a
```

JERALD TENNANT, MD - 10/16/2024

Page 26

```
 1   with dementia, Dr. Tennant?
 2        A.  No.
 3        Q.  Have you ever been diagnosed with any form of
 4   memory loss?
 5        A.  Yes.
 6        Q.  Tell me about that.
 7        A.  In somewhere near the 1995s I was doing
 8   research for the Excimer laser refractive surgery.  I
 9   handled viruses and got encephalitis.  And during that
10   period of my encephalitis, my memory was certainly less
11   than before I got sick.
12        Q.  At some point you recovered, correct?
13        A.  Yes.
14        Q.  Did all of the memory loss that you suffered
15   when you had encephalitis return after you recovered
16   from encephalitis?
17             MS. MAM:  Object to form.
18        A.  There's no scientific tests that were done
19   before and after to answer that question specifically.
20        Q.  (BY MR. GRIFFITH)  So it's fair to say you
21   don't know, correct?
22        A.  Yes.
23        Q.  Thank you.  So at some point you -- strike
24   that.
25             At some point you were no longer involved
```

JERALD TENNANT, MD - 10/16/2024

1    in selling Scenar devices in the United States, correct?

2         A.   Yes.

3         Q.   Do you recall when that happened?

4         A.   Yes.   It was somewhere in the neighborhood of

5    2002, 2003 probably.   Somewhere in that neighborhood.

6         Q.   Do you recall whether you first met Tim Smith

7    before or after you were no longer involved in selling

8    Scenar devices in the United States?

9         A.   Tim Smith made the appointment and came to my

10   office during the time that we were selling Scenar.   And

11   we continued to sell Scenar until he provided us with

12   the prototype and eventually the BioModulator that I

13   approved.   And at that point we switched from Scenar to

14   BioModulator.

15        Q.   And can you explain why you decided to stop

16   selling the Scenar device?

17              MS. MAM:   Object to form.

18        A.   Well, I do recall, for example, it was very

19   difficult to get -- sometimes difficult to get the

20   Scenar devices.   Certainly it was difficult to get any

21   kind of repair that was needed.   And also I felt like I

22   had discovered better frequency waveforms, better

23   frequencies and a better approach to clinical use than

24   the Russians.

25              And so for that reason, when the

JERALD TENNANT, MD - 10/16/2024

1      Q.  So sitting here today you can't identify any
2  behavior of Scott Tennant's that causes you to say that
3  he has betrayed you and dishonored the Tennant name?
4              MS. MAM:  Object to form.
5      A.  Well, it's hard to know where to start.
6      Q.  (BY MR. GRIFFITH)  How about one example?
7      A.  One example is that I have critically sick
8  patients sit in my office as we speak.  I cannot treat
9  them properly because of Scott's collusion with Avazzia
10  where I can't get devices to treat my patients.
11              And they -- and Avazzia won't even sell me
12  my own devices because they say they have a contract
13  with Scott to prevent that.  So they are colluded
14  against my being able to be a physician to take care of
15  sick folks, and that's unconscionable.
16              You don't know how many people he's hurting
17  because he refu- -- they won't even sell me wires to
18  make the devices work.  My personal device at the office
19  quit working.  They won't repair it, because Scott has
20  inhibited them from doing so.  So is that enough?
21      Q.  Did you think about your patients before you
22  terminated the royalty agreements?
23              MS. MAM:  Object to form.
24      A.  Yeah.  I thought about that because I didn't
25  know that he had colluded with Avazzia to prevent them

JERALD TENNANT, MD - 10/16/2024

1    Q.  Okay.  So your position is that you don't want
