# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| MARTEN GROUP, INC. d/b/a SENERGY MEDICAL GROUP and SCOTT TENNANT,<br><br>    Plaintiffs,<br><br>v.<br><br>JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, and CURADOR, LLC,<br>    Defendants. | Case No. 3:24-cv-01852<br><br>**JURY TRIAL DEMANDED** |

# DEFENDANTS' REPLY IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.  INTRODUCTION ...............................................................................................1

II. ARGUMENT ON REPLY ...................................................................................1

    A.  No Magical Language is Required to Enforce the Parties' Licensing Agreements.................................................................................................1

    B.  Dr. Tennant's Development, Licensing, and Commercial Support of the Brand Demonstrates the Use in Commerce Required By Law.......4

    C.  Even Were the Licensing Agreements Unenforceable, the Parties Acted According to an Implied License.................................................7

    D.  Dr. Tennant's Pre-Suit Conduct Is Consistent With the 30-Day Notice Period Following Termination and Does Not Negate the Irreparable Harm to His Brand ....................................................................................9

    E.  Dr. Tennant's Refusal to Support Senergy's Continued Infringement Is Consistent with the Requested Injunctive Relief ............................10

III. CONCLUSION...................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Equistar Chemicals L.P. v. Indeck Power Equip. Co.*,
 No. 4:18-CV-4349, 2020 WL 4746469 (S.D. Tex. Aug. 17, 2020)................2

*Exxon Corp. v. Oxxford Clothes, Inc.*,
 109 F.3d 1070 (5th Cir. 1997) ........................................................................8

*Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*,
 434 F. Supp. 3d 473 (E.D. Tex. 2020) .....................................................5, 11

*Gonzalez v. Dinning*,
 394 F.3d 388 (5th Cir. 2004) ..........................................................................3

*Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*,
 549 F.2d 368 (5th Cir. 1977) ..........................................................................4

*Nat'l Union Fire Ins. Co. of Pittsburg, PA v. CBI Industries, Inc.*,
 907 S.W.2d 517 (Tex. 1995) ..........................................................................2

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
 44 F.4th 180 (3d Cir. 2022) ..........................................................................10

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*,
 473 S.W.3d 296 (Tex. 2015) ..........................................................................2

*Turner v. HMH Pub. Co.*,
 380 F.2d 224 (5th Cir. 1967) ..........................................................................5

**Statutes/Rules**

15 U.S.C. § 1055 ................................................................................................5

15 U.S.C. § 1115(a) ...........................................................................................4

15 U.S.C. § 1116(a) .........................................................................................10

15 U.S.C. § 1127 ................................................................................................5

21 C.F.R. § 801.1 ................................................................................................7

## Other

J. Thomas McCarthy, 2 *McCarthy on Trademarks & Unfair Comp.* § 18.48 (5th ed. 2024) ........................................................................................................3, 4

## I.     INTRODUCTION

Counter-Defendants Scott Tennant and Marten Group, Inc. d/b/a Senergy Medical Group (collectively "Senergy") ask this Court to ignore the parties' signed Licensing Agreements and 20 years of the parties' performance so that they may avoid injunctive relief that would halt the willful continuing infringement of Dr. Tennant and Tennant Devices and Accessories, LLC's (collectively "Dr. Tennant") registered trademarks. Dr. Tennant, meanwhile, has demonstrated the urgent need for injunctive relief and the likelihood of success on his claim based on the undistorted historical facts and the law. The Court should issue a preliminary injunction prohibiting Senergy's continued infringement.

## II.    ARGUMENT ON REPLY[1]

### A.    No Magical Language is Required to Enforce the Parties' Licensing Agreements.

Despite 20 years of evidence to the contrary, Senergy now asserts that the Licensing Agreements did not grant a right to use Dr. Tennant's trademarks. Dkt. 52 at 12-15. This bizarre position is unsupported by the language of the agreements and the parties' actions.

