**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MARTEN GROUP, INC. d/b/a SENERGY MEDICAL GROUP and SCOTT TENNANT,<br><br>    Plaintiffs,<br><br>v.<br><br>JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, and CURADOR, LLC,<br><br>    Defendants. | § § § § § § § § § § § § § § § § § § | Case No. 3:24-cv-01852<br><br>**JURY TRIAL DEMANDED** |

## <u>APPENDIX TO DEFENDANTS' REPLY IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Local Rule 7.1, Defendants submit the attached evidence referenced in its Reply in Support of Amended Motion for Preliminary Injunction.

## <u>INDEX</u>

| EXHIBIT NO. | DESCRIPTION | APP. PAGE NOS. |
|---|---|---|
| E | Declaration of Chelsey L. Mam in Support of Defendants' Reply in Support of Amended Motion for Preliminary Injunction | APP 001 - 002 |
| E-1 | Excerpts from Dr. Tennant's deposition that occurred on October 16 & 17, 2024 | APP 003 – 0026 |

---

Dated:  November 12, 2024          Respectfully submitted,

*/s/Tyler L. Farmer*
Tyler L. Farmer
WSBA No. 39912
*Pro Hac Vice*
Tyler.farmer@bclplaw.com
Ariel A. Martinez
WSBA No. 54869
*Pro Hac Vice*
Ariel.martinez@bclplaw.com
Chelsey L. Mam
WSBA No. 44609
*Pro Hac Vice*
Chelsey.mam@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER
LLP
999 3ʳᵈ Ave., Suite 4400
Seattle, WA 98104
Tel: (206) 623-1700
Fax: (206) 623-8717

Justin D. Hanna
Texas Bar No. 24095726
Bryan Cave Leighton Paisner  LLP
2200 Ross Avenue, Suite 4200W
Dallas, TX  75201-7965
(214) 721 8052
E: Justin.Hanna@bclplaw.com

ATTORNEYS FOR DEFENDANTS
JERALD TENNANT, MD, JOHN
TENNANT, TERESA JESSEN TENNANT,
JARED TENNANT, TENNANT DEVICES
AND ACCESSORIES, LLC, and
CURADOR, LLC

## __CERTIFICATE OF SERVICE__

I certify that this document is being served via ECF on counsel of record.

*/s/Tyler L. Farmer*_____
Tyler L. Farmer

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MARTEN GROUP, INC. d/b/a SENERGY MEDICAL GROUP and SCOTT TENNANT, <br><br>     Plaintiffs, <br><br> v. <br><br> JERALD TENNANT, MD, JOHN TENNANT, TERESA JESSEN TENNANT, JARED TENNANT, TENNANT DEVICES AND ACCESSORIES, LLC, and CURADOR, LLC, <br><br>     Defendants. | Case No. 3:24-cv-01852 <br><br> **JURY TRIAL DEMANDED** |

## DECLARATION OF CHELSEY L. MAM IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION

I, Chelsey L. Mam, hereby declare as follows:

1.     I am one of the attorneys for Defendants in this matter. I am over age 18 and am competent to be a witness. I am making this declaration based on facts within my own personal knowledge.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the deposition of Jerald Tennant, MD on October 16 & 17, 2024.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Seattle, Washington on this 12th day of November, 2024.

_s/Chelsey L. Mam_
Chelsey L. Mam, WSBA #44609

## CERTIFICATE OF SERVICE

I certify that this document is being served via ECF on counsel of record.

_/s/Tyler L. Farmer_
Tyler L. Farmer

# EXHIBIT E-1

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARTEN GROUP, INC. D/B/A    )
SENERGY MEDICAL GROUP AND    )
SCOTT TENNANT,    )
    )
            Plaintiffs,    )
    )
VS.    )
    ) Case No.
JERALD TENNANT, MD, JOHN    ) 3:24-cv-01852-E
TENNANT, TERESA JESSEN    )
TENNANT, JARED TENNANT,    )
TENNANT DEVICES AND    )
ACCESSORIES, LLC, AND    )
CURADOR, LLC,    )
    )
            Defendants.    )

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
JERALD TENNANT, MD
OCTOBER 16, 2024
VOLUME 1 OF 2
-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JERALD
TENNANT, MD, produced as a witness at the instance
of the Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on October 16, 2024,
from 10:37 a.m. to 4:27 p.m., before Christy
Cortopassi, CSR in and for the State of Texas,
reported by machine shorthand, at the law offices
of Bryan Cave Leighton Paisner LLP, 2200 Ross
Avenue, Suite 4200W, Dallas, Texas 75201, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

