IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARTEN GROUP INC et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:24-CV-01852-E |
| | § | |
| JERALD L TENNANT et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Jerald L. Tennant, John Tennant, Jared Tennant, Teresa Jessen Tennant, Tennant Devices and Accessories, LLC, and Curador LLC.'s (together as "Dr. Tennant") Amended Motion for Preliminary Injunction. (ECF No. 48). Dr. Tennant requests a preliminary injection against Plaintiffs Marten Group Inc. d/b/a Senergy Medical Group and Scott Tennant (together as "Senergy") to (i) prohibit Senergy from the "continued use of each of the trademarks at issue—Tennant BioTransducer®, Tennant BioModulator®, and Healing is Voltage®," and (ii) require Senergy to "submit a report within 30 days of the injunction demonstrating all actions they have taken to comply with the order." (ECF No. 48 at 30). Senergy filed its Response. (ECF No. 52). Dr. Tennant filed his Reply. (ECF No. 56). Having considered the Motion, the Response and Reply, the record, and the relevant law, the Court hereby **DENIES** the Motion. (ECF No. 48) The Court additionally **DENIES AS MOOT** Defendant's initial Motion for Preliminary Injunction. (ECF No. 24). The Court **GRANTS** the Parties' Joint Motion for Extension of Time to Complete Mediation. (ECF No. 62).

### I. BACKGROUND

#### A. Procedural Background

Litigation involving these parties began as a breach of contract claim, regarding the sale and compensation for widgets, filed in state court by Dr. Tennant. (*See* Dallas County Civil Cause No. DC-24-10471). The instant action was filed by Senergy in federal court on July 21, 2024, after which Dr. Tennant nonsuited his state court claims on September 4, 2024. (ECF No. 1; 48 at 20; 52 at 13). On August 27, 2024, Dr. Tennant first asserts his trademark infringement claim under 15 U.S.C. § 1114 in his Answer and Counterclaim in this case. (ECF No. 22 at 36-40). On August 28, 2024, Dr. Tennant first moved for a Preliminary Injunction. (ECF No. 24). Subsequently, on October 11, 2024, Dr. Tennant filed his Amended Motion for Preliminary Injunction. (ECF No. 48). Senergy filed its response. (ECF No. 52). Dr. Tennant filed his reply. (ECF No. 56).

#### B. Factual Background

The parties vigorously contest nearly all the facts of this case. The Dr. Tennant parties allege that Dr. Tennant, after being diagnosed with a debilitating illness, conceived and developed, with the aid of a U.S. based manufacturer, two therapeutic devices: Tennant Biomodulator® and Tennant BioTransducer®. (ECF No. 48 at 8). Dr. Tennant alleges he brought the devices to market through his medical practice and educational seminars, ultimately applying to register the marks by 2005. (ECF No. 48 at 8). Dr. Tennant then alleges that he and Scott (collectively "Senergy") executed the "2003 Royalty Agreement" allowing Senergy to market and sell the devices for a period of 20 years. (ECF No. 48 at 9). In 2012 the parties executed a second Royalty Agreement. (ECF No. 48 at 9). According to Dr. Tennant, he then "unequivocally canceled the Licensing Agreements on June 21, 2024." (ECF No. 48 at 16). The cancelation of the Agreements stemmed from an alleged underpayment of royalties that had been occurring since at least 2021. (ECF No.

48 at 15-16). After the expiration of the 30-day notice required by the Agreements, Senergy continued to use the trademarks; specifically, "Senergy is presently engaged in the sale and advertising of goods under TENNANT marks, including but not limited to TENNANT BIOMODULATOR and TENNANT BIOTRANSDUCER and variants thereof." (ECF No. 48 at 16-17).

By contrast, the Senergy parties allege that, in the beginning, "Dr. Tennant and Scott, through Senergy, sold a Russian-made, Soviet-era microcurrent BioModulator-type device branded as "SCENAR" before manufacturing and selling their own devices. (ECF No. 52 at 9). These Russian-made devices were unreliable and thus, in 2004, Senergy found a domestic partner, Avazzia, to launch a competing device. (ECF No. 52 at 9). Beginning in 2005, Senergy began exclusively selling this Avazzia-produced BioModulator. (ECF No. 52 at 9). Senergy alleges that Dr. Tennant cannot prove that he is the senior user of the trademarks because Senergy developed a market to sell the devices through their seminars and sales. (ECF No. 52 at 12). These seminars, which Dr. Tennant claims are his "use in commerce," were funded exclusively by Senergy who "paid for booths and staffed them with its employees and created and paid for all DVDs, CDs, [and] printed materials, including workbooks." (ECF No. 52 at 12). Because of their use in commerce, Senergy alleges that Senergy, or Avazzia, is presumed to be the trademark owner—as opposed to Dr. Tennant. (ECF No. 52 at 16). Senergy bases this claim, in part, on the reality that Senergy has been the only retailer to ever offer the contested devices and corresponding trademarks in commerce. (ECF No. 52 at 28-29). Senergy alleges that the instant case is ultimately motivated by money and access to the business leads contained in Senergy's records, pointing to pre-suit correspondence between the parties as justification. (ECF No. 52 at 26).