2    your patients buying devices from Senergy to help you
3    treat them because of your trademark dispute with
4    Senergy, correct?
5                MS. MAM:  Object to form.
6        A.  So if it were not for the collusion between
7    Scott and Avazzia, my patients could be treated.  But
8    it's the collusion between them that prevents Avazzia
9    from selling me my own devices so I can take care of my
10   patients.
11       Q.  (BY MR. GRIFFITH)  Let me ask you this.  Other
12   than you, is there any reason that any of your patients
13   can't, right now, buy a BioModulator or BioTransducer
14   device, bring it to you and have you treat them?
15               MS. MAM:  Object to form.
16       A.  Ask me the question again.
17       Q.  (BY MR. GRIFFITH)  Yeah.  Other than -- well, I
18   want you to identify all reasons that you can't treat
19   your patients with devices that they purchase from
20   Senergy right now.
21               MS. MAM:  Object to form.
22       A.  Because it's -- and to the best of my
23   understanding, Senergy is breaking a contract, which is
24   in essence, in my mind, breaking the law by continuing
25   to sell my devices when they have no license to do so.

JERALD TENNANT, MD - 10/16/2024

1   BioModulator branded devices?

2              MS. MAM:  Object to form.

3       A.  I don't know.

4       Q.  (BY MR. GRIFFITH)  Do you know whether you had

5   ever prescribed a Tennant BioModulator branded device

6   that was paid for by the United States Federal

7   Government?

8       A.  I don't remember.  I don't recall.

9       Q.  Earlier you said that Avazzia and Scott are

10  colluding, correct?

11      A.  Yes.

12      Q.  Okay.  What exactly are they colluding to do?

13      A.  When I talked to Tim Smith and Tammy Lahusky at

14  Avazzia saying, you know, I want you to start -- I'm

15  giving you license to start selling the devices to

16  someone else besides Senergy, they said, sorry, we have

17  a contract where we can only sell them to Senergy.

18              And I said, Well, it's my belief you don't

19  have standing to make such a contract because I own the

20  trademarks and I'm the one who gave you the original

21  specifications to make my devices.

22              And I own the trademarks and, thus, they

23  are mine and so you have no standing to make such a

24  contract with Senergy.  And they said, Well, we're just

25  not going to sell them to anybody but Senergy until a

JERALD TENNANT, MD - 10/16/2024

Page 48

1    judge tells us we have to stop.

2         Q.  You have said that -- several times today that

3    you provided specifications to Avazzia, correct?

4         A.  Yes.

5         Q.  What specifications are you referring to?

6         A.  I told them -- I have got the -- well, first of

7    all, it doesn't matter which device that they have made.

8    They are using my trademarks and my proprietary

9    information.

10               I would say I want you -- I would like to

11   have this device made and I would like it.  Would you

12   make?  It.  And they say, Yes.  And I said, Okay.  Here

13   in writing are my descriptions of how -- of what I want

14   in this device, how it's supposed to work, et cetera.

15   And so those are all well documented.

16        Q.  Okay.  And so were those documented in emails?

17        A.  Yes.

18        Q.  How else were those specifications and

19   proprietary information documented?

20        A.  Well, a perfect example would be when we

21   upgraded the BioTransducer Crystal Wave a few months

22   ago.  Tammy Lahusky came to my office building and with

23   six prototypes and asked me to go through them and tell

24   her which ones work the best, which ones I desired would

25   be the proper update to make, which of those prototypes.

JERALD TENNANT, MD - 10/16/2024

Page 74