---

[1] Senergy consistently mischaracterizes the facts relevant to the trademarks at issue. Dkt. 52 at 2-6. Dr. Tennant will address the pertinent incorrect assertions in his argument and does not adopt any of Senergy's incorrect facts, even if not specifically addressed.

**DEFENDANTS' REPLY IN SUPPORT OF AMENDED**                                                                 **PAGE 1**
**MOTION FOR PRELIMINARY INJUNCTION**

When interpreting a contract, the Court's objective is to "ascertain the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. of Pittsburg, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Courts construing contracts "bear[] in mind the particular business activity" and "avoid[] unreasonable constructions when possible and proper." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

The Licensing Agreements are unambiguous. They address Dr. Tennant's license to Scott Tennant (and Senergy) to use his "property." Tennant Appendix (Dkt. 48-1) ("App.") 005 ¶ 7 & 0032. "The property" is defined broadly as "the Tennant Biomodulator." *Id.* Encompassed within that broad definition is the full panoply of rights that Dr. Tennant developed and owned, including his know-how, the proprietary features of the product (*e.g.*, unique frequencies), and the healthcare brand that he was building based entirely on *his* name and *his* life story.

To avoid this broad definition of property, Senergy improperly injects the word "technology" into the definition. Dkt. 52 at 20. Narrowing the definition of property by inserting the word "technology" is entirely inconsistent with the business activity at the time—*i.e.* Scott's agreement to *sell* medical devices bearing Dr. Tennant's marks. This is critical, as Senergy's own citations highlight. In *Equistar Chemicals L.P. v. Indeck Power Equip. Co.*, the plaintiff purchased

equipment that arguably required use of the source code to maintain, which made the scope of the use of technology language an issue. No. 4:18-CV-4349, 2020 WL 4746469, *12-13 (S.D. Tex. Aug. 17, 2020). By contrast here, the parties' business relationship did not require Senergy to use the "technology," only sell it.

The broad interpretation of property is also consistent with the contract terms. The Court "must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (applying Texas contract law). Here, where Dr. Tennant's property rights also included the proprietary features of the products, the parties' agreement to keep such information confidential is unsurprising. Dr. Tennant's agreement to deliver documents that explain proper use of the marked devices only supported Senergy selling the devices. *Contra* Dkt. 52 at 22. Similarly, because Senergy would ultimately be selling the marked medical devices to the public, an indemnity provision was prudent. *Contra id.*

Senergy's assertion that a term specifically addressing control was necessary both misrepresents the cited treatise and basic principles of trademark law. Dkt. 52 at 20. As that treatise explains, "[e]ven without a formal contractual right of control, if there has been sufficient *actual* control, then that is sufficient." J. Thomas McCarthy, 2 *McCarthy on Trademarks & Unfair Comp.* ("2 McCarthy") §

18.48 (5th ed. 2024); *see also Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977) (trademark licensor's duty "requires only minimal quality control"). This is because "[i]t is trademark law that creates the duty to control quality in a license, not a contractual promise." 2 McCarthy § 18.48. Dr. Tennant's amended motion demonstrates exactly that required exercise of actual control, which Senergy did not rebut. Dkt. 48 at 30-32; App. 007-009 ¶¶ 12-16.

**B.     Dr. Tennant's Development, Licensing, and Commercial Support of the Brand Demonstrates the Use in Commerce Required By Law.**

Ignoring both the 2003 contract and the Lanham Act presumption in favor of the registered owner, Senergy makes the outrageous assertion that it or Avazzia own the trademarks as the senior users. This argument, based on revisionist history, is factually and legally incorrect.