JERALD TENNANT, MD - 10/16/2024

```
1                  A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4          Mr. Casey Griffith
           Mr. Kirk Voss
5          GRIFFITH BARBEE PLLC
           One Arts Plaza
6          1722 Routh Street
           Dallas, Texas 75201
7          214.446.6020
           casey.griffith@griffithbarbee.com
8          kirk.voss@griffithbarbee.com

9
     FOR THE DEFENDANTS JERALD TENNANT, MD, JOHN TENNANT,
10   TERESA JESSEN TENNANT, JARED TENNANT, TENNANT
     DEVICES AND ACCESSORIES, LLC, AND CURADOR, LLC:
11
           Ms. Chelsey Mam
12         Mr. Justin Hanna
           BRYAN CAVE LEIGHTON PAISNER LLP
13         999 Third Avenue
           Suite 4400
14         Seattle, Washington 98104
           206.294.7425
15         chelsey.mam@bclplaw.com
           justin.hanna@bclplaw.com
16

17

18   ALSO PRESENT:
           Jerry Gutierrez, Marten Group
19         Jared Tennant
           Scott Tennant
20
           Alex Oviedo & Tony Harris - Videographers
21

22

23

24

25
```

JERALD TENNANT, MD - 10/16/2024

Page 9

```
 1   figure out whether you knew of Tim Smith before Avazzia
 2   was formed?
 3                 MS. MAM:  Object to form.  Go ahead.
 4        A.  Yes.
 5        Q.  (BY MR. GRIFFITH)  And how does it help you?
 6        A.  To the best of my recollection, Tim Smith came
 7   to -- made an appointment and came to see me somewhere
 8   in the neighborhood of 2002, 2003.
 9        Q.  Do you recall signing a -- and actually, before
10   I start going into any exhibits, my understanding is --
11   and I am sympathetic because I had a detached retina in
12   early August.
13                 But my understanding is that you do have
14   trouble reading documents; is that fair to say?
15        A.  Yes.
16        Q.  Okay.  Can you describe for me, generally, what
17   kind of problems you have reading documents?
18        A.  The -- first of all, I see next to nothing out
19   of my left eye.  And my right eye sees approximately
20   20/60, so -- 20/50, 22/60, somewhere in that
21   neighborhood, which means I can't read standard print.
22   And my vision varies from hour to hour.  So it depends
23   on how tired I am, what I can read.
24        Q.  Okay.  And is there a specific condition that
25   causes these eyes problems that you have?
```

JERALD TENNANT, MD - 10/16/2024

1    Q.  Do you recall -- well, let me ask you this.  Do

2    you recall signing any agreements with Avazzia?

3    A.  I'm not recalling at this moment a specific

4    agreement.  It was more, hey, will you manufacture this

5    for me and here are the specifications.

6    Q.  Okay.

7    A.  So that started the thing.

8    Q.  Okay.  So -- well, let me ask -- let me ask you

9    this way.  Can you tell me today what agreements you

10   recall you have ever had with Avazzia?

11           MS. MAM:  Object to form.

12   A.  So the agreements have been, I would design a

13   device that I wanted to be manufactured.  And I would

14   talk to Tim Smith and sometimes his daughter, Tammy

15   Lahusky, who worked with Tim and say, this is what I

16   want, can you and will you build it.

17           And then we would agree upon that, yes, I

18   will or no, I can't or whatever and what it would cost.

19   And then they would do it.

20   Q.  (BY MR. GRIFFITH)  Okay.  And I know one of the

21   issues we are going to get to later is some royalty

22   agreements that you entered into with Scott Tennant, for

23   example.  And so you know that there are terms of

24   agreements, correct?