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). To obtain injunctive relief, a movant must establish (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that irreparable harm will result if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm to the defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974)). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co.,* 760 F.2d at 621. A plaintiff is not required to prove its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits for preliminary injunction purposes. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). But the movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621. A preliminary injunction "is appropriate only if the anticipated injury is imminent and irreparable," *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975), and not speculative. *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015); *see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient" to show irreparable harm.). "In general, a harm, is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). But money damages may not be adequate in special circumstances such as where a decision on the merits would not be possible without an injunction. *Janvey*, 647 F.3d at 600. The

party seeking preliminary injunctive relief carries the burden of persuasion on all four elements. *Bluefield Water Ass'n, Inc. v. City of Starkville*, 57 F.3d 250, 253 (5th Cir. 2009).

### III. ANALYSIS

The Court now considers Dr. Tennant's Amended Motion for Preliminary Injunction. (ECF No. 48). As previously explained, the facts of this case are largely disputed by the parties. Both parties have submitted memorandums of law and appendices in support of their positions on the issues underlying the Motion. To prevail on an application for preliminary injunction, Dr. Tennant bears the burden of persuasion on each required element. *Bluefield Water Ass'n Inc.*, 577 F.3d at 253. Because Dr. Tennant has not shown a substantial likelihood that he will prevail on the merits, nor that irreparable harm will occur in the absence of an injunction, the Court DENIES his application for preliminary injunction.

#### A. Likelihood of Success under Lanham Act

The Court first considers whether Dr. Tennant has established a substantial likelihood that he will prevail on his trademark infringement claim under the Lanham Act. 15 U.S.C. § 1114(1). "Though federal law does not create trademarks, Congress has long played a role in protecting them." *B & B Hardware*, 575 U.S. 138, 142 (2015). The Lanham Act currently embodies the federal trademark scheme. *B & B Hardware,* 575 U.S. at 142; 15 U.S.C. § 1051 *et seq.* The Lanham act authorizes owners of trademarks that are used in interstate commerce to bring infringement actions in federal court. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *see also* 15 U.S.C. § 1114(1)(a) (registered marks). To prevail on a trademark infringement claim under the Lanham Act, "a plaintiff must first show that the mark is legally protectable and then must establish infringement[.]" *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (citations omitted). An infringement exists "where one 'uses (1)

any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution[,] or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive.'" *Am. Rice, Inc.*, 518 F.3d at 329 (quoting *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap and Emblem Mfg.*, 510 F.2d 1004, 1009–10 (5th Cir.1975); 15 U.S.C. § 1114).

### i. Legally Protectable Mark

Though the rights of the marks are vigorously contested by the parties, the Court assumes, *in arguendo*, that Dr. Tennant has met the first prong of a trademark infringement claim, that a mark is legally protectable, under the Lanham Act.[1]

### ii. Trademark Infringement

Next, to prevail under the Lanham Act, Dr. Tennant must establish infringement of the mark. *Am. Rice, Inc.*, 518 F.3d at 329. However, Dr. Tennant's provided documentation does not tend to show infringement—specifically that the use of the trademarks "is likely to cause confusion, or to cause mistake or deceive." *Am. Rice. Inc.*, 518 F.3d at 329. Courts traditionally analyze the likelihood of confusion under the Lanham Act by utilizing factors known as the "digits of confusion." *Rex Real Estate I, L.P. v. Rex Real Estate Exchange, Incorporarted*, 80 F.4th 607, 620 (5th Cir. 2023). Dr. Tennant claims this test is inapplicable in the instant case, citing to a franchise case from the Northern District of Texas, that states "[w]here the infringing party uses the exact same mark on the same product, the likelihood of confusion is self-evident and no digits of confusion analysis is required." (ECF No. 48 at 29) (citing *TGI Friday's Inc. v. Great Nw. Restaurants, Inc.,* 652 F.Supp.2d 763, 767 (N.D. Tex. 2009)). This Court disagrees.