```
 1   that.
 2              You recall participating in the production
 3   of videos in which you appeared?
 4      A.  Yes.  I produced videos myself and also we did
 5   the seminars.  And those videos were collected by
 6   Senergy and used on their websites, as well as mine, to
 7   my knowledge.  But, again, I'm not -- I was not
 8   intimately involved with how all that was managed.
 9      Q.  Do you know who paid for those videos and
10   seminars?
11              MS. MAM:  Object to form.
12      A.  I don't, again, know all of those details.  I
13   know that in general Senergy would get me to tell them
14   when I was available to give seminars.  And then they
15   would obtain the place in which those were going to
16   happen and make all of those details.
17              And then a combination of the Senergy staff
18   and the clinic staff would be involved with making the
19   thing happen, taking care of all of the people that
20   came.
21              And then I was -- I did all of the creation
22   of the educational material in the sense that I created
23   all of the lectures, the -- all of the Keynotes or
24   PowerPoints, with exception of sometimes some of the
25   lecture would be given by part of the clinic staff and
```

JERALD TENNANT, MD - 10/16/2024

1   they would create their own PowerPoints.

2                So basically the material of my methodology

3   which I created and has become known as the Tennant

4   method around the world was my creation, which I

5   contributed.  And Senergy contributed setting up the

6   management of the venue.

7                And so there was -- it was a dual effort to

8   try to educate people how to take care of themselves.

9        Q.   (BY MR. GRIFFITH)  Did Senergy pay for any of

10  the content that was created that you just described?

11       A.   Primarily, I'm going to say no, with the

12  possible exception -- and I'll explain that.

13               For many years the seminar was given by

14  having a Thursday evening be open to the public.  And I

15  gave that lecture.  And then people who had signed up to

16  learn would come on Friday and Saturday.

17               And for many years I and I alone gave all

18  of those lectures as well.  And then in later years some

19  of the medical staff from the clinic would give some of

20  those specific lectures.

21               And -- but then Senergy decided to change

22  the Thursday night, quit doing it the way I had done it

23  all those years, and have a Senergy employee give that

24  lecture on Thursday.  And they did not -- they quit

25  opening it up to the public.

JERALD TENNANT, MD - 10/16/2024

1    include that as well.

2        Q.  So like a -- I'm sorry.  Go ahead.

3        A.  So, again, there was this -- a big manual that

4    was given out.  Now oftentimes you would see laying

5    around various other things that Senergy might have

6    created, maybe a brochure kind of thing about something

7    or other.

8            And they might hand those out or have them

9    laying on the table or whatever.  And so there would be

10    offerings from Senergy's perspective.

11        Q.  And you didn't pay for the creation of those

12    Senergy materials, correct?

13        A.  That's correct.

14        Q.  I want to go back to when you first started

15    working with Tim Smith and Avazzia.  You mentioned

16    previously that you said you hired Scott Tennant to work

17    with you on this Scenar and what became the Tennant

18    BioModulator project, right?

19        A.  That's not totally correct.

20        Q.  Okay.  How is that incorrect?

21        A.  So when -- to the best of my recollection, when

22    Scott came to work with us, I hired him to sell Scenar

23    devices, which I was involved with at that time.  And I

24    wanted somebody to do that so I could pay more attention

25    to my medical practice and developing my things.

JERALD TENNANT, MD - 10/16/2024

1          And so basically Scott's job was to sell

2   devices, and my job was to create devices and create the

3   methodologies that have become known around the world as

4   the Tennant method of treating patients.

5          And so Scott was always someone whose

6   specific job was to figure out how to help -- how to

7   sell devices that I developed.  And as part of that

8   process, obviously, he would sometimes interface with

9   Avazzia.

10          Or he would interface with other people or,

11   you know, help -- try to figure out what we were going

12   to do as far as where we were going to have the next

13   conference and that sort of thing.

14          But his obligation and his responsibility

15   was always sort of like the -- you know, a patient may

16   come in and the physician may say to the nurse, Nurse,

17   please, go change that dressing.

18          Well, a physician didn't change the

19   dressing but he gave the order and the nurse did it

20   under the supervision and observation and instructions

21   of the physician.

22          And that's always been the relationship

23   between Scott and me, is that his job was to be selling

24   devices.  My job was to be figuring out how to create

25   devices and make people well.

JERALD TENNANT, MD - 10/16/2024

1    And no matter what the labels were, it was

2    always understood -- it's always been understood that

3    that's what was going on and happening, at least, in

4    everybody's mind that worked around me.  And people that

5    knew us knew that that's the way things were set up.

6    So, yeah.

7    MR. GRIFFITH:  Move to strike,

8    nonresponsive.

9    Q.  (BY MR. GRIFFITH)  Dr. Tennant, is it fair to

10    say that Scott Tennant was a good salesman?

11    MS. MAM:  Object to form.

12    Q.  (BY MR. GRIFFITH)  Let me -- strike that.  Let

13    me ask it a different way.  Is Scott Tennant a good

14    salesman?

15    A.  Okay.

16    Q.  Just an okay salesman?

17    A.  Yeah.

18    Q.  Okay.  It took you a long time to answer that

19    question.  What were you struggling with?

20    A.  Well, it depends on what he's trying to sell.

21    Q.  Okay.  How about devices that Avazzia

22    manufactured?

23    A.  Well, sometimes he was there; sometimes he's

24    off doing other things that have nothing to do with the

25    devices.

JERALD TENNANT, MD - 10/16/2024

Page 153

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3   MARTEN GROUP, INC. D/B/A      )
     SENERGY MEDICAL GROUP AND     )
 4   SCOTT TENNANT,                )
                                   )
 5                  Plaintiffs,    )
                                   )
 6   VS.                           ) Case No.
                                   ) 3:24-cv-01852-E
 7   JERALD TENNANT, MD, JOHN      )
     TENNANT, TERESA JESSEN        )
 8   TENNANT, JARED TENNANT,       )
     TENNANT DEVICES AND           )
 9   ACCESSORIES, LLC, AND         )
     CURADOR, LLC,                 )
10                                 )
                    Defendants.    )
11

12                  REPORTER'S CERTIFICATION
               DEPOSITION OF JERALD TENNANT, MD
13                    OCTOBER 16, 2024

14       I, Christy Cortopassi, Certified Shorthand

15   Reporter in and for the State of Texas, hereby

16   certify to the following:

17       That the witness, JERALD TENNANT, MD, was duly

18   sworn by the officer and that the transcript of the

19   oral deposition is a true record of the testimony

20   given by the witness;

21       That the deposition transcript was submitted

22   on _____ to the witness or to the

23   attorney for the witness for examination, signature

24   and return to Hanna & Hanna by _____;

25       That the amount of time used by each party at
```