As an initial matter, Senergy's assertion that the trademark registrations are "irrelevant" to Dr. Tennant's ownership is wrong. Dkt. 52 at 16. Registrants "enjoy a presumption of validity and exclusivity." 15 U.S.C. § 1115(a). This is critical where, as here, Dr. Tennant registered his trademarks and Scott and Senergy were aware of those registrations. App. 005 ¶¶ 7-8; App. 007 ¶¶ 11-13. Yet, neither at the time of registration nor any time in the intervening ***20 years*** did either Senergy

or Scott contest Dr. Tennant's ownership. *See* App. 005 ¶ 7. This demonstrates their understanding that Dr. Tennant owned the trademarks.

Senergy's effort to establish itself as the senior user is unsupported by the law. The Lanham Act provides that when a mark is used by a related company—*i.e.* a company whose use of the mark is controlled by the registrant (15 U.S.C. § 1127)—that use inures to the registrant's benefit and does not affect the validity of the registration. 15 U.S.C. § 1055. This is true even for first use by a licensee: "[i]f first use of the mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant . . . ." 15 U.S.C. § 1055; *see also Turner v. HMH Pub. Co.*, 380 F.2d 224, 229 (5th Cir. 1967) (night club franchisor did not personally run the clubs, but still benefited from the first use by franchisees).

This is exactly the case here. Dr. Tennant developed the improved frequency voltages and hired Avazzia to manufacture the marked devices to his specifications.[2] App. 004-005 ¶ 6; Tennant Supplemental Appendix ("Supp. App.") 7 (Tennant Dep. 11:8-19). Pursuant to the 2003 Licensing Agreement, Dr. Tennant

---

[2] Even if Senergy had standing to assert Avazzia is the senior user (which it does not), the facts demonstrate Avazzia's manufacturing was at the direction of Dr. Tennant. *See Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 490 (E.D. Tex. 2020).

delegated the first sales to Senergy (via Scott) by way of the Licensing Agreements. App. 0032-0038 (Ex. 5). He then personally supported and promoted those sales. *E.g.*, App. 005 ¶ 9; App. 009 ¶ 17; Supp. App. 15-16 (Tennant Dep. 74:2-75:8). Senergy complains that it paid for the promotional materials and seminars that Dr. Tennant promoted. Dkt. 52 at 19. But that is exactly the role Dr. Tennant delegated to Senergy—direct to customer sales. Meanwhile, Dr. Tennant maintained control throughout. *E.g.*, App. 007-009 ¶¶ 12-16; Supp. App. 17-19 (Tennant Dep. 77:14-79:6); Supp. App. 23-24 (Tennant Dep. 289:3-290:16).

Senergy's effort to confuse Dr. Tennant's ownership based on exact dates of events is unpersuasive. Dkt. 52 at 15-16 & 23-24. For nearly 20 years Dr. Tennant was *at all times* the undisputed owner of the trademarks and controlled the quality of the products bearing his marks. This includes his development of the relationship with Tim Smith who would later become the CEO of Avazzia, and his exercise of control over that manufacturing process. App. 007 ¶ 12; *see also* Supp. App. 6-10 (Tennant Dep. 9:6-8; 11:8-19; 14:11-16; 26:25-27:14). And, his oversight of Senergy's actions during the period when the first sales occurred. App. 007 ¶ 13; Supp. App. 17-19 (Tennant Dep. 77:14-79:8).

Senergy's desperate pitch that the trademark prosecution demonstrates its or Avazzia's first use is equally meritless. Dkt. 52 at 10-11. The fact that the

specimen shows Avazzia as the manufacturer is irrelevant to senior usage. Dkt. 52 at 10. Dr. Tennant had engaged Avazzia for that very purpose, and federal regulations require that the manufacturer include its label on any medical devices. *See* 21 C.F.R. § 801.1 (requiring the device label to contain the name and place of business of the manufacturer or distributor). Similarly, Dr. Tennant's use of pictures from Senergy's website only confirms the relationship between the parties: (a) Dr. Tennant created and carried the brand on his goodwill (App. 003 ¶ 3), while (b) Senergy sold the devices to the public and paid Dr. Tennant royalties according to the License Agreements (App. 005 ¶ 8).