25           MS. MAM:  Object to form.

JERALD TENNANT, MD - 10/16/2024

Page 14

```
 1        Q.  And is it fair to say that, sitting here today,
 2    you can't recall whether Avazzia made the BioTransducer
 3    device for you or the BioModulator device?
 4              MS. MAM:  Object to form.
 5        A.  Well, I recall, of course, them making those
 6    devices.  But you asked me the question a while ago,
 7    what was the first device Avazzia ever made.  I have no
 8    idea what the first device they ever made.
 9        Q.  (BY MR. GRIFFITH)  Okay.  Well, let's talk
10    about this -- let's talk about it this way.
11              Do you recall when Avazzia made a
12    BioModulator device at your request?
13        A.  The first discussion of that was when Tim Smith
14    made an appointment and came to my office, somewhere in
15    the neighborhood of 2002 or 2003.  That is as best I can
16    recall.
17        Q.  And do you recall whether you asked -- well,
18    strike that.
19              Did you ask Avazzia to make a BioTransducer
20    device for you after that?
21        A.  Yes.
22        Q.  Okay.  And do you recall how long after that
23    you made that request?
24        A.  It was approximately 2004.
25        Q.  You think that you made the request to build a
```

JERALD TENNANT, MD - 10/16/2024

```
 1   with dementia, Dr. Tennant?
 2        A.   No.
 3        Q.   Have you ever been diagnosed with any form of
 4   memory loss?
 5        A.   Yes.
 6        Q.   Tell me about that.
 7        A.   In somewhere near the 1995s I was doing
 8   research for the Excimer laser refractive surgery.  I
 9   handled viruses and got encephalitis.  And during that
10   period of my encephalitis, my memory was certainly less
11   than before I got sick.
12        Q.   At some point you recovered, correct?
13        A.   Yes.
14        Q.   Did all of the memory loss that you suffered
15   when you had encephalitis return after you recovered
16   from encephalitis?
17             MS. MAM:  Object to form.
18        A.   There's no scientific tests that were done
19   before and after to answer that question specifically.
20        Q.   (BY MR. GRIFFITH)  So it's fair to say you
21   don't know, correct?
22        A.   Yes.
23        Q.   Thank you.  So at some point you -- strike
24   that.
25             At some point you were no longer involved
```

HANNA & HANNA, INC.
713.840.8484

JERALD TENNANT, MD - 10/16/2024

1  in selling Scenar devices in the United States, correct?

2      A.  Yes.

3      Q.  Do you recall when that happened?

4      A.  Yes.  It was somewhere in the neighborhood of

5  2002, 2003 probably.  Somewhere in that neighborhood.

6      Q.  Do you recall whether you first met Tim Smith

7  before or after you were no longer involved in selling

8  Scenar devices in the United States?

9      A.  Tim Smith made the appointment and came to my

10  office during the time that we were selling Scenar.  And

11  we continued to sell Scenar until he provided us with

12  the prototype and eventually the BioModulator that I

13  approved.  And at that point we switched from Scenar to

14  BioModulator.

15      Q.  And can you explain why you decided to stop

16  selling the Scenar device?

17          MS. MAM:  Object to form.

18      A.  Well, I do recall, for example, it was very

19  difficult to get -- sometimes difficult to get the

20  Scenar devices.  Certainly it was difficult to get any

21  kind of repair that was needed.  And also I felt like I

22  had discovered better frequency waveforms, better

23  frequencies and a better approach to clinical use than

24  the Russians.

25          And so for that reason, when the

JERALD TENNANT, MD - 10/16/2024

```
 1      Q.  So sitting here today you can't identify any
 2  behavior of Scott Tennant's that causes you to say that
 3  he has betrayed you and dishonored the Tennant name?
 4              MS. MAM:  Object to form.
 5      A.  Well, it's hard to know where to start.
 6      Q.  (BY MR. GRIFFITH)  How about one example?
 7      A.  One example is that I have critically sick
 8  patients sit in my office as we speak.  I cannot treat
 9  them properly because of Scott's collusion with Avazzia
10  where I can't get devices to treat my patients.
11              And they -- and Avazzia won't even sell me
12  my own devices because they say they have a contract
13  with Scott to prevent that.  So they are colluded
14  against my being able to be a physician to take care of
15  sick folks, and that's unconscionable.
16              You don't know how many people he's hurting
17  because he refu- -- they won't even sell me wires to
18  make the devices work.  My personal device at the office
19  quit working.  They won't repair it, because Scott has
20  inhibited them from doing so.  So is that enough?
21      Q.  Did you think about your patients before you
22  terminated the royalty agreements?
23              MS. MAM:  Object to form.
24      A.  Yeah.  I thought about that because I didn't
25  know that he had colluded with Avazzia to prevent them
```

JERALD TENNANT, MD - 10/16/2024

1    Q.  Okay.  So your position is that you don't want

2   your patients buying devices from Senergy to help you

3   treat them because of your trademark dispute with

4   Senergy, correct?

5            MS. MAM:  Object to form.

6        A.  So if it were not for the collusion between

7   Scott and Avazzia, my patients could be treated.  But

8   it's the collusion between them that prevents Avazzia

9   from selling me my own devices so I can take care of my

10   patients.