---

[1] The Court notes that, in its *arguendo* assumption, it has not conducted a merits analysis on the element of whether "the mark is legal protectable." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

"To evaluate whether there is a likelihood of confusion, we use a non-exhaustive list of factors known as the 'digits of confusion.'" *Rex Real Estate I, L.P.*, 80 F.4th at 620 (citing *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009). "'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion." *Xtreme Lashes, LLC.*, 576 F.3d at 226. The Fifth Circuit has held that the relevant digits are: "(1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *Rex Real Estate I, L.P.*, 80 F.4th at 620. "No digit is dispositive, and the digits may weigh differently from case to case, 'depending on the particular facts and circumstances involved.'" *Xtreme Lashes, LLC*, 579 F.3d at 227. "In addition to the digits of confusion, the particular context in which the mark appears must receive special emphasis." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485-86 (5th Cir. 2004).

### a. Digits (i) and (ii)−Type of Trademark and Mark Similarity

The first two digits in the analysis are (i) the type of trademark and (ii) mark similarity. *Rex Real Estate I, L.P.*, 80 F.4th at 620. "The degree of similarity between marks 'is determined by comparing the marks' appearance, sound, and meaning.'" *Rex Real Estate I, L.P.*, 80 F.4th at 622 (citing *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998)). "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features," but "courts should give more attention to the dominant features of a mark." *Xtreme Lashes, LLC*, 576 F.3d at 228 (internal quotation marks and citations omitted). The record supports the contention that, pertaining to the first two digits of confusion, the marks at contest are the identical marks to those subject to trademark. (*See generally* ECF Nos. 48; 52).

### b. Digits (iii) and (iv)– Product Similarity and Identity of Retail Outlets and Purchasers

Under the third and fourth digits of confusion—product similarity and identity of retail outlets and purchasers—the record tends to go against the likelihood of confusion. The Fifth Circuit has discussed these digits, stating

> "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). Likewise, "[d]issimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendants' goods lessen the possibility of confusion, mistake, or deception." *Id.* (quotation marks and citation omitted). "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Elvis Presley Enters.*, 141 F.3d at 202. "The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand ... The actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand ... Consumer perception is the controlling factor." *Id.* "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id.* (citation omitted).

*Rex Real Estate I, L.P.*, 80 F.4th at 623. Further, courts look to the similarities between the retail outlets and the purchasers of the products to assess likelihood of confusion. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir. 1980),

Here, the record indicates that since the devices were brought to market, they have been exclusively sold by Senergy. (ECF No.52 at 22-23). Dr. Tennant testified, in deposition, that "at some point Senergy became a distributor of BioModulator devices that were manufactured by Avazzia" and that no one other than Synergy had sold the device marketed under the Tennant BioModulator name prior to the current litigation. (ECF No. 52-1 at 262; 273). Further, Dr.

Tennant does not allege that anyone else is currently competing in the market with the trademarks selling the contested devices. As such, it is unlikely that purchasers would confuse the product or identity of retail outlets as they devices have only ever been sold by Senergy.

### c. Digit (v)—Advertising Media Identity

For the fifth digit—advertising media identity—the record tends to go against the likelihood of confusion. For this digit we look to the "similarity between the parties' advertising campaigns. The greater the similarity in the campaigns, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980). However, even if companies do not advertise in identical channels, the fact that they target the same class of buyers can support an inference that they "use similar advertising and marketing channels." *Xtreme Lashes, LLC*, 576 F.3d at 229.

Here, both parties argue that *they* are the party that have historically advertised the device, and that the primary mode of advertisement was through conferences and speaking engagements. (ECF Nos. 48 at 8; 52 at 19). Dr. Tennant alleges in his Motion that he, "initially introduced the Tennant BioModulator® to the market through his medical practice and education seminars[.]" (ECF No. 48 at 8). Senergy contests this alleging that Senergy (i) "paid for, developed, and distributed the promotional material used in those seminars," (ii) "organized, paid for, and staffed those seminars," and (iii) "paid for Dr. Tennant's attendance and expenses at those seminars." (ECF No. 52 at 19). Dr. Tennant discussed these seminars, during his deposition, as follows:

> Q. What did you use the Senergy credit card for?
> A. My agreement with Senergy was that if I was to travel somewhere to teach or give a seminar that Senergy would cover my expenses for going to teach.
> Q. Okay. So is it fair to say that whenever you took business trips to teach or speak at seminars, Senergy paid your expenses to do that?
> A. Yes, in general, that's true.
>
> […]

> Q. Who paid for the booth?
> A. Senergy.
> Q. Okay. Who did the marketing for seminars and conference that Senergy put on or you participated in?
> A. By and large, the marketing was done by Senergy. And it was not uncommon for there to be notices sent out from - - to the clinic database or on our website that I would be speaking someplace.
> Q. Okay. And other than emails that were sent out by the clinic, who paid for all the other marketing that was done for these seminars and conferences?
>
> […]
>
> [A]: Certainly, the majority of the expenses of those things were paid for by Senergy.