JERALD TENNANT, MD - 10/16/2024

Page 154

1    the deposition is as follows:

2    Mr. Casey Griffith.....04:03
     Ms. Chelsey Mam........00:00

3

4        I further certify that pursuant to FRCP No.

5    30(f)(i) that the signature of the deponent:

6        __X__ was requested by the deponent or a party

7    before the completion of the deposition and that

8    the signature is to be returned within 30 days from

9    date of receipt of the transcript.  If returned,

10   the attached Changes and Signature Page contains

11   any changes and the reasons therefor;

12       _____ was not requested by the deponent or a

13   party before the completion of the deposition.

14       I further certify that I am neither counsel

15   for, related to, nor employed by any of the parties

16   or attorneys in the action in which this proceeding

17   was taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19       Certified to by me this 21st of October, 2024.

20

21   _____
     Christy Cortopassi, Texas CSR 6222

22   Expiration Date: 10/31/2026
     HANNA & HANNA, INC.

23   CRF # 10434; Expires 10-31-2026
     8582 Katy Freeway, Suite 105

24   Houston, Texas  77024
     713-840-8484 - 713-583-2442

25   www.hannareporting.com

HANNA & HANNA, INC.
713.840.8484

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARTEN GROUP, INC., D/B/A    )
SENERGY MEDICAL GROUP AND    )
SCOTT TENANT,                )
                             )
          Plaintiffs,        )
                             )                Case No.
VS.                          )         3:24-cv-01852-E
                             )
JERALD TENNANT, MD, JOHN     )
TENNANT, TERESA JESSEN       )
TENNANT, JARED TENNANT,      )
TENNANT DEVICES AND          )
ACCESSORIES, LLC, AND        )
CURADOR, LLC,                )
                             )
          Defendants.        )
-----------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
JERALD TENNANT, M.D.
VOLUME 2
OCTOBER 17, 2024
-----------------------------------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF JERALD

TENNANT, M.D., produced as a witness at the instance

of the Plaintiffs and duly sworn, was taken in the

above-styled and numbered cause on Thursday,

October 17, 2024, from 10:34 a.m. to 4:08 p.m.,

before Kari Behan, CSR, RPR, CRR, a Texas certified

machine shorthand reporter, at the offices of Bryan

Cave Leighton Paisner LLP, 2200 Ross Avenue,

Suite 4200W, Dallas, Texas 75201, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