Finally, Senergy's argument that Dr. Tennant cannot claim infringement of the terms Biomodulator or Biotransducer is a red-herring. Dkt. 52 at 7. Dr. Tennant's position is that Senergy's use of the marks Tennant BioModulator®, Tennant BioTransducer®, and Healing is Voltage®, which are registered to TDA with the USPTO is infringement. Dkt. 48 at 6.

## C. Even Were the Licensing Agreements Unenforceable, the Parties Acted According to an Implied License.

Senergy incorrectly asserts that there can be no implied license because the Licensing Agreements do not confer such rights. Dkt. 52 at 24-26. This conflates express and implied licenses.

Any discussion of an implied license is necessary only because Senergy denies the enforceability of the existing trademark licenses. Dkt. 52 at 19-22. An implied license arises from the parties' actions, not an express contractual agreement: "even if the parties intend no formal licensing agreement . . . the entire course of conduct between a trademark owner and accused infringer may create an implied license." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997). The Court can readily find an implied license based on the parties' 20 years of conduct. *See* Dkt. 48 at 27-28.

The Licensing Agreement terms do not preclude such a finding. Senergy cites the "Other Rights" section as foreclosing an implied license. Dkt. 52 at 24. That term only states that the Agreements themselves cannot confer other rights beyond those expressly recognized. App. 0038 (Ex. 5) ("Nothing contained in this Agreement shall be construed as conferring by implication . . . any license or other right except licenses and rights expressly granted hereunder to that party."). Dr. Tennant has never urged that the Court find an implied license based on the express licenses granted; rather, the Court can find an implied license from the myriad other conduct of the parties consistent with a trademark license. Nor does the 2016 modification change this analysis. As Senergy recognizes, Dr. Tennant's Tennant BioTransducer® mark was in use for years before the 2016 modification

expressly recognized it. Dkt. 52 at 26. Importantly, for all of those years Senergy paid Dr. Tennant a royalty for use of that mark in concert with the other royalty payments. App. 005 ¶ 8. This is exactly the conduct that creates an implied license.

### D. Dr. Tennant's Pre-Suit Conduct Is Consistent With the 30-Day Notice Period Following Termination and Does Not Negate the Irreparable Harm to His Brand.

Ironically, after two decades of accepting Dr. Tennant's trademark ownership without objection, Senergy now argues that the two months between Dr. Tennant seeking a resolution without court intervention and filing his motion contravenes the requested injunctive relief. Dkt. 52 at 27. Not so.

That Dr. Tennant tried to negotiate an agreed resolution for Senergy's breach of contract—*i.e.* damages that can be addressed with money—is of no moment.[3] The basis of Dr. Tennant's preliminary injunction motion arises from Senergy's infringement *after* termination and the 30-day notice period that expired on July 21. At the time Dr. Tennant made his pre-termination offer, the only issue was Senergy's breach of the Licensing Agreements by fraudulently underreporting sales of marked devices and, in turn, underpaying royalties. Now that Senergy admittedly continues to use the trademarks without permission (Dkt. 1 ¶ 53), Dr. Tennant has been forced to address Senergy's trademark infringement. Dr. Tennant

---

[3] Dr. Tennant's offer to compromise is inadmissible. ER 408.

is entitled to a presumption of irreparable harm based on the ongoing infringement that has and will impact his goodwill and trademark quality control in an incalculable amount. 15 U.S.C. § 1116(a); *see also* Dkt. 48 at 32-32 (addressing harm).

Senergy also takes the incredible position, without citation to any actual supporting facts, that it has adduced evidence there is no likely confusion to support the irreparable harm. Dkt. 52 at 28. Senergy's case law does not support its position. In *Nichino Am., Inc. v. Valent U.S.A. LLC*, the court considered likely confusion between similar (not identical) marks for products sold at different prices and to consumers who regularly sought expert advice before purchasing. 44 F.4th 180, 183 & 187 (3d Cir. 2022). That situation is far different from the inherent confusion engendered by Senergy's continued use of the *identical mark* on identical products sold to the identical set of consumers. Dr. Tennant undoubtedly will experience irreparable harm to his brand from the confusion Senergy creates by continuing to pose as his approved distributor and affiliate.