11       Q.  (BY MR. GRIFFITH)  Let me ask you this.  Other

12   than you, is there any reason that any of your patients

13   can't, right now, buy a BioModulator or BioTransducer

14   device, bring it to you and have you treat them?

15            MS. MAM:  Object to form.

16       A.  Ask me the question again.

17       Q.  (BY MR. GRIFFITH)  Yeah.  Other than -- well, I

18   want you to identify all reasons that you can't treat

19   your patients with devices that they purchase from

20   Senergy right now.

21            MS. MAM:  Object to form.

22       A.  Because it's -- and to the best of my

23   understanding, Senergy is breaking a contract, which is

24   in essence, in my mind, breaking the law by continuing

25   to sell my devices when they have no license to do so.

JERALD TENNANT, MD - 10/16/2024

Page 47

```
 1   BioModulator branded devices?
 2              MS. MAM:  Object to form.
 3       A.  I don't know.
 4       Q.  (BY MR. GRIFFITH)  Do you know whether you had
 5   ever prescribed a Tennant BioModulator branded device
 6   that was paid for by the United States Federal
 7   Government?
 8       A.  I don't remember.  I don't recall.
 9       Q.  Earlier you said that Avazzia and Scott are
10   colluding, correct?
11       A.  Yes.
12       Q.  Okay.  What exactly are they colluding to do?
13       A.  When I talked to Tim Smith and Tammy Lahusky at
14   Avazzia saying, you know, I want you to start -- I'm
15   giving you license to start selling the devices to
16   someone else besides Senergy, they said, sorry, we have
17   a contract where we can only sell them to Senergy.
18              And I said, Well, it's my belief you don't
19   have standing to make such a contract because I own the
20   trademarks and I'm the one who gave you the original
21   specifications to make my devices.
22              And I own the trademarks and, thus, they
23   are mine and so you have no standing to make such a
24   contract with Senergy.  And they said, Well, we're just
25   not going to sell them to anybody but Senergy until a
```

JERALD TENNANT, MD - 10/16/2024

1    judge tells us we have to stop.

2        Q.   You have said that -- several times today that

3    you provided specifications to Avazzia, correct?

4        A.   Yes.

5        Q.   What specifications are you referring to?

6        A.   I told them -- I have got the -- well, first of

7    all, it doesn't matter which device that they have made.

8    They are using my trademarks and my proprietary

9    information.

10            I would say I want you -- I would like to

11   have this device made and I would like it.  Would you

12   make?  It.  And they say, Yes.  And I said, Okay.  Here

13   in writing are my descriptions of how -- of what I want

14   in this device, how it's supposed to work, et cetera.

15   And so those are all well documented.

16       Q.   Okay.  And so were those documented in emails?

17       A.   Yes.

18       Q.   How else were those specifications and

19   proprietary information documented?

20       A.   Well, a perfect example would be when we

21   upgraded the BioTransducer Crystal Wave a few months

22   ago.  Tammy Lahusky came to my office building and with

23   six prototypes and asked me to go through them and tell

24   her which ones work the best, which ones I desired would

25   be the proper update to make, which of those prototypes.

JERALD TENNANT, MD - 10/16/2024

Page 74

1    that.

2                    You recall participating in the production

3    of videos in which you appeared?

4        A.    Yes.    I produced videos myself and also we did

5    the seminars.    And those videos were collected by

6    Senergy and used on their websites, as well as mine, to

7    my knowledge.    But, again, I'm not -- I was not

8    intimately involved with how all that was managed.

9        Q.    Do you know who paid for those videos and

10   seminars?

11                   MS. MAM:    Object to form.

12       A.    I don't, again, know all of those details.    I

13   know that in general Senergy would get me to tell them

14   when I was available to give seminars.    And then they

15   would obtain the place in which those were going to

16   happen and make all of those details.

17                   And then a combination of the Senergy staff

18   and the clinic staff would be involved with making the

19   thing happen, taking care of all of the people that

20   came.