(ECF No. 52-1 at 302-303). Here, the record supports that Senergy has done much of the marketing of the widget and as such, it is unlikely that confusion will arise as they are the sole marketing campaign.

### d. Digit (vi)—Defendant's Intent

Under the sixth digit of confusion—Defendant's Intent—the record is neutral. In some cases, if "a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity." *Exxon Corp.*, 628 F.2d at 506 (citations omitted). However, "[i]f there is no evidence of intent to confuse, then this factor is neutral." *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 195 (5th Cir. 2018). There is nothing in the record nor alleged by Dr. Tennant to indicate that Senergy has ever used the mark with the intent to confuse. Therefore, this digit is neutral. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 983 F.3d 280, 296 (5th Cir. 2020) ("we usually indicate that an absence of intent renders th[is] digit neutral").

(*this space left intentionally blank*)

### e. Digit (vii)—Actual Confusion

Under the seventh digit of confusion—Actual Confusion—the record tends to go against the likelihood of confusion. For this analysis, "[a]ctual confusion need not be proven," but it is "the best evidence of a likelihood of confusion." *Xtreme Lashes, LLC*, 576 F.3d at 229. "A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017) (citation omitted). A plaintiff alleging infringement must show that the defendant's use of marks, "as opposed to some other source, caused a likelihood of confusion." *Scott Fetzer Co.*, 381 F.3d at 487. Here, Dr. Tennant argues that "the confusion that Senergy has created is self-evident and intentional." (ECF No. 28 at 29). Specifically, Dr. Tennant alleges that,

> Senergy's entire website is designed to sell Dr. Tennant's life story and his Tennant devices.
> […]
> The advertising by Senergy further bolsters the likelihood of confusion. Senergy's website continues to place Dr. Tennant at the heart of the advertising by specifically associating the devices with Dr. Tennant directly. This includes highlighting Dr. Tennant's personal endorsement because of his own use of the products (Farmer Ex. B-1 at App. 192; B-2 at App. 199) and explaining Dr. Tennant as the source of the marketed devices: "Dr. Tennant's frequency sets, protocols, training, and books" that sets these devices apart from other Avazzia manufactured produces.

(ECF No. 48 at 29-30). However, Dr. Tennant offers no evidence regarding this factor—he points to no anecdotal instances of confusion of customers nor any other points of confusion to support his arguments. As such, this Court concludes this digit tends to weigh against a likelihood of confusion.

### f. Digit (viii)—Degree of Care Exercised by Potential Purchasers

Under the eighth digit of confusion—Degree of Care Exercised by Potential Purchasers—the record tends to go against the likelihood of confusion. For the final digit, the Court looks to both the kind of goods or services offered and the kind of purchasers. Degree of care exercised by potential purchasers is often correlated to the price of the product or service. *See e.g., Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 483 (5th Cir. 2008) ("Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion."). Here, the contested devices require a prescription from a medical doctor for the potential purchaser to obtain them. (ECF Nos.52 at 29; 52-1 at 301). Though neither party alleges the cost of the devices, it follows that consumers who must seek a prescription for the device would exercise a high degree of care in their purchase. As such, this Court concludes this digit tends to weigh against a likelihood of confusion.

### g. Conclusion

Because no digit is dispositive, and the digits must be weighed differently from case to case, this Court must look at the totality of the digits to determine the likelihood of confusion. *Xtreme Lashes, LLC*, 579 F.3d at 227. Though the contested marks are the exact trademarks being used by Senergy, it is apparent from the record that Senergy has always served as the exclusive retailer of the devices, and they have historically developed the marketing materials. *See supra* III(A)(ii)(a)-(c). Further, there has been no evidence of actual confusion submitted to the Court, nor a reason that potential purchasers are not sophisticated enough to avoid confusion. *See supra* III(A)(ii)(d)-(e). Thus, taken as a whole, the Court concludes that the evidence here is insufficient to demonstrate that Dr. Tennant has "clearly carried the burden of persuasion" on the Substantial

Likelihood of Success prong. *See PCI Transp., Inc. v. Fort Worth & W.R. Co.*, 418 F.3d 535, (5th Cir. 2005).