JERALD TENNANT, M.D. – VOLUME 2 – 10/17/2024

```
 1              Do you recall that conversation?
 2      A.  Yeah.  Vaguely, yeah.
 3      Q.  Okay.  When you -- when, kind of in a general
 4  sense, would that kind of confidential information about
 5  your devices be discussed?  What context?
 6              MR. GRIFFITH:  Object to form.
 7              THE WITNESS:  So there were meetings that
 8  would be held with -- with Avazzia and me and sometimes
 9  Scott would be in those meetings, and he would,
10  obviously, hear me discuss:  Okay, this is the way that
11  I want to do this and this is why I want to do it, or he
12  would observe:  Okay, we took these prototypes, and they
13  asked me to decide which one works the best.  He would
14  be sitting there watching me do it, and he commented on
15  why this worked better than that.
16              And then, obviously, there would be times
17  when I would go to say:  Okay, look, Scott and Jerry,
18  this is what's coming, and this is the way this works,
19  and you need to understand how it works so when people
20  ask you que- -- you know, patients ask you questions or
21  your staff needs the education, you know the answers to
22  this, but of course, this is confidential information
23  and expect you to keep it confidential and, you know,
24  only people who need to know need to know.
25              So it was, you know -- and then there would
```

JERALD TENNANT, M.D. - VOLUME 2 - 10/17/2024

1    be times when I would get a question from Avazzia -- you

2    know, I'm just making up something -- do you want a

3    orange case or a blue case, and I would copy Scott on

4    the answer to that.

5             Because, again, throughout these years, I

6    viewed us as a team, you know, as sort -- as I talked

7    about, a general and his lieutenant, a doctor and his

8    nurse, et cetera, et cetera.  Scott was -- was somebody

9    who -- who was there to understand what I was doing, why

10   I was doing it so he could do a better job of selling

11   the devices.

12            And plus, for me, it was another -- you

13   know, some people take their son fishing; I took Scott

14   under my wing and said:  Hey, let's talk about making

15   people well with electronics.  So that was confidential

16   information.

17   BY MS. MAM:

18        Q.  And -- and can you give me some examples --

19   without getting into the -- the science piece of it, but

20   what kinds of things did you consider confidential?

21        A.  Well, certainly my designs and the reason

22   behind it.  You know, some people like to play golf,

23   some people like to go fishing, some people like to do

24   whatever.  I like to figure out things that make people

25   get well.

JERALD TENNANT, M.D. - VOLUME 2 - 10/17/2024

Page 301

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION
 3   MARTEN GROUP, INC., D/B/A    )
     SENERGY MEDICAL GROUP AND    )
 4   SCOTT TENANT,                )
                                  )
 5          Plaintiffs,           )
                                  )         Case No.
 6   VS.                          )      3:24-cv-01852-E
                                  )
 7   JERALD TENNANT, MD, JOHN     )
     TENNANT, TERESA JESSEN       )
 8   TENNANT, JARED TENNANT,      )
     Tennant Devices AND          )
 9   ACCESSORIES, LLC, AND        )
     CURADOR, LLC,                )
10                                )
            Defendants.           )
11   ------------------------------------------------------
12                   REPORTER'S CERTIFICATION
13              ORAL & VIDEOTAPED DEPOSITION OF
                     JERALD TENNANT, M.D.
14                         VOLUME 2
                   THURSDAY, OCTOBER 17, 2024
15
          I, Kari J. Behan, CSR, RPR, CRR, and in and for
16   the State of Texas, do hereby certify that the facts
     as stated by me in the caption hereto are true;
17
          That there came before me the aforementioned named
18   person, who was by me duly sworn to testify the truth
     concerning the matters in controversy in this cause;
19
          And that the examination was reduced to writing by
20   computer transcription under my supervision; that the
     deposition is a true record of the testimony given by
21   the witness.
22        I further certify that I am neither attorney or
     counsel for, nor related to or employed by, any of the
23   parties to the action in which this deposition is taken,
     and further that I am not a relative or employee of any
24   attorney or counsel employed by the parties hereto, or
     financially interested in the action.
25
```

JERALD TENNANT, M.D. - VOLUME 2 - 10/17/2024

Page 302

```
 1        Certified to by me this 21st of October, 2024.

 2

 3

 4                    Kari Behan
                 _____
 5               KARI BEHAN, CSR, CCR, RPR, CRR
                 Texas CSR NO. 8564;
                 Expiration Date: 7-31-2026
 6               HANNA & HANNA, INC.
                 CRF # 10434; Expires 10-31-2026
 7               8582 Katy Freeway, Suite 105
                 Houston, Texas 77024
 8               713-840-8484 | 713-583-2442
                 www.hannareporting.com
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Supp App 26