E.   **Dr. Tennant's Refusal to Support Senergy's Continued Infringement Is Consistent with the Requested Injunctive Relief.**

Dr. Tennant's amended motion demonstrates that the equitable balance and harm to the public support an injunction. Dkt. 48 at 33-35. That Senergy has

interfered with Dr. Tennant's ability to sell the marked devices only further supports that position. *Contra* Dkt. 52 at 22-23. The basis for Avazzia's refusal to provide marked devices to Dr. Tennant for sale is Senergy's claimed "exclusive" contract (notably unsupported by actual documentation). Supp. App. 11-14 (Tennant Dep. 33:6-20; 37:1-10; 47:12-48:1); *see also* Dkt. 52 at 9. Until Senergy is required to comply with the license termination or Dr. Tennant negotiates with and brings a new manufacturer up to speed, the only available devices are those that Senergy is selling in direct violation of Dr. Tennant's rights. This public detriment would be cured by the injunctive relief sought.

Similarly, that Dr. Tennant profits from his ideas, proprietary technology, and trademarked brand developed around his life story is not a basis to deny the injunction. *Contra* Dkt. 52 at 28-29. This is the commercial reality of medical developments. And the arguable impact to Senergy (Dkt. 52 at 29) is irrelevant to the balance of equities. *Fletcher's*, 434 F. Supp. 3d at 497.

### III.   CONCLUSION

For the reasons discussed in Dr. Tennant's amended motion (Dkt. 48) and herein, the Court should grant its request for a preliminary injunction.

Dated:  November 12, 2024               Respectfully submitted,


                                        /s/Tyler L. Farmer
                                        Tyler L. Farmer
                                        WSBA No. 39912
                                        *Pro Hac Vice*
                                        Tyler.farmer@bclplaw.com
                                        Ariel A. Martinez
                                        WSBA No. 54869
                                        *Pro Hac Vice*
                                        Ariel.martinez@bclplaw.com
                                        Chelsey L. Mam
                                        WSBA No. 44609
                                        *Pro Hac Vice*
                                        Chelsey.mam@bclplaw.com
                                        BRYAN CAVE LEIGHTON PAISNER LLP
                                        999 3rd Ave., Suite 4400
                                        Seattle, WA 98104
                                        Tel: (206) 623-1700
                                        Fax: (206) 623-8717

                                        Justin D. Hanna
                                        Texas Bar No. 24095726
                                        Bryan Cave Leighton Paisner LLP
                                        2200 Ross Avenue, Suite 4200W
                                        Dallas, TX  75201-7965
                                        (214) 721 8052
                                        E: Justin.Hanna@bclplaw.com

                                        ATTORNEYS FOR DEFENDANTS
                                        JERALD TENNANT, MD, JOHN
                                        TENNANT, TERESA JESSEN TENNANT,
                                        JARED TENNANT, TENNANT DEVICES
                                        AND ACCESSORIES, LLC, and
                                        CURADOR, LLC

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(i), the undersigned certifies that the parties have complied with the meet and confer requirements of Local Rule CV-7(h) and that the foregoing motion and relief sought therein is opposed.

By: */s/Tyler L. Farmer*
Tyler L. Farmer

## CERTIFICATE OF WORD COUNT

Pursuant to Section II.A. of the Court's Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, the undersigned hereby certifies that, per the word-processor register, the foregoing Reply in Support of Motion contains 2,480 words, excluding the case caption, signature block, and certificates.

By: */s/Tyler L. Farmer*
Tyler L. Farmer

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record through CM/ECF on November 12, 2024.

By: */s/Tyler L. Farmer*
Tyler L. Farmer