21                   And then I was -- I did all of the creation

22   of the educational material in the sense that I created

23   all of the lectures, the -- all of the Keynotes or

24   PowerPoints, with exception of sometimes some of the

25   lecture would be given by part of the clinic staff and

JERALD TENNANT, MD - 10/16/2024

```
 1    they would create their own PowerPoints.

 2              So basically the material of my methodology

 3    which I created and has become known as the Tennant

 4    method around the world was my creation, which I

 5    contributed.  And Senergy contributed setting up the

 6    management of the venue.

 7              And so there was -- it was a dual effort to

 8    try to educate people how to take care of themselves.

 9        Q.  (BY MR. GRIFFITH)  Did Senergy pay for any of

10    the content that was created that you just described?

11        A.  Primarily, I'm going to say no, with the

12    possible exception -- and I'll explain that.

13              For many years the seminar was given by

14    having a Thursday evening be open to the public.  And I

15    gave that lecture.  And then people who had signed up to

16    learn would come on Friday and Saturday.

17              And for many years I and I alone gave all

18    of those lectures as well.  And then in later years some

19    of the medical staff from the clinic would give some of

20    those specific lectures.

21              And -- but then Senergy decided to change

22    the Thursday night, quit doing it the way I had done it

23    all those years, and have a Senergy employee give that

24    lecture on Thursday.  And they did not -- they quit

25    opening it up to the public.
```

JERALD TENNANT, MD - 10/16/2024

1    include that as well.

2         Q.  So like a -- I'm sorry.  Go ahead.

3         A.  So, again, there was this -- a big manual that

4    was given out.  Now oftentimes you would see laying

5    around various other things that Senergy might have

6    created, maybe a brochure kind of thing about something

7    or other.

8              And they might hand those out or have them

9    laying on the table or whatever.  And so there would be

10   offerings from Senergy's perspective.

11        Q.  And you didn't pay for the creation of those

12   Senergy materials, correct?

13        A.  That's correct.

14        Q.  I want to go back to when you first started

15   working with Tim Smith and Avazzia.  You mentioned

16   previously that you said you hired Scott Tennant to work

17   with you on this Scenar and what became the Tennant

18   BioModulator project, right?

19        A.  That's not totally correct.

20        Q.  Okay.  How is that incorrect?

21        A.  So when -- to the best of my recollection, when

22   Scott came to work with us, I hired him to sell Scenar

23   devices, which I was involved with at that time.  And I

24   wanted somebody to do that so I could pay more attention

25   to my medical practice and developing my things.

JERALD TENNANT, MD - 10/16/2024

1          And so basically Scott's job was to sell

2   devices, and my job was to create devices and create the

3   methodologies that have become known around the world as

4   the Tennant method of treating patients.

5          And so Scott was always someone whose

6   specific job was to figure out how to help -- how to

7   sell devices that I developed.  And as part of that

8   process, obviously, he would sometimes interface with

9   Avazzia.

10          Or he would interface with other people or,

11   you know, help -- try to figure out what we were going

12   to do as far as where we were going to have the next

13   conference and that sort of thing.

14          But his obligation and his responsibility

15   was always sort of like the -- you know, a patient may

16   come in and the physician may say to the nurse, Nurse,

17   please, go change that dressing.

18          Well, a physician didn't change the

19   dressing but he gave the order and the nurse did it

20   under the supervision and observation and instructions

21   of the physician.

22          And that's always been the relationship

23   between Scott and me, is that his job was to be selling

24   devices.  My job was to be figuring out how to create

25   devices and make people well.

JERALD TENNANT, MD - 10/16/2024

```
 1              And no matter what the labels were, it was
 2   always understood -- it's always been understood that
 3   that's what was going on and happening, at least, in
 4   everybody's mind that worked around me.  And people that
 5   knew us knew that that's the way things were set up.
 6   So, yeah.
 7              MR. GRIFFITH:  Move to strike,
 8   nonresponsive.
 9        Q.  (BY MR. GRIFFITH)  Dr. Tennant, is it fair to
10   say that Scott Tennant was a good salesman?
11              MS. MAM:  Object to form.
12        Q.  (BY MR. GRIFFITH)  Let me -- strike that.  Let
13   me ask it a different way.  Is Scott Tennant a good
14   salesman?
15        A.  Okay.
16        Q.  Just an okay salesman?
17        A.  Yeah.
18        Q.  Okay.  It took you a long time to answer that
19   question.  What were you struggling with?
20        A.  Well, it depends on what he's trying to sell.
21        Q.  Okay.  How about devices that Avazzia
22   manufactured?
23        A.  Well, sometimes he was there; sometimes he's
24   off doing other things that have nothing to do with the
25   devices.
```