### B. Irreparable Harm

Though an inability to carry the burden of persuasion on the Substantial Likelihood of Success prong precludes the Court from granting the "extraordinary remedy" of a preliminary injunction, the Court further concludes that Dr. Tennant is unable to succeed on the Irreparable Harm prong. *Future Proof Brands, L.L.C.*, 983 F.3d at 298.

In 2020, Congress amended to Lanham Act to provide that, when a party seeks an injunction for alleged violation of the Lanham Act, such party "shall be entitled to a rebuttable presumption of irreparable injury upon a finding of ... a likelihood of success on the merits[.]" 15 U.S.C. § 1116(a). Because the Court concludes that Dr. Tennant has not established a substantial likelihood of success on the merits of their trademarks infringement claim, he is not entitled to the presumption of irreparable injury.

Irreparable harm requires a showing that: (1) the harm to Plaintiffs is imminent, (2) the injury would be irreparable, and (3) that Plaintiffs have no other adequate legal remedy. *See Chacon*, 515 F.2d at 925. Dr. Tennant has not introduced any evidence of his own to show a threat of irreparable injury, which cannot be adequately compensated by monetary damages. Instead, Dr. Tennant cites to a string of franchise cases to support his contention that "[t]he inability to exercise control 'poses a substantial threat of injury' to the 'reputation and the goodwill' associated with the mark's brand; this injury cannot be remedied with money damages." (ECF No. 48 at 33) (citing *TGI Friday's Inc.*, 652 F.Supp.2d at 771). The Court finds this argument unavailing as Senergy is not a franchisee of Dr. Tennant's but instead has served as the exclusive retailer of the contested devices. As such, the Court determines that, as an alternative ground for denying Dr. Tennant's

Motion for Preliminary Injunction, he has failed to carry his burden of persuasion that his real or threatened injuries cannot be compensated by monetary damages.

## IV.   Parties Obligations Under *Dondi*

As a warning to the Parties, the Court reminds them of their practice obligations under *Dondi*, with regard to their conduct, conferences, pleadings, and communication with one another and the Court. *Dondi Properties Corp. v. Com. Sav. & Loan Ass'n*, 121 F.R.D. 284, 287-89 (N.D. Tex. 1988).[2] Specifically the court calls the Parties attention to their obligation to "treat each other, the opposing party, the court, and members of the court staff with courtesy and civility and conduct themselves in a professional manner at all times." *Dondi*, 121 F.R.D. at 288. The Court has reviewed the entire record and notes that in multiple filings, the Parties have included tangential

---

[2] *Inter alia*, the Northern District of Texas has adopted the following standards of practice:

> (A) In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.
> (B) A lawyer owes, to the judiciary, candor, diligence and utmost respect.
> (C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.
> (D) A lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity.
> (E) Lawyers should treat each other, the opposing party, the court, and members of the court staff with courtesy and civility and conduct themselves in a professional manner at all times.
> (F) A client has no right to demand that counsel abuse the opposite party or indulge in offensive conduct. A lawyer shall always treat adverse witnesses and suitors with fairness and due consideration.
> (G) In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer's conduct, attitude, or demeanor towards opposing lawyers.
> (H) A lawyer should not use any form of discovery, or the scheduling of discovery, as a means of harassing opposing counsel or counsel's client.
> (I) Lawyers will be punctual in communications with others and in honoring scheduled appearances, and will recognize that neglect and tardiness are demeaning to the lawyer and to the judicial system.
> (J) If a fellow member of the Bar makes a just request for cooperation, or seeks scheduling accommodation, a lawyer will not arbitrarily or unreasonably withhold consent.
> (K) Effective advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.

*Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284, 287–88 (N.D. Tex. 1988).

information, of a personal nature, and used inflammatory language; the Court instructs the parties that it views this behavior unfavorably and it shall cease to occur throughout the pendency of the litigation. In the event of such future behavior, the Court will consider sanctions.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Dr. Tennant's Amended Motion for Preliminary Injunction. (ECF No. 48) The Court additionally **DENIES AS MOOT** Dr. Tennant's initial Motion for Preliminary Injunction. (ECF No. 24). The Court **GRANTS** the Parties' Joint Motion for Extension of Time to Complete Mediation. (ECF No. 62).

**SO ORDERED:** this 18th day of March, 2025.

*[Signature: Ada Brown]*

Ada Brown
UNITED STATES DISTRICT JUDGE