JERALD TENNANT, MD - 10/16/2024

Page 153

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
 2                  DALLAS DIVISION

 3  MARTEN GROUP, INC. D/B/A     )
    SENERGY MEDICAL GROUP AND    )
 4  SCOTT TENNANT,               )
                                 )
 5              Plaintiffs,      )
                                 )
 6  VS.                          ) Case No.
                                 ) 3:24-cv-01852-E
 7  JERALD TENNANT, MD, JOHN     )
    TENNANT, TERESA JESSEN       )
 8  TENNANT, JARED TENNANT,      )
    TENNANT DEVICES AND          )
 9  ACCESSORIES, LLC, AND        )
    CURADOR, LLC,                )
10                               )
              Defendants.        )
11
12          REPORTER'S CERTIFICATION
        DEPOSITION OF JERALD TENNANT, MD
13              OCTOBER 16, 2024
14      I, Christy Cortopassi, Certified Shorthand
15  Reporter in and for the State of Texas, hereby
16  certify to the following:
17      That the witness, JERALD TENNANT, MD, was duly
18  sworn by the officer and that the transcript of the
19  oral deposition is a true record of the testimony
20  given by the witness;
21      That the deposition transcript was submitted
22  on _____ to the witness or to the
23  attorney for the witness for examination, signature
24  and return to Hanna & Hanna by _____;
25      That the amount of time used by each party at
```

JERALD TENNANT, MD – 10/16/2024

Page 154

```
 1   the deposition is as follows:
 2   Mr. Casey Griffith.....04:03
     Ms. Chelsey Mam........00:00
 3
 4        I further certify that pursuant to FRCP No.
 5   30(f)(i) that the signature of the deponent:
 6        __X__ was requested by the deponent or a party
 7   before the completion of the deposition and that
 8   the signature is to be returned within 30 days from
 9   date of receipt of the transcript.  If returned,
10   the attached Changes and Signature Page contains
11   any changes and the reasons therefor;
12        _____ was not requested by the deponent or a
13   party before the completion of the deposition.
14        I further certify that I am neither counsel
15   for, related to, nor employed by any of the parties
16   or attorneys in the action in which this proceeding
17   was taken, and further that I am not financially or
18   otherwise interested in the outcome of the action.
19        Certified to by me this 21st of October, 2024.
20
21        Christy Cortopassi
          _____
          Christy Cortopassi, Texas CSR 6222
22        Expiration Date: 10/31/2026
          HANNA & HANNA, INC.
23        CRF # 10434; Expires 10-31-2026
          8582 Katy Freeway, Suite 105
24        Houston, Texas  77024
          713-840-8484 – 713-583-2442
25        www.hannareporting.com
```

HANNA & HANNA, INC.
713.840.8484

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARTEN GROUP, INC., D/B/A    )
SENERGY MEDICAL GROUP AND    )
SCOTT TENANT,                )
                             )
        Plaintiffs,          )
                             )              Case No.
VS.                          )          3:24-cv-01852-E
                             )
JERALD TENNANT, MD, JOHN     )
TENNANT, TERESA JESSEN       )
TENNANT, JARED TENNANT,      )
TENNANT DEVICES AND          )
ACCESSORIES, LLC, AND        )
CURADOR, LLC,                )
                             )
        Defendants.          )
-----------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
JERALD TENNANT, M.D.
VOLUME 2
OCTOBER 17, 2024
-----------------------------------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF JERALD

TENNANT, M.D., produced as a witness at the instance

of the Plaintiffs and duly sworn, was taken in the

above-styled and numbered cause on Thursday,

October 17, 2024, from 10:34 a.m. to 4:08 p.m.,

before Kari Behan, CSR, RPR, CRR, a Texas certified

machine shorthand reporter, at the offices of Bryan

Cave Leighton Paisner LLP, 2200 Ross Avenue,

Suite 4200W, Dallas, Texas 75201, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

1          Do you recall that conversation?

2     A.  Yeah.  Vaguely, yeah.

3     Q.  Okay.  When you -- when, kind of in a general

4  sense, would that kind of confidential information about

5  your devices be discussed?  What context?

6               MR. GRIFFITH:  Object to form.

7               THE WITNESS:  So there were meetings that

8  would be held with -- with Avazzia and me and sometimes

9  Scott would be in those meetings, and he would,

10  obviously, hear me discuss:  Okay, this is the way that

11  I want to do this and this is why I want to do it, or he

12  would observe:  Okay, we took these prototypes, and they

13  asked me to decide which one works the best.  He would

14  be sitting there watching me do it, and he commented on

15  why this worked better than that.

16               And then, obviously, there would be times

17  when I would go to say:  Okay, look, Scott and Jerry,

18  this is what's coming, and this is the way this works,

19  and you need to understand how it works so when people

20  ask you que- -- you know, patients ask you questions or

21  your staff needs the education, you know the answers to

22  this, but of course, this is confidential information

23  and expect you to keep it confidential and, you know,

24  only people who need to know need to know.

25               So it was, you know -- and then there would

JERALD TENNANT, M.D. - VOLUME 2 - 10/17/2024

1    be times when I would get a question from Avazzia -- you

2    know, I'm just making up something -- do you want a

3    orange case or a blue case, and I would copy Scott on

4    the answer to that.

5                    Because, again, throughout these years, I

6    viewed us as a team, you know, as sort -- as I talked

7    about, a general and his lieutenant, a doctor and his

8    nurse, et cetera, et cetera.  Scott was -- was somebody

9    who -- who was there to understand what I was doing, why

10   I was doing it so he could do a better job of selling

11   the devices.

12                   And plus, for me, it was another -- you

13   know, some people take their son fishing; I took Scott

14   under my wing and said:  Hey, let's talk about making

15   people well with electronics.  So that was confidential

16   information.

17   BY MS. MAM:

18        Q.  And -- and can you give me some examples --

19   without getting into the -- the science piece of it, but

20   what kinds of things did you consider confidential?

21        A.  Well, certainly my designs and the reason

22   behind it.  You know, some people like to play golf,

23   some people like to go fishing, some people like to do

24   whatever.  I like to figure out things that make people

25   get well.

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION
 3   MARTEN GROUP, INC., D/B/A   )
     SENERGY MEDICAL GROUP AND   )
 4   SCOTT TENANT,               )
                                 )
 5           Plaintiffs,         )
                                 )           Case No.
 6   VS.                         )       3:24-cv-01852-E
                                 )
 7   JERALD TENNANT, MD, JOHN    )
     TENNANT, TERESA JESSEN      )
 8   TENNANT, JARED TENNANT,     )
     Tennant Devices AND         )
 9   ACCESSORIES, LLC, AND       )
     CURADOR, LLC,               )
10                               )
             Defendants.         )
11   -------------------------------------------------------
12                  REPORTER'S CERTIFICATION
13            ORAL & VIDEOTAPED DEPOSITION OF
                     JERALD TENNANT, M.D.
14                         VOLUME 2
                   THURSDAY, OCTOBER 17, 2024
15
         I, Kari J. Behan, CSR, RPR, CRR, and in and for
16   the State of Texas, do hereby certify that the facts
     as stated by me in the caption hereto are true;
17
         That there came before me the aforementioned named
18   person, who was by me duly sworn to testify the truth
     concerning the matters in controversy in this cause;
19
         And that the examination was reduced to writing by
20   computer transcription under my supervision; that the
     deposition is a true record of the testimony given by
21   the witness.
22       I further certify that I am neither attorney or
     counsel for, nor related to or employed by, any of the
23   parties to the action in which this deposition is taken,
     and further that I am not a relative or employee of any
24   attorney or counsel employed by the parties hereto, or
     financially interested in the action.
25
```

JERALD TENNANT, M.D. - VOLUME 2 - 10/17/2024

Page 302

1          Certified to by me this 21st of October, 2024.

2

3

4          *Kari Behan*
           _____
           KARI BEHAN, CSR, CCR, RPR, CRR

5          Texas CSR NO. 8564;
           Expiration Date: 7-31-2026

6          HANNA & HANNA, INC.
           CRF # 10434; Expires 10-31-2026

7          8582 Katy Freeway, Suite 105
           Houston, Texas 77024

8          713-840-8484 | 713-583-2442
           www.hannareporting